REDACTED VERSION
COMPLETE VERSION FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED and RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED, | ) ) ) ) ) |
| Plaintiffs, | ) Case No. 09 CV 1086 (VM) (DF) ) ECF Case |
| v. | ) ) |
| COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., and LST I LLC, | ) ) ) |
| Defendants. | ) ) ) |

**PLAINTIFFS' OBJECTIONS TO
NOVEMBER 5, 2010 DISCOVERY ORDER**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

MATTER BEFORE THE COURT ............................................................................................... 1

BACKGROUND .......................................................................................................................... 1

SUMMARY OF ARGUMENT .................................................................................................... 3

STATEMENT OF FACTS ........................................................................................................... 5

PROCEDURAL HISTORY.......................................................................................................... 8

ARGUMENT ............................................................................................................................. 12

    I.    The Order is Clearly Erroneous in that it Does Not Rule Upon Plaintiffs'
        Objections that the Interrogatories are Improper ...................................................... 13

           A.    The Defendants Exceeded the 25 Interrogatory Limit Specified in
                Federal Rule of Civil Procedure 33(a)(1) ...................................................... 13

           B.    The Subparts of Interrogatories 1 through 8 Asking Plaintiffs to
                Identify Laws Violated, State All Facts that Support Their Contentions,
                Identify All Documents that Support Their Contentions, and Identify All
                Witnesses that Support Their Contentions Far Exceed the Scope of
                Permitted Interrogatories ............................................................................... 15

    II.    The Order is Clearly Erroneous in its Finding that Defendants Have Not
        Waived any Privilege that Would Attach to Communications with Their
        Counsel Regarding the NYAG by Placing Those Communications At
        Issue in This Proceeding ........................................................................................... 16

    III.    The Order Misconstrues the Ruling of Judge Cote and Reaches a Clearly
        Erroneous Decision Regarding Plaintiffs' Request for Additional Depositions ....... 19

CONCLUSION.......................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### <u>Cases</u>

<u>Byas v. Doe</u>, No. 93 Civ. 8965 (PKL), 1994 WL 225462 (S.D.N.Y. May 26, 1994) ................. 12

<u>Clean Earth Remediation and Constr. Servs., Inc. v. Am. Int'l Group, Inc.</u>, 245 F.R.D. 137 (S.D.N.Y. 2007) ............................................................................................ 15

<u>In re County of Erie</u>, 546 F.3d 222 (2d Cir. 2008) ......................................... 16, 17, 18

<u>John Doe Co. v. United States</u>, 350 F.3d 299, 306 (2d Cir. 2003)) ............................. 17

<u>Kendall v. GES Exposition Servs., Inc.</u>, 174 F.R.D. 684 (D. Nev. 1997) .................................... 14

<u>Martinez v. California</u>, Case No. 07-CV-996, 2008 WL 5101359 (E.D. Cal. Dec. 3, 2008) ....... 22

<u>RxUSA Wholesale, Inc. v. McKesson Corp.</u>, Case No. 06-CV-4343, 2007 WL 1827335 (E.D.N.Y. June 25, 2007) ........................................................................................ 21

<u>Strode v. City of Venice, Illinois</u>, Case No. 06-CV-228, 2007 WL 1595559 (S.D. Ill. June 1, 2007) ............................................................................................ 21-22

<u>Thompson v. Keane</u>, No. 95 Civ. 2442, 1996 WL 229887 (S.D.N.Y. May 6, 1996). ........... 12, 14

<u>Thompson v. Lantz</u>, Case No. 04-2084, 2009 WL 3157563 (D. Conn. Sept. 25, 2009)) ........... 14

<u>Tribune Co. v. Purcigliotti</u>, Case No. 93-7222, 1997 WL 540810 (S.D.N.Y. Sept. 3, 1997) ...... 15

<u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364 (1948)) .................................................... 12, 17

### <u>Statutes</u>

FED. R. CIV. P. 30(a)(2) ........................................................................................... 1

FED. R. CIV. P. 30(b)(6) .................................................................................. 9, 17, 23

FED. R. CIV. P. 33(a)(1) ............................................................................... 3, 13, 15

FED. R. CIV. P. 72(a) ......................................................................................... 1, 12

New York Executive Law § 63(12) ...................................................................... 7

New York General Business Law § 340 *et seq* ........................................................ 7

New York General Business Law § 352 *et seq* ........................................................ 7

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Rule 72.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, Plaintiffs respectfully submit these objections to the November 5, 2010 Discovery Order of Magistrate Judge Debra Freeman (hereinafter "Order").  (Dkt. No. 68.)

## MATTER BEFORE THE COURT

On June 22, 2010, after Judge Cote's recusal and the reassignment of the case, the Court referred discovery disputes between the parties to Magistrate Judge Freeman for resolution. These discovery disputes included: (1) Plaintiffs' objections to Defendants' extensive contention interrogatories; (2) Plaintiffs' motion, on grounds of implied and at-issue waiver, to compel disclosure of documents and information that Defendants claim are protected by attorney-client privilege,; and (3) Plaintiffs' request to take seven additional depositions beyond the ten depositions automatically permitted by Rule 30(a)(2) of the Federal Rules of Civil Procedure, and to reopen fact discovery for that purpose. Judge Freeman denied these requests by order of November 5, 2010 (the "Order").  Plaintiffs assert that this ruling was clearly erroneous in several respects, as outlined in the argument that follows.

## BACKGROUND

This is a breach of contract action.  Plaintiffs ("Ritchie") and Defendants ("Coventry") were parties to a series of contracts, known as Master Policy Purchase Agreements ("MPPAs"), under which Coventry acquired and then sold to Ritchie life insurance policies worth hundreds of millions of dollars, which Ritchie planned to securitize or resell.  Under the MPPAs, over a period of 15 months in 2005 and 2006, Ritchie paid Coventry approximately $752,000,000 for 1085 life insurance policies.  The MPPAs contained warranties and representations in Ritchie's favor designed to protect the quality of the title to the policies Ritchie purchased, including that

1

the policies had not been originated (purchased) by Coventry in violation of law or regulation, and that during the purchase period there were no "actions, suits or proceedings . . . now pending, or to the Seller's knowledge threatened, against or affecting the Seller or its asserts or properties . . . that might adversely affect" the sale process.

It turned out that during the purchase period, Coventry was under investigation by the New York Attorney General ("NYAG") for bid rigging in connection with the acquisition of the policies from insureds, and had received two subpoenas from the NYAG, in July of 2005 and in March of 2006, seeking information regarding bid rigging.  Neither the investigation nor the subpoenas were disclosed to Ritchie until late June 2006 when outside counsel to Coventry informed them.  Even then, this disclosure did not accurately report the extent of the focus of the investigation upon Coventry.  When the NYAG filed a civil complaint on October 26, 2006 against Coventry and one of its officers, Reid Burger, seeking damages and a right of rescission for the owners who sold the policies to Coventry, Ritchie as forced into bankruptcy court to clear the title and eliminate the rescission threat.  Ritchie sold the policies it purchased for approximately $452,500,000 in a bankruptcy auction at a loss of approximately $270,000,000.

This action followed, asserting that Coventry had breached the no violations and no proceedings warranties and representations in the MPPAs contracts because they were false. Ritchie's complaint follows the NYAG Complaint in alleging that Coventry acquired the policies it sold to Ritchie in violation of state and federal laws prohibiting bid rigging, fraudulent business practices, and fraud.  Ritchie's complaint also alleges a breach of the "no proceedings" warranty and representation, as it was not true in light of the NYAG's investigation of Coventry and Coventry's knowledge thereof from the subpoenas issued to it and the communications between Coventry's outside counsel and the NYAG during that investigation.

2

## SUMMARY OF ARGUMENT

Coventry served several contention interrogatories on Ritchie on February 23, 2010 that sought a detailed, qualitative listing of all of the Plaintiffs' evidence – "all facts," all exhibits supporting each fact, and "all witnesses" supporting each fact. Ritchie interposed objection to eight of these contention interrogatories. First, Ritchie asserted that Coventry exceeded the limit of twenty-five interrogatories because, with distinct subparts, they served over 49 interrogatories. Second, the numerous subparts of the interrogatories require Ritchie, for each of the hundreds of life insurance policies in issue, to list "all facts and identify all witnesses and documents that support [their] contention[s]" that Coventry purchased the policies in violation law. The request for this massive level of detail far exceeds any reasonable scope of interrogatory discovery, and would require Ritchie to lay out its entire order of proof – tying facts and witnesses and exhibits to each policy – in a gross invasion of Ritchie's trial strategy and the work product of its counsel. The November 5, 2010 Order does not address these objections. While Ritchie is prepared to list each law or regulation they claim was violated by Coventry's origination of the policies in issue, the request to list all facts, documents, and witnesses, and thus to preload Plaintiff's case in chief into an interrogatory answer, is a clear abuse of Rule 33.

Ritchie also asserts here that the November 5, 2010 Order erroneously determined that Coventry only relied upon non-privileged factual information in asserting the defense that they did not violate the no proceedings warranty and representation – that they did not believe the NYAG's investigation threatened the title to the policies sold or that Coventry as a potential defendant based on what the attorneys from the NYAG told Coventry's outside counsel about the focus of their investigation. The deposition testimony reveals, however, that Coventry is relying not simply upon factual information received from their counsel, but upon extensive

3

communications with their outside counsel in the NYAG's investigation that are qualitative assessments of the threat posed to Coventry by that investigation, and thus the legal advice of their attorneys.  Coventry's witnesses have testified extensively about their communications with counsel regarding whether Coventry was the "focus" of the NYAG's investigation and what the potential outcomes of the investigation could be.  Yet, Coventry hides behind privilege when Ritchie seeks to cross-examine these statements for accuracy and credibility.  Settled case law prohibits this tactic – the use of the advice of counsel, however veiled, as a defensive sword while at the same time shielding that advice from cross-examination.

Finally, the November 5, 2010 Order did not reach the merits of Ritchie's request to take additional depositions, as it determined that Ritchie's request was untimely, and that Judge Cote had previously denied it, and thus that "Plaintiffs should not be permitted to reopen a decided issue."  However, Ritchie raised the issue before deposition discovery was concluded, and complied with the Court's instructions and reraised the issue sufficiently promptly.  Judge Cote expressly gave Ritchie the opportunity to renew the request for additional depositions.  That issue was delayed when the Court invited, then granted a recusal motion because the outside counsel to Coventry in the NYAG investigation, upon whom Coventry bases its defense to violation of the no proceedings warranty, were her step-son's partners at O'Melveny & Myers. When the merits are considered, Ritchie respectfully argues that given the hundreds of policies at issue, the dozens of lawyers and others involved in the NYAG's investigation, and the deficiencies in the testimony of the witnesses thus far, seven additional depositions are appropriate and manifestly not an abuse of the discovery process.  Many of these critical witnesses reside outside of New York and, thus, Ritchie will be deprived entirely of this important testimony at trial unless it is preserved by videotaped deposition.

## STATEMENT OF FACTS

On June 30, 2005, Ritchie and Coventry entered into a series of contracts by which Plaintiff Ritchie Risk-Linked Strategies Trading (Ireland), Limited would purchase policies from Defendant LST I LLC.  (Compl. ¶19.)   One of the contracts, the Master Policy Purchase Agreement, contained representations and warranties that guaranteed that the policies sold to Ritchie would be purchased by Coventry in compliance with law and that there were no proceedings pending or, to Coventry's knowledge, threatened that would impact the assets or the sale process.  (Compl. ¶23.)   Ritchie contends that both aspects of these representations and warranties were false.  (Compl. ¶29.)   The Complaint alleges that Coventry purchased numerous policies through bid-rigging and fraud.  (Compl. ¶44.)   In addition, it alleges that Coventry was under investigation by the NYAG for those very same practices as of at least July 27, 2005 when Defendant Coventry First received the first of two subpoenas from the NYAG.  (Compl. ¶45.)

The June 30, 2005 Master Policy Purchase Agreement was "amended and restated" on September 8, 2005.  (Compl. ¶19.)  Plaintiff Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited executed an additional Master Policy Purchase Agreement and other contracts with Coventry on December 15, 2005.  (Compl. ¶19.)   All of the MPPAs contain nearly identical representations and warranties and all were breached.  (Compl. ¶29.)

After acquiring a significant number of policies from Coventry, Ritchie began creating the documentation and consulting with the third parties necessary to securitize a portion of the policies.  (Halter Decl. Exhibit A, Mulholland Depo. 158:18 to 161:3.) This included receiving an investment grade rating from Moody's.   Moody's gave a provisional A(3) rating to the transaction on October 11, 2006.  (Compl. ¶50.)

In the meantime, on July 25, 2005 and again on March 2, 2006, the NYAG issued subpoenas to Defendant Coventry First as part of an investigation of bid-rigging and fraud, among other illegal and unfair practices, in the purchase of life insurance policies by Coventry and others.  (Halter Decl. Exhibits B and C.)  The July 25, 2005 subpoena made clear that the NYAG was investigating ███████████████████████████████████████████ ██████████████████████████████████.  (Halter Decl. Exhibit B.)  The March 2, 2006 subpoena seeks greater detail and goes on to inquire about ███████████████████. (Halter Decl. Exhibit C.)

Coventry initially retained white-collar criminal defense firm diGenova & Toensing, LLP to represent them with respect to the NYAG's investigation and subpoena.  (Halter Decl. Exhibit T, Welsh Depo.: 144:22 to 145:12.)  Shortly after receiving the second subpoena in March 2006, Coventry also retained O'Melveny & Myers ("O'Melveny") to represent them with respect to the subpoenas.  (Halter Decl. Exhibit D, Brooks Depo. 72:8 to 74:3.)

Despite the fact that Coventry continued to sell life insurance policies to Ritchie during the investigation and subpoena responses, and that the parties were working on the planned securitization during that time, neither Coventry nor O'Melveny mentioned the investigation until June 2006.  (Halter Decl. Exhibit E, Passage Depo. 210:8 to 215:16.)  On June 26, 2006, for the first time, Ritchie was informed of the NYAG's investigation.  (Halter Decl. Exhibit A, Mulholland Depo. 321:17 to 322:14; 340:13 to 345:7.)  O'Melveny partner, Dan Passage, made the disclosure and indicated that Defendant Coventry First had received a subpoena from the NYAG in March 2006.  (Halter Decl. Exhibit A, Mulholland Depo. 321:17 to 322:14; 340:13 to 345:7.)  The "disclosure" did not indicate the subpoena was actually the second such subpoena and did not accurately disclose the threat the investigation posed to the policies Ritchie

purchased and continued to purchase.  (Halter Decl. Exhibit A, Mulholland Depo. 321:17 to 322:14; 340:13 to 345:7.)

The following day, on June 27, 2006, another O'Melveny partner, Brian Brooks, made additional "disclosures" to Ritchie regarding the NYAG's investigation.  (Halter Decl. Exhibit A, Mulholland Depo. 321:17 to 322:14; 340:13 to 345:7.)  Brooks led a conference call with Ritchie and their corporate counsel regarding the March 2006 subpoena.  (Halter Decl. Exhibit A, Mulholland Depo. 321:17 to 322:14; 340:13 to 345:7.)  Brooks told Ritchie that Coventry First was not a target of the Attorney General's investigation, that National Financial Partners – who was never charged – was seen as the target of the investigation.  (Halter Decl. Exhibit A, Mulholland Depo. 321:17 to 322:14; 340:13 to 345:7.)  Brooks described Defendant Coventry First as only a source of information for the investigation and stated the potential downside to the investigation was an antitrust suit against the life settlement industry as a whole.  (Halter Decl. Exhibit A, Mulholland Depo. 321:17 to 322:14; 340:13 to 345:7.)  The Complaint alleges that these representations were materially false or misleading.  (Compl. ¶¶47-49.)

On October 26, 2006, the NYAG filed a civil complaint against Defendants Coventry First, Montgomery Capital, The Coventry Group, and Reid S. Berger, a Vice President of Defendant Coventry First.  (Compl. Ex. A.)  The complaint alleged that Coventry had engaged in fraudulent business practices in violation of New York Executive Law § 63(12), anti-competitive behavior in violation of New York General Business Law § 340 *et seq.*, securities violations pursuant to New York General Business Law § 352 *et seq.*, fraud, and inducement of breach of fiduciary duty.  (Compl. Ex. A. at ¶12.)  The NYAG complaint gave specific examples of bid-rigging and falsifying documents in the purchase of life insurance policies by Coventry and indicated that they were aware of additional violations.  (Compl. Ex. A. at ¶¶27-45.)  Three of

7

the policies specifically cited by the NYAG were life insurance policies Coventry sold to Ritchie.  (Compl. Ex. A. at ¶¶40-42, 43, and 52.)

In addition to disgorgement of profits and other damages, the NYAG's complaint sought to allow every insured who had sold a policy to Coventry since 2001, the option to rescind the sale to Coventry.  (Compl. Ex. A. at pg. 32.)

That same day, as a result of the NYAG's complaint, Moody's withdrew the provisional rating it had issued for the securitization of the life insurance policies.  (Compl. Ex. C.)  Ritchie was not able to complete its intended securitization as a result.  To avoid the threat of rescission posed by the NYAG's complaint and to clear the title to the policies so Ritchie could resell them, Ritchie filed for bankruptcy and conducted a sale through which the bankruptcy court could quiet title.  (Halter Decl. Exhibit F, Caruso Depo. 43:10 to 44:11.)

## PROCEDURAL HISTORY

On March 3, 2010, Plaintiffs sent a letter to Judge Cote requesting permission, pursuant to Local Rule 37.2, to make a motion to allow Plaintiffs to take five depositions beyond the presumptive ten depositions.  (Halter Decl. Exhibit G)  The Plaintiffs identified: a representative of diGenova & Toensing, LLP; Brian Brooks from O'Melveny & Myers LLP, Peter Gaynor from Life Insurance Settlements, Inc., a representative of Davis Polk & Wardwell, LLP, and Mark Hellerer from Pillsbury Winthrop Shaw Pittman LLP as potential deponents.  On March 4, 2010, Defendants opposed the request.  (Halter Decl. Exhibit H.)

On March 8, 2010, Judge Cote conducted a conference call regarding Plaintiffs' request to make a motion for additional depositions.  (Halter Decl. Exhibit I.)  Though Plaintiffs were not given an opportunity to brief the issue, Judge Cote indicated that she did not have "the kind of showing" to "go above the ten deposition limit here."  (Halter Decl. Exhibit I at 7:8-9.)  Judge

Cote further indicated that Plaintiffs should "take [the previously noticed] 30(b)(6) deposition. Hopefully, that is going to solve all of [Plaintiffs'] problems with respect to the four [requested] attorney witnesses.  If it doesn't, you can renew your application to me."  (Halter Decl. Exhibit I at 3:25 – 4:2.)

Also during the March 8, 2010 call, Judge Cote indicated that, if Plaintiffs renewed their application, she would not hear it as she "recuse[s] herself in matters concerning O[']Melveny." (Halter Decl. Exhibit I at 4:7.)  This comment by Judge Cote immediately resulted in briefing regarding whether Judge Cote should recuse herself here.  (*See, e.g.*, Dkt. Nos. 35, 38, 40-44, 48, and 49.)  Judge Cote ultimately recused herself on April 8, 2010 and the case was reassigned to this Court.  (Dkt. Nos. 41 and 46.)

The Court scheduled an initial conference on April 30, 2010.  (Halter Decl. Exhibit J.)  At Defendants' request, the April 30, 2010 conference was rescheduled to May 14, 2010 (Dkt. No. 51) and then again rescheduled at Defendants' request to June 11, 2010 (Dkt. No. 54).  The initial conference has not been held as the Court referred the case to Magistrate Judge Debra Freeman on June 22, 2010.  (Dkt. Nos. 60 and 61.)

On June 18, 2010, the parties submitted a joint letter to the Court, on Defendants' counsel's letterhead, regarding the propriety of extensive contention interrogatories Defendants served.  (Halter Decl. Ex. K.)  These eight interrogatories at issue are as follows:

> Interrogatory No. 1: **State all facts** on which you base your contention that "Defendants likely acquired most if not all of the life insurance policies sold to Ritchie I and Ritchie II through a pattern of bribes, bid-rigging, fraud and falsification of documents…." Compl. ¶ 43; *see also id.* ¶29 ("Plaintiffs learned that many if not all the life insurance policies they had purchased from LST likely had been purchased by Defendants in violation of federal, state, and local law and regulations").

**Interrogatory No. 2:** If Plaintiffs contend that Coventry First's Origination of any Conveyed Life Settlement Policy violated any federal, state, or local law or regulations, Compl. ¶ 29, then [1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed Life Settlement Policy identified, [2] state the legal or theoretical basis for your contention, [3] identify all laws, statutes or regulations you claim were violated, <u>and [4] state **all facts** and [5] **identify all witnesses** and [6] **documents that support your contention**</u>.

**Interrogatory No. 3:** If Plaintiffs contend that the sale of any Conveyed Life Settlement Policy to Ritchie I or Ritchie II violated the Ritchie I MPPA or Ritchie II MPPA, then [1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed Life Settlement Policy identified, [2] state the legal or theoretical basis for your contention, [3] identify each provision of the Ritchie I MPPA or Ritchie II MPPA you claim was violated, <u>and [4] state **all facts** and [5] **identify all witnesses** and [6] **documents that support your contention**</u>.

**Interrogatory No. 4:** If Plaintiffs contend that any Conveyed Life Settlement Policy was Originated unlawfully due to "bid-rigging," or because Defendants paid "brokers…undisclosed 'co-brokering fees,' to 'sit on' or reduce competitive bids from buyers," Compl. ¶32, then [1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed Life Settlement Policy identified, <u>[2] state **all facts** and [3] **identify all witnesses** and [4] **documents that support your contention**</u>.

**Interrogatory No. 5:** If Plaintiffs contend any Conveyed Life Settlement Policy was Originated unlawfully due to the creation of "false and misleading documentation," Compl. ¶33, then [1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed Life Settlement Policy identified, <u>[2] state **all facts** and [3] **identify all witnesses** and [4] **documents that support your contention**</u>.

**Interrogatory No. 6:** If Plaintiffs contend any Conveyed Life Settlement Policy was Originated unlawfully due to the use of "gross offers," Compl. ¶38, then [1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed life Settlement Policy identified, [2] identify all laws, statutes, and regulations you claim were violated, and <u>[3] state **all facts** and [4] **identify all witnesses** and [5] **documents that support your contention**</u>.

Interrogatory No. 7: If Plaintiffs contend any Conveyed Life Settlement Policy was Originated unlawfully due to "falsifying any paperwork the [s]eller sees to show less compensation than is actually paid to brokers," Compl. ¶33, then [1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each such Conveyed Life Settlement Policy identified, [2] state **all facts** and [3] **identify all witnesses** and [4] **documents that support your conclusion.**

Interrogatory No. 8: If Plaintiffs contend any Conveyed Life Settlement Policy was Originated unlawfully for reasons other than those identified in response to Interrogatories 1-7, then [1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed Life Settlement Policy identified, [2] identify the basis for your contention, [3] identify all laws, statutes or regulations you claim were violated, and [4] state **all facts** and [5] **identify all witnesses** and [6] **documents that support your contention**.

(Halter Decl. Exhibit K, at Ex. A pp. 4-5 (emphasis added).)

On June 24, 2010, Magistrate Judge Freeman convened a conference call with counsel for the parties.  At that time, in addition to the dispute regarding Defendants' contention interrogatories, Plaintiffs informed the Court that they had intended to raise two additional discovery issues with the Court during the scheduling conference: (1) a motion to compel discovery of documents and information that Defendants assert are privileged, based on the fact that Defendants have waived the alleged privilege by placed that information at-issue in this proceeding ("At-Issue Waiver Motion") and (2) a motion for additional depositions, pursuant to Judge Cote's invitation to renew the request should the 30(b)(6) deposition not satisfy the Plaintiffs' concerns ("Additional Deposition Motion").  (Halter Decl. ¶13.)

At the June 24th conference, Judge Freeman asked the parties to submit letter briefs regarding Plaintiffs' two requested motions.  (Halter Decl. ¶13.)  On July 26, 2010, the parties submitted letter briefs regarding the At-Issue Waiver Motion and Additional Deposition Motion.  (Halter Decl. Exhibits. L, M, N, and O.)

11

On July 30, 2010, Judge Freeman held a conference call with the parties to discuss the Defendants' Contention Interrogatories Motion and Plaintiffs' At-Issue Waiver Motion and Additional Deposition Motion.  (Halter Decl. Exhibit P.)  During the call, Judge Freeman provided the parties with time to submit additional briefing regarding some issues Judge Freeman raised during the call.  (Halter Decl. Exhibit P.)

On August 23, 2010, the parties submitted letters providing additional argument regarding Defendants' Contention Interrogatories Motion.  (Halter Decl. Exhibits Q and S.)  In addition, the parties submitted additional briefing regarding the At-Issue Waiver Motion.  (Halter Decl. Exhibits P and R.)  On November 5, 2010, Judge Freeman issued the Order in issue here.  (Dkt. No. 68.)

## ARGUMENT

Rule 72(a) of the Federal Rules of Civil Procedure permits a party to "serve and file objections to [an] order [of a magistrate judge] within 14 days after being served with a copy." FED. R. CIV. P. 72(a).  "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.*

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Byas v. Doe*, No. 93 Civ. 8965 (PKL), 1994 WL 225462, at *1 (S.D.N.Y. May 26, 1994) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Further, "[a]n order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Thompson v. Keane*, No. 95 Civ. 2442, 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996).

I. **The Order is Clearly Erroneous in that it Does Not Rule Upon Plaintiffs' Objections that the Interrogatories are Improper.**

The Order does not address substantial objections made by Plaintiffs to the scope of the interrogatories. Plaintiffs pointed out the following ways Defendants' contention interrogatories were improper: (1) the combined 49 subparts to the interrogatories served by Defendants are distinct and thus, exceed the limit of 25 provided for in Federal Rule of Civil Procedure 33(a)(1); and (2) the subparts of the interrogatories asking Plaintiffs to "state all facts and identify all witnesses and documents that support [their] contention[s]" are not proper uses of interrogatories. The objections to Defendants' contention interrogatories, which were not considered by the Order, are significant and require final determination.

A. The Defendants Exceeded the 25 Interrogatory Limit Specified in Federal Rule of Civil Procedure 33(a)(1).

Rule 33(a)(1) of the Federal Rules of Civil Procedure provides that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party <u>no more than 25 written interrogatories, including all discrete subparts</u>." FED. R. CIV. P. 33(a)(1) (emphasis added).

Defendants' first set of interrogatories contained six numbered interrogatories. Defendants' second set interrogatories, the ones at issue here, contained ten numbered interrogatories. However, the interrogatories contain several subparts. Interrogatory No. 2, for example, reads as follows:

> If Plaintiffs contend that Coventry First's Origination of any Conveyed Life Settlement Policy violated any federal, state, or local law or regulations, Compl. ¶ 29, then [1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed Life Settlement Policy identified, [2] state the legal or theoretical basis for your contention, [3] identify all laws, statutes or regulations you claim were violated, and [4] state all facts and [5] identify all witnesses and [6] documents that support your contention.

13

(Halter Decl. Exhibit K, at Ex. A pg. 4.)

"A subpart is discrete and therefore regarded as a separate interrogatory when it is logically or factually independent of the question posed by the basic interrogatory." *See Thompson v. Lantz*, Case No. 04-2084, 2009 WL 3157563, at *1 (D. Conn. Sept. 25, 2009)) (internal quotation omitted).  In other words, subparts are deemed a single interrogatory only were they are "logically or factually subsumed with <u>and necessarily related to</u> the primary question." *Kendall v. GES Exposition Servs., Inc.*, 174 F.R.D. 684, 685 (D. Nev. 1997).

Here, the subparts require (1) identification of policies, (2) a legal or theoretical basis for certain contentions, (3) identification of each of the laws violated, (4) identification of all facts Plaintiffs will rely on, (5) identification all witnesses Plaintiffs will rely on, and (6) identification of all documents Plaintiffs will rely on.  (*See, e.g.*, Halter Decl. Exhibit K at 4-5.)  Thus, Defendants' Second Set of Interrogatories alone contain at least 44 discrete subparts.[1]

Defendants counter this argument by pointing to the preamble to the interrogatories: "[i]f Plaintiffs contend that Coventry First's Origination of any Conveyed Life Settlement Policy violated any federal, state, or local law or regulations, Compl. ¶ 29, then" provide the information requested.  (*See, e.g.*, Halter Decl. Exhibit K at 4.)  Defendants argue that since Plaintiffs could answer "no" to the preamble and avoid answering the remaining subparts, the subparts are therefore related.  This argument is disingenuous and without merit.  The preamble is a recitation of allegations from the Complaint regarding the Defendants' breaches of the contracts.  (*See, e.g.*, Halter Decl. Exhibit K at 4-5.)  A party cannot avoid the numerical limit on interrogatories by posing the ultimate question in the case and then asking independent questions as subparts related to that ultimate question.

---

[1]      In addition to the 36 subparts of interrogatories described above, interrogatories 9 and 10 contain eight subparts.  (Halter Decl. Exhibit K, at Ex. A pg. 6.)

The Order does not address the fact that Defendants exceeded the number of interrogatories permitted by Rule 32(a)(1).  As a result, the Order should be modified to correct this oversight by requiring Plaintiffs to answer each interrogatory only to the extent it calls for Plaintiffs to "[1] identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed Life Settlement Policy identified, [2] state the legal or theoretical basis for [their] contention, and [3] identify all laws, statutes or regulations you claim were violated."  (*See, e.g.*, Halter Decl. Exhibit K at 4-5.)

      B.  <u>The Subparts of Interrogatories 1 through 8 Asking Plaintiffs to Identify Laws Violated, State All Facts that Support Their Contentions, Identify All Documents that Support Their Contentions, and Identify All Witnesses that Support Their Contentions Far Exceed the Scope of Permitted Interrogatories.</u>

Interrogatories 1 through 8 far exceed the scope of permissible discovery, and impermissibly invade Plaintiffs' protected trial strategy.  "[A] number of cases have held that interrogatories seeking identification of all facts supporting a particular allegation are inherently improper."  *See Clean Earth Remediation and Constr. Servs., Inc. v. Am. Int'l Group, Inc.*, 245 F.R.D. 137, 141 (S.D.N.Y. 2007) (citations omitted). Further, interrogatories are not an appropriate method to require a party to identify trial exhibits, witnesses, and strategy.  *See, e.g.*, *Tribune Co. v. Purcigliotti*, Case No. 93-7222, 1997 WL 540810, at *2 (S.D.N.Y. Sept. 3, 1997). Yet, here that is precise what Defendants seek – recitation, presumably binding on Plaintiffs, of Plaintiffs' entire trial strategy including facts Plaintiffs will rely on, all documents Plaintiffs intend to use as exhibits, and a list of all of Plaintiffs intended witnesses.  The time for such disclosures occurs during the Pretrial Submissions pursuant to the Court's Trial Procedures.

But the vice here is even greater than merely being premature.  Defendants seek interrogatory responses that would reveal how the Plaintiffs intend to use each of the facts,

witnesses, and documents to prove their case.  Such information is protected work product and should not be disclosed at any stage of the proceeding.

The interrogatories are also unfairly burdensome. There are hundreds of policies Plaintiffs contend were purchased in violation of law.  Identifying all facts that support their contention for each policy, identifying all documents that support their contentions for each policy, and identifying all witnesses that support their contentions for each policy would be incredibly burdensome, if not impossible.

It is error to require Plaintiffs to respond to these aspects of the interrogatories.  The Order should be modified to limit Plaintiffs' responses to the contention interrogatories to "identify each such Conveyed Life Settlement Policy by insured name and policy number and, for each Conveyed Life Settlement Policy identified, [2] state the legal or theoretical basis for [their] contention and [3] identify all laws, statutes or regulations you claim were violated."

**II.   The Order is Clearly Erroneous in its Finding that Defendants Have Not Waived any Privilege that Would Attach to Communications with Their Counsel Regarding the NYAG by Placing Those Communications At Issue in This Proceeding.**

"Generally, [c]ourts have found waiver by implication [1] when a client testifies concerning portions of the attorney-client communication, . . . [2] when a client places the attorney-client relationship directly at issue, . . . and [3] when a client asserts reliance on an attorney's advice as an element of a claim or defense . . . ."  *In re County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008) (internal quotations omitted, ellipses in original).  Defendants have waived the attorney-client privilege in all three ways.

The Order describes two findings with respect to whether or not the privilege Defendants assert had been waived: (1) that the witnesses did not selectively disclose portions of privileged information and (2) that Defendants were not relying on privileged communications in this

proceeding.  (Dkt. No. 1 at 3-4.)  Defendants, however, are relying on privileged information to try to defend against the claims that they breached the "no proceedings" representation and warranty.  The Order was clearly erroneous and contrary to law to find otherwise.

A party that relies on privileged advice from its counsel to assert a claim or defense waives the privilege that would otherwise attach to that advice.  *In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008).  "[U]nfairness to the adversary results . . . when a party uses *an assertion of fact* to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion."  *Id.* at 229 (*quoting John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003)) (emphasis added).

Defendants' 30(b)(6) witness, Amy Welsh, testified that Coventry First's Chairman Alan Buerger told her that he relied upon communications from Coventry's counsel to support his purported view that Coventry was not the target of the NYAG investigation:



(Halter Decl. Exhibit T, Welsh Depo., 96:17 to 97:10 (emphasis added); *see also* Welsh Depo.: 131:22 to 133:17.)   Ms. Welsh provided further testimony regarding Coventry's purported defense that it was not the target of the investigation.



████████████████████████████████████████

(Halter Decl. Exhibit T, Welsh Depo., 99:6 to 15 (emphasis added).)

Brian Brooks, the O'Melveny attorney that represented Defendants with respect to the NYAG's Investigation, provided even more background on Defendants' intended defense and the conversations Ms. Welsh referenced in her testimony.  Mr. Brooks indicated "███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████."  (Halter Decl. Exhibit D, Brooks Depo. 305:4 to 305:11) (emphasis added).

A party may not use an assertion of fact as a sword to further its cause and at the same time rely upon attorney-client privilege to shield privileged material "potentially capable of rebutting" the assertion.  *County of Erie*, 546 F.3d at 229.  That prohibition is precisely what Defendants attempt here.

Defendants provided over a million pages of documents to the NYAG and at least three of Defendants' employees provided testimony to the NYAG.  (Halter Decl. Exhibit T, Welsh Depo. 63:4 to 64:12; 165:16 to 166:9; 216:20 to 218:19; 220:6 to 20.)  Reid Buerger, executive vice president of the Defendants, asserted his Fifth Amendment rights and refused to answer questions on the grounds that it would incriminate him during his interview with the NYAG. (Compl. Ex. A. at ¶¶35, 47, 55, 61, and 64.)  However, Defendants have denied Plaintiffs the ability to explore the credibility of Defendants' purported belief that they were not a target of the NYAG's investigation through the assertion of privilege with respect to communications with outside counsel regarding the status and threat of the NYAG investigation.  (*See, e.g.*, Halter

---

[2]       Mr. Brooks changed the word "████████" to "██████" in his deposition errata sheet.

Decl., Exhibit U, Reid Buerger Depo. (Jan. 13, 2010): 140:3 to 143:15; and Exhibit V, Alan Buerger Depo.: 186:21 to 187:22.)

Contrary to Defendants' assertions, Welsh's testimony that "██████████████████ ██████████████████████████████████████████," (Halter Decl. Exhibit T, Welsh Depo., 89:10 to 12 (emphasis added)), is not a recantation of the statements made to Defendants' counsel by the NYAG.  As Welsh testified, what the NYAG *actually* indicated to counsel was that ████████████████████████████ ████████████████████████.  (Halter Decl. Exhibit T, Welsh Depo., 100:15 to 25, 105:15 to 106:7, and 147:5 to 17.)  As such, the conclusion that Coventry "██████████████ ███████████████" plainly carries the gloss and overlay of the legal interpretation of Coventry's outside counsel.

The Order is in error in permitting Defendants to use, as a sword, allegations that they were not aware of the focus of or threat posed by the NYAG's investigation while, at the same time, permitting Defendants to rely upon the attorney-client privilege to shield material "potentially capable of rebutting" the assertion.

## III.    The Order Misconstrues the Ruling of Judge Cote and Reaches a Clearly Erroneous Decision Regarding Plaintiffs' Request for Additional Depositions.

The Order relies heavily on Defendants' assertion that Plaintiffs did not raise their request to take additional depositions until July 26, 2010 – four months after the purported close of fact discovery on March 26, 2010.  This is an erroneous reading of the procedural history in this case and led the Court to an incorrect ruling.

Plaintiffs initial raised the issue before Judge Cote in a letter to her on March 3, 2010.  (Halter Decl. Exhibit G.)  In that letter, which was subject to a two-page page limit, Plaintiffs asked permission to submit formal briefing on the issue pursuant to Local Rule 37.2.  On

19

March 8, 2010, Judge Cote denied the request without briefing and invited Plaintiffs to reraise the request after the 30(b)(6) deposition of Defendants.  (Halter Decl. Exhibit I at 3:24 – 4:2.) Thereafter, at the Court's invitation, the parties engaged in a month-long submission process regarding whether Judge Cote should recuse herself sparked by the request to make a motion for additional depositions.  (*See, e.g.*, Dkt. Nos. 35, 38, 40-44, 48, and 49.)  Judge Cote ultimately recused herself on April 8, 2010.  (Dkt. No. 41.)

During the time period after the 30(b)(6) deposition of Defendants on March 9, 2010, Plaintiffs were entitled to a reasonable amount of time to review the deposition transcript to determine the extent additional depositions were necessary and of whom.  In addition, Plaintiffs were in the process of preparing to take and defend twelve depositions between March 11, 2010 and May 5, 2010.

Judge Freeman held a conference call regarding discovery on June 24, 2010.  At that time, Plaintiffs did reraise their request for additional depositions and Judge Freeman requested briefing on the issue.  The parties ultimately provided the joint submission the Order describes on July 26, 2010.  (Halter Decl. Exhibit N and O.)

Further, Defendants served supplemental initial disclosures on March 26, 2010 – the last day of fact discovery under the initial scheduling order.  Defendants' supplemental initial disclosures identified 111 individuals "likely to have discoverable information that Defendants may use to support their claims or defenses."  (Halter Decl. Exhibit W, at 2.)  Five of the seven individuals Plaintiffs seek to depose were identified in Defendants' supplemental initial disclosures.  (Halter Decl. Exhibit W.)

Plaintiffs' request for additional deposition is not untimely.  Plaintiffs first made the request on March 3, 2010, before the scheduled close of fact discovery.  Then, as invited by

Judge Cote, Plaintiffs reraised the request after reviewing the 30(b)(6) deposition.  Plaintiffs did so at the first conference with the Court thereafter, June 24, 2010.

Additional depositions are appropriate in this case.  "Where a party who is seeking discovery has demonstrated why the additional testimony is necessary, a court has discretion to allow more than ten depositions."  *RxUSA Wholesale, Inc. v. McKesson Corp.*, Case No. 06-CV-4343, 2007 WL 1827335, at *2 (E.D.N.Y. June 25, 2007).  In exercising its discretion, the Court may consider "the needs of the case, the amount in controversy, the importance of the issues at stake and the importance of the proposed discovery in resolving the issues."  *Id.*

Defendants breached the contracts between the parties in two ways: (1) by violating law in acquiring the life insurance policies ultimately conveyed to Plaintiffs and (2) by providing false representations that no proceedings were ongoing or threatened that would materially impact Defendants or the sale process.  Both breaches involve numerous percipient witnesses.

There are hundreds of insurance transactions – hundreds of insureds and hundreds of brokers and agents.  Defendants' acquisition of life insurance polices for resale to Plaintiffs -- as alleged in the NYAG's Complaint, and Plaintiffs' Complaint here – violated numerous laws and regulations, including those prohibiting bid rigging, fraud, falsifying business records, securities fraud, and others.  These violations of law breached the contracts between the parties.

In addition, there are several lawyers, numerous executives at Defendants, and personnel from the NYAG's office materially involved in the NYAG's investigation of Defendants.  The investigation caused a breach the "No Proceedings" representation and warranty of the contracts.

In addition to the breach claims, there is an alter ego claim that must be litigated regarding the four Defendants and four of Plaintiffs ten depositions were 30(b)(6) depositions of the four Defendants.  *See Strode v. City of Venice, Illinois*, Case No. 06-CV-228, 2007 WL

1595559, at *1 (S.D. Ill. June 1, 2007).  Given the number of witnesses and the complex nature of the facts here, Plaintiffs should not be held to the presumptive limit of ten depositions.

Moreover, Plaintiffs will be prejudiced if not permitted to take additional depositions.  At least three of the seven intended deponents are non-party witnesses located outside of the jurisdiction of the Court.  Plaintiffs need depositions to preserve their testimony for trial.

In addition, most of Defendants' employees who were deposed repeatedly claimed an inability to recall the important details of several of the life insurance policy purchases that form the factual predicate of Plaintiffs' claims.  (See e.g. Halter Decl. Exhibit X, Jacobs Depo. 410:5 to 410:21, 438:15 to 439:20, 443:10 to 447:8; Exhibit Y, Shovlin Depo. 179:19 to 181:3, 203:6 to 204:5; Exhibit Z, Dodaro Depo. 141:9 to 142:14, 147:6 to 148:20, 166:20 to 168:19, 170:14 to 171:20, Exhibit U, Reid Buerger Depo. (Jan. 13, 2010) 305:24 to 309:20.)  Even where the employee recalled a transaction, the veracity of their recollection can only be tested by the testimony of at least a few of the hundreds of brokers, agents, other intermediaries, and policyholders with whom they dealt..

Further, the bench trial in this matter will be unnecessarily delayed if Plaintiffs are not permitted to take the requested depositions.  *See Martinez v. California*, Case No. 07-CV-996, 2008 WL 5101359, at *2 (E.D. Cal. Dec. 3, 2008) (finding "leave to go beyond the number of depositions permitted by the rule [wa]s warranted" to "prevent delays at both the dispositive motion stage and trial [and,] given the complex nature" of the case).  The additional depositions will assist in informing the parties about the facts underlying the dispute and, thereby, enable a more efficient trial.

The additional witnesses Plaintiffs seek to depose are as follows:

- Joseph diGenova, the partner at diGenova & Toensing primarily responsible for the representation of Defendants with respect to the NYAG Investigation from July 2005 to March 2006.  Amy Welsh testified extensively regarding conversations Mr. diGenova purportedly had with the NYAG's office and the Defendants rely on those alleged conversations as part of their defense here.  (*See, e.g.*, Halter Decl. Exhibit M, Welsh Depo. 89:6 to 93:2, 99:25 to 109:2.) Mr. diGenova is located in Washington, D.C.

- Alex Seldin, general counsel to the Defendants during the time period in question and the person primarily responsible for responding to the subpoenas from the NYAG and interacting with counsel.

- Maria Filipakis, the former Assistant Attorney General who principally handled the NYAG's investigation and whom Defendants allege told Defendants they were "not the focus of the inquiry," and that the investigation was "not about Coventry."  (See Halter Decl. Exhibit M, Welsh Depo. 89:6 to 93:2, 99:25 to 109:2)

- Krista Lake, an Executive Vice President of Defendant Coventry First with knowledge of Defendants' responses to the subpoenas from the NYAG as well as knowledge of the policy purchase practices at the heart of Plaintiffs allegations.  Krista Lake was originally noticed as part of Plaintiffs' intended ten depositions, however, after the discussion with the Court on March 8, 2010 regarding the additional depositions where Plaintiffs' request remained unresolved, Plaintiffs decided to replace the deposition of Ms. Lake with one of the intended additional depositions – a deposition of Brian Brooks from O'Melveny & Myers LLP.  Defendants originally identified Ms. Lake as their 30(b)(6) witness with respect to the NYAG's investigation and Defendants' Initial Disclosures indicate she "is

likely to have information regarding inquiries by state regulatory authorities concerning Coventry First's origination of life insurance policies." (Halter Decl. Exhibit W, at 3.)

- Peter Gaynor, an executive of Life Insurance Settlements, Inc., a life settlement broker, who negotiated and received many of the improper "co-broker" payments the Plaintiffs and the NYAG allege constitute bid-rigging. Mr. Gaynor is located in Florida.

- Scott Kirby, co-President of Advanced Settlements, a life settlement broker, who negotiated and received many of the improper "co-broker" payments the Plaintiffs and the NYAG allege constitute bid-rigging. Mr. Kirby is located in Florida.

- An insured whose policy was purchased through improper practices. Plaintiffs originally identified Harman Cooper for this deposition but, unbeknownst to Plaintiffs, Herman Cooper is deceased.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs ask that the Court amend the November 5, 2010 Order in accordance with the above objections.

Dated: November 19, 2010
      New York, New York

Respectfully submitted,
LIDDLE & ROBINSON, L.L.P.


_____/s_____
Jeffrey L. Liddle
James R. Hubbard
James W. Halter
800 Third Avenue, 8th Floor
New York, NY 10022
Tel: (212) 687-8500
Fax: (212) 687-1505
*Counsel for Plaintiffs*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 19th day of November, 2010, I caused true and correct copies of the foregoing to be served, by e-mail and by overnight delivery, on:

> David A. Forkner, Esq.
> Kenneth J. Brown, Esq.
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C. 20005
> dforkner@wc.com
> kbrown@wc.com

Dated: November 19, 2010
      New York, New York

_____/s_____
James W. Halter

25