REDACTED VERSION
COMPLETE VERSION FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED and RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED<br><br>Plaintiffs,<br><br>v.<br><br>COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., and LST I LLC,<br><br>Defendants. | Case No. 09 Civ. 1086 (VM)(DCF)<br>(ECF Case) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO PRECLUDE PLAINTIFFS' REQUEST FOR "COSTS AND FEES RELATED TO THE BANKRUPTCY PROCESS"

LIDDLE & ROBINSON, L.L.P.
Jeffrey L. Liddle
James R. Hubbard
James W. Halter
800 Third Avenue, 8th Floor
New York, NY 10022
Tel: (212) 687-8500
Fax: (212) 687-1505
*Counsel for Plaintiffs*

## **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ..............................................................................i-ii

PRELIMINARY STATEMENT .........................................................................1

STATEMENT OF FACTS ................................................................................2

PROCEDURAL HISTORY.............................................................................4

ARGUMENT.................................................................................................12

I.  THE COST AND FEES PLAINTIFFS INCURRED DURING THE
    BANKRUPTCY PROCESS ARE A PART OF PLAINTIFFS' GENERAL
    DAMAGES, NOT "CONSEQUENTIAL DAMAGES" AS DEFENDANTS CLAIM....12

II. EVEN IF THE DEFENDANTS COULD DEMONSTRATE A DEFICIENCY IN
    PLAINTIFFS' DISCLOSURES, ANY SUCH DEFICIENCY WOULD BE
    JUSTIFIED AND HARMLESS SO DEFENDANTS ARE NOT ENTITLED TO
    A REMEDY...............................................................................................14

    A.  Any Alleged Deficiency in Disclosure of Plaintiffs' Damages Was Justified
        As Plaintiffs Provided the Information Available to Them and Were
        Unaware of Defendants' Purported Misunderstanding Regarding
        Plaintiffs' Damages.........................................................................15

    B.  Any Alleged Deficiency in Disclosure of Plaintiffs' Damages Was
        Harmless as Defendants Still Have Ample Time to Prepare for Trial,
        Defendants Did Take Extensive Fact Discovery Regarding the Bankruptcy
        Process, and the Parties Have Not Yet Engaged in Expert Discovery
        Which Will Include Plaintiffs' Damages.............................................18

III. THE SANCTIONS OF PRECLUSION IS NOT WARRANTED HERE.......................20

IV. DEFENDANTS HAVE FAILED TO ESTABLISH THAT
    EQUITABLE ESTOPPEL APPLIES HERE..................................................22

CONCLUSION..............................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Linblad Travel, Inc.*, 730 F.2d 89 (2d Cir. 1984) ............................................................. 12

*Allstate Ins. Co. v. Nassiri*, No. 08-cv-00369 (JCM)(GWF), 2010 WL 5248111
    (D. Nev. Dec. 16, 2010) ........................................................................................... 18, 19, 22

*Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191 (S.D.N.Y. 2006) ................... 12

*Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630 (2d Cir. 2005) .......................................... 18

*Exo-Pro, Inc. v. Seirus Innovative Accessories*, No. CV 05-3629 (LDW)(AKT),
    2008 WL 4878513 (S.D.N.Y. Feb. 19, 2008) .......................................................................... 22

*Fleming v. Verizon N.Y., Inc.*, No. 03 Civ. 5639 (WHP), 2006 WL 2709766
    (S.D.N.Y. Sept. 22, 2006) ................................................................................................. 18, 21

*Hein v. Cuprum, S.A., de C.V.*, 53 Fed. Appx. 134 (2d Cir. 2002) ............................................... 21

*In re Becker*, 407 F.3d 89 (2d Cir. 2005) ...................................................................................... 23

*Jockey Int'l, Inc. v. M/V "Leverkusen Express,"* 217 F. Supp. 2d 447 (S.D.N.Y. 2002) ............. 15

*Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706 (2d Cir. 2001) ...................... 22

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007) ............................ 13

*Nguyen v. IBP, Inc.*, 162 F.R.D. 675 (D. Kan. 1995) ................................................................... 15

*Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435 (2d Cir. 2006) ......................................... 23

*Patterson v. Balsamico.* 440 F.3d 104 (2d Cir. 2006) ............................................................. 18, 21

*Rienzi & Sons, Inc. v. N. Puglisis & F. Industra Paste Alietari S.P.A.*,
    08-CV-2540 (DLI)(JMA), 2011 WL 1239867 (E.D.N.Y. Mar. 30, 2011) ............................... 18

*U.S. Bank N.A. v. Ables & Hall Builders*, 696 F. Supp. 2d 428 (S.D.N.Y. 2010) ....................... 13

**Other Authorities**

New York Executive Law § 63(12) ............................................................................ 3

New York General Business Law § 340 .................................................................... 3

New York General Business Law § 352 *et seq.* ....................................................... 3

**Rules**

Fed. R. Civ. P. 26(a) ........................................................................................... 15, 17

Fed. R. Civ. P. 30(b)(6) .................................................................................. 8, 20, 22

Fed. R. Civ. P. 37(c) ....................................................................................... 14, 18, 20

Fed. R. Civ. P. 37(c)(1) ................................................................................... 14, 18, 20

Local Rule 33.3 ........................................................................................................ 9

## PRELIMINARY STATEMENT

Defendants' motion to preclude damages related to Plaintiffs' bankruptcy misconstrues the nature of the damages and the discovery in this matter to manufacture a problem that does not exist. The costs and fees of Plaintiffs' bankruptcy have always been an aspect of the general, direct damages in this case. As consistently described in the Complaint and in discovery, Plaintiffs are seeking their out-of-pocket losses – here, the difference between the amount Plaintiffs paid for the life insurance policies they bought from Defendants and the amount Plaintiffs received when sold the policies in a bankruptcy auction.

As discussed in the Complaint, the bankruptcy process was a crucial part of the damages in this case and of Plaintiffs' mitigation. "[T]he [Attorney General's Complaint] sought an order directing the named defendants, including Coventry, to 'offer the right of rescission to all [s]eller who entered into Purchase Agreements with Defendant Coventry from 2001 to the present." (Compl., Dt. # 1, ¶50.) "Following the public disclosure of the [Attorney General's Complaint], [Plaintiffs] were forced to seek bankruptcy court protection for their title to the policies purchased from LST, and to auction the policies under the auspices of the bankruptcy court to the highest bidder." (Compl. ¶ 52.)

In order to sell the policies and avoid the threat of rescission, Plaintiffs filed for bankruptcy and asked the bankruptcy court to ensure Plaintiffs could convey "clean title" to potential sellers. Thus, bankruptcy was part of Plaintiffs' mitigation efforts and was disclosed from the very beginning of this matter.

For Defendants to claim that the costs and fees related to Plaintiffs' bankruptcy is a "new category of damages" is without merit. Preclusion is not appropriate.

## STATEMENT OF FACTS

The present dispute arises out of Plaintiffs' purchase of over 1,000 life settlements from Defendants.  In early 2005, Plaintiffs and their affiliates sought to purchase life settlement policies from Defendants.  Plaintiffs sought to create a diverse pool of life settlement policies to securitize and otherwise sell at a profit.

On June 30, 2005, Plaintiffs and Defendants entered into a series of contracts by which Plaintiff Ritchie Risk-Linked Strategies Trading (Ireland), Limited would purchase policies from Defendant LST I LLC.  One of the contracts, the Master Policy Purchase Agreement, contained representations and warranties, that, in sum and substance, guaranteed that the policies sold to Plaintiff would be purchased in compliance with law and that there were no proceedings pending or, to the Defendants' knowledge, threatened, that would impact the assets or the sale process. Both aspects of these representations and warranties were false.  Defendants purchased numerous policies through bid-rigging and fraud.  In addition, Defendants were under investigation by the New York Attorney General ("NYAG") for those very same practices at least as of July 27, 2005 when Defendants received the first of two subpoenas from the NYAG.

The June 30, 2005 Master Policy Purchase Agreement was "amended and restated" on September 8, 2005.  Plaintiff Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited executed an additional Master Policy Purchase Agreement and other contracts with Defendants on December 15, 2005.  All of the Master Policy Purchase Agreements contain nearly identical representations and warranties and all were breached.

In approximately the fall of 2005, after acquiring a significant number of policies from Defendants, Plaintiffs began creating, preparing for, and consulting with the third parties necessary to complete a securitization of a portion of the policies.  This included receiving an

investment grade rating from Moody's.   Moody's gave a provisional A(3) rating to the transaction on October 11, 2006.

In the meantime, unbeknownst to Plaintiffs, on July 25, 2005 and again on March 2, 2006, the NYAG issued subpoenas to Defendant Coventry First as part of an investigation of bid-rigging and fraud, among other illegal and unfair practices, in the purchase of life settlements by Defendants and others.   Despite the fact that Defendants continued to sell life settlements to Plaintiffs during the investigation and subpoenas and that the parties were working on the planned securitization during that time, Defendants did not mention the pending investigation by the NYAG.

On October 26, 2006, the NYAG filed a complaint against Defendants Coventry First, Montgomery Capital, and Coventry Group, and Reid S. Berger, a Vice President of Defendant Coventry First, Executive Vice President and 20% owner of Defendant Coventry Group, as well as an officer and shareholder of Defendant Montgomery Capital.   The complaint alleged that Defendants had engaged in fraudulent business practices in violation of New York Executive Law § 63(12), anti-competitive behavior in violation of New York General Business Law § 340 *et seq.*, securities violations pursuant to New York General Business Law § 352 *et seq.*, fraud, and inducement of breach of fiduciary duty.

The NYAG's complaint gave specific examples of bid-rigging and falsifying documents in the purchase of life settlements by Defendants and indicated that they were aware of additional violations.   Three of the policies specifically mentioned by the NYAG were life settlements Defendants sold to Plaintiffs.

In addition to disgorgement of profits and other damages, the NYAG sought to provide every insured who had sold a policy to Defendants the option to rescind the sale to Defendants.

3

That same day, as a result of the NYAG's complaint, Moody's withdrew the provisional rating it had issued for the securitization of the life settlement policies. As a result, Plaintiffs were not able to complete their intended securitization.

To avoid the threat of rescission posed by the NYAG's complaint, Plaintiffs filed for bankruptcy and conducted a sale through which the bankruptcy court could quiet title. Plaintiffs were not able to mitigate all of their damages through the sale process.

## PROCEDURAL HISTORY

On May 2, 2007, Plaintiffs and others filed a complaint against Defendants and others ("First Ritchie Suit"). The First Ritchie suit was based largely on the same facts at issue in the present matter and asserted claims of breach of contract, fraud, breach of fiduciary duty, fraudulent inducement, and RICO.

The parties engaged in limited discovery during the First Ritchie Suit. Most important to the matter presently before the Court, the parties exchanged initial disclosures on July 5, 2007.[1]

On March 17, 2008, the plaintiffs in the First Ritchie Suit voluntarily dismissed the case pursuant to Federal Rule of Civil Procedure 41(a)(1).

Plaintiffs subsequently retained new counsel and re-filed the breach of contract claim against Defendants on February 6, 2009 ("Second Ritchie Suit"). The Second Ritchie Suit is the matter presently before the Court.[2]

---

[1] The "damages" section of Plaintiffs' initial disclosures states: "Ritchie Capital has alleged that it suffered damages in an amount believed to be not less than approximately $700 million, based on, among other things, the amounts for which Plaintiffs purchased the insurance policies from Defendants, the accretion of the policies, the ongoing cost of servicing the policies, the premiums for the policies, lost opportunity costs relating to the inability to carry forward the planned securitization transaction, and reputation damages. Ritchie Capital is entitled to trebled damages pursuant to the Racketeer Influenced and Corrupt Organizations Act, compensatory damages, and punitive damages. The documentation on which Ritchie Capital relied in reaching this initial estimate is described above, under 'Documents.' Ritchie Capital will further refine its claim for damages as the litigation progresses." (Halter Decl. Ex K at 4.)

The Complaint in the Second Ritchie Suit described the bankruptcy process of Plaintiffs, stating that Plaintiffs "were forced to seek bankruptcy court protection for their title to the policies purchased from LST, and to auction the policies under the auspices of the bankruptcy court to the highest bidder." (Compl. ¶52.)   The Complaint then went on to describe and approximate the out-of-pocket losses by Plaintiffs and Plaintiffs' mitigation of these out-of-pocket losses through the proceeds of the bankruptcy auction.   (Compl. ¶¶53-56.)   The Complaint indicates that the Plaintiffs are seeking "compensatory damages" and that Plaintiffs seek to recover for the "damage to the value of the life insurance policies purchased from Defendants, transaction costs including the cost of maintaining the policies in force, and the loss of reasonably anticipated profits, in an amount not less than $400,000,000." (Compl. pg. 22 and ¶66.)

Fact discovery with respect to the Second Ritchie Suit proceeded from September 2009 until May 5, 2010.[3]   At the outset of the discovery period, the parties agreed that, in lieu of exchanging new initial disclosures, they would use the initial disclosures exchanged during the First Ritchie Suit.  Defendants served amended initial disclosures, by mail, on the final scheduled day of fact discovery, March 26, 2010.

Defendants engaged on extensive discovery on all matters relevant to this proceeding, including Plaintiffs' bankruptcy.   For example, on February 5, 2010, Defendants served a

---

[2]      Defendants' Memorandum of Law alleges "[i]n fact, upon information and belief, Plaintiffs waited to file this lawsuit until the Bankruptcy Court dismissed the last lingering adversary proceeding brought in the bankruptcy, which occurred just two days earlier, on February 4, 2009." (Defs.' Mem. of Law at 13-14.)   While there does not appear to be any relevance to Defendants' claim that the timing was intentional, it bears noting that the timing of the present complaint and the end of the bankruptcy proceeding is coincidental.

[3]      The scheduling order set by Judge Cote indicated fact discovery would close on March 26, 2010.   However, with the Court's permission, the parties agreed to conduct additional fact depositions after the close of fact discovery.

subpoena for the production of documents on Houlihan Lokey, the investment bank that conducted the bankruptcy auction for Plaintiffs.  Among other documents, the subpoena called for "All documents and communications concerning services performed by Houlihan Lokey for Plaintiffs or [Ritchie Capital Management] related, in any way, to any Conveyed Life Settlement Policy, including all engagement letters, contracts, and invoices, including reviewing Plaintiffs' assets, stratifying those assets, discussing sales strategies, and soliciting interest from prospective investors."  (Halter Decl. Ex. A at 9.[4])  The subpoena also called for "[a]ll documents and communications concerning Houlihan Lokey's solicitation of potential purchasers of, or investors in [Plaintiffs'] assets including any Conveyed Life Settlement Policy, and discussions with potential bidders regarding [Plaintiffs'] assets.  See December 21, 2007 Affidavit of Bradley C. Geer in Support of Debtor's Complaint ¶ 3; Transcript of December 24, 2007 Deposition of Bradley C. Geer at 8, 13."[5]  (Halter Decl. Ex. A at 9.)  The subpoena contained 27 document requests, most calling for the production of documents related to the bankruptcy process.

Plaintiffs did not oppose the subpoena and assisted Houlihan Lokey in producing more than 800,000 pages of documents in response to the subpoena.

Defendants also served a subpoena calling for the production of documents on Development Specialists, Inc. ("DSI") on January 8, 2010.  DSI was a company that assisted Plaintiffs with the bankruptcy.  Among other documents, the subpoena called for "[a]ll documents and communications concerning Potential Purchasers from June 20, 2007, through

---

[4]    "Halter Decl." refers to the Declaration of James W. Halter filed contemporaneously herewith.

[5]    The cites at the close of the request refer to documents created during Plaintiffs' bankruptcy proceedings.

the date on which the final Conveyed Life Settlement Policy was sold in the Ritchie I and II

Bankruptcy.   This includes all documents and communications with or concerning Potential

Purchasers." (Halter Decl. Ex. B at 12.)   The subpoena also called for "[a]ll documents and

communications concerning the claim that the 'decline in value also has affected the Debtors'

ability to execute a planned securitization transaction and impaired the ability of the Debtors to

pay their obligations with regard to the Policies, thereby impacting further the marketability of

the Debtors' assets through ordinary sale processes and requiring the Debtors to seek relief under

the Bankruptcy Code in order to preserve the value of the assets for their creditors.'  June 19,

2007 Affidavit of Fred C. Caruso Pursuant to Local Bankruptcy Rule 1007-2 ¶ 7." (Halter Decl.

Ex. B at 34.)  Several other document requests from the subpoena to DSI also call for documents

related to the bankruptcy proceeding.

Plaintiffs did not oppose the subpoena and assisted DSI in producing more than 150,000

pages of documents in response to the subpoena.

Defendants further served subpoenas calling for the production of documents on, and

received documents from, Lewis & Ellis, an actuarial firm Plaintiffs retained during the actuarial

process, and ABN AMRO Bank, N.V. ("ABN AMRO"), the successful bidder in the bankruptcy

auction and the entity that provided financing to Plaintiffs during the bankruptcy process.

(Halter Decl. Exs. C and D.)  Again, Plaintiffs did not oppose the subpoenas and assisted Lewis

& Ellis in responding to the subpoena directed to it.

Defendants spent substantial time during depositions asking and receiving answers from

witnesses regarding the bankruptcy.  This testimony included Fred Caruso, Plaintiffs' former

Chief Restructuring Officer during the bankruptcy. (Halter Decl. Ex. E at 34:23 – 55:3; 96:22 –

99:5 (███████████████████████████████████████████); 111:5 – 121:8;

142:8 – 159:9; 185:23 – 195:6; 267:17 – 269:22; 304:3 – 307:5 (██████████████████ ██████████████████████████ )).

Defendants also deposed a representative of ABN AMRO pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure extensively regarding the bankruptcy process and its role in financing Plaintiffs leading up to the bankruptcy process.  (*See, e.g.*, Halter Decl. Ex. F at 76:25 – 80:24; 189:10 – 197:10; 206:23 – 215:16; 264:13 – 265:23; 329:13 – 344:11; 359:22 – 361:3.)

Defendants also elicited a substantial amount of deposition testimony regarding the bankruptcy process from the designated representative of Plaintiffs pursuant to Rule 30(b)(6). (*See, e.g.*, Halter Decl. Ex. G at 44:25 – 52:13 (█████████████████ ); 303:6 – 318:13; 335:8 – 339:4; 343:7 – 349:4; 546:8 – 550:14; 686:14 – 693:8.)  Despite Defendants' claims to the contrary, Plaintiffs' Rule 30(b)(6) did discuss Plaintiffs' mitigation of damages through the bankruptcy and the retention of an investment bank to assist in that process as follows:





(Halter Decl. Ex. G, at 546:8-548:23.)[6]

On February 24, 2010, pursuant to Local Rule 33.3, Defendants served interrogatories on Plaintiffs seeking Plaintiffs' contentions with respect to various matters ("Defendants' Contention Interrogatories").    In substantial part, the Defendants overreached "in both the drafting and scope of their interrogatories" and, as a result, the interrogatories were "overly broad and unduly burdensome."    (Dkt. # 80 at 6-7 (J. Marrero).)    Plaintiffs objected to the

---

[6]    Defendants never asked the witness to list the damages Plaintiffs are seeking, instead asking "▮▮▮▮ ▮▮▮'s alleged breach caused Ritchie's alleged harm" (Halter Decl. Ex. G at 552:10-11) and "▮▮ list all of the reasons it caused damage▮" (Halter Decl. Ex. G at 553:10-11) which call for a discussion of causation, not the damages themselves, and the questions were answered as such.

interrogatories on those grounds.  However, Plaintiffs did provide the substantive responses to

Defendants' damages interrogatory.  Plaintiffs accurately indicated:

> Since Plaintiffs' experts have not yet completed their review and
> analysis of the damages in this case, Plaintiffs cannot, at this time,
> provide an accurate damages calculation.  Plaintiffs will be seeking
> the following categories of damages:
>
> - Compensatory damages;
> - Expectation damages, including lost profits;
> - Prejudgment and post-judgment interest; and
> - Attorney's fees

(Halter Decl. Ex. H at 14.)  The categories of damages identified are the same as those identified

in the Complaint.

Defendants requested a more detailed description of damages so, on March 17, 2011,

Plaintiffs supplemented the damages interrogatory indicating:

> Since expert discovery has not been completed and
> Plaintiffs' experts have not yet completed their review and analysis
> of the damages in this case, Plaintiffs reserve the right to amend
> this response at a later time based on additional information.
>
> Notwithstanding the General Objections and the Specific
> Objections to Interrogatory No. 10, Plaintiffs provide the following
> good faith estimate of damages.
>
> Compensatory Damages:
>
> Ritchie I paid $652,799,643 to purchase policies from
> Defendants (other than the nineteen matured policies discussed
> below).  Ritchie I paid $95,823,750 to keep those policies in force.
> Ritchie I received $86,187,260 in loans and withdrawals from
> those policies.  Thus, the net acquisition cost for the policies to
> Ritchie I was $662,436,133.
>
> Nineteen policies matured while held by Ritchie I which
> resulted in a net gain for Ritchie I of $16,414,714.51.  Ritchie I
> sold the remaining policies for $410,564,670.15.
>
> Thus, Ritchie I seeks damages for its out-of-pocket losses
> with respect to the policies in the amount of $235,456,748.34.

Ritchie II paid $105,907,072 to purchase policies from Defendants (other than the one matured policy discussed below). Ritchie II paid $5,909,237 to keep those policies in force. Ritchie II received $12,951,000 in loans and withdrawals from those policies. Thus, the net acquisition cost for those policies to Ritchie II was $98,865,309.

One policy matured while held by Ritchie II which resulted in a net gain for Ritchie II of $426,267.00. Ritchie II sold all but one of the remaining policies for $58,205,720.98.

Thus, Ritchie II seeks damages for its out-of-pocket losses with respect to the policies in the amount of $40,233,321.02.

Ritchie I and Ritchie II also paid $12,718,973 in costs and fees related to the bankruptcy process and seek that amount as part of their compensatory damages as well.

Expectation Damages

Ritchie I and Ritchie II purchased the policies from Defendants at an agreed-upon discount rate of 10%. The discount rate for the sale of the 598 policies due to the anticipated securitization was 8%. Thus, the anticipated profit to Ritchie I and Ritchie II combined was $66,875,839.

Ritchie I and Ritchie II anticipated the remaining policies would be sold at the same discount rate and they would have received a combined profit of $93,180,013.

Additional Damages

Ritchie I and Ritchie II also seek prejudgment and post-judgment interest and attorneys fees in an amount to be determined.

(Halter Decl. Ex. I at 11-12).

Expert discovery has not yet begun in this case. Plaintiffs anticipate using an expert to testify regarding the damages calculations and to further refine them.

Defendants now claim that the "costs and fees related to the bankruptcy process" is a "new damages theory" and that Defendants did not take sufficient discovery of this "damage

theory." Such a claim is without merit. As Defendants were aware from the Complaint, the bankruptcy process has been a clear aspect of Plaintiffs' damages and the mitigation of those damages and, as a result, Defendants have engaged in extensive discovery regarding Plaintiffs' mitigation efforts through the bankruptcy.

## ARGUMENT

### I. THE COSTS AND FEES PLAINTIFFS INCURRED DURING THE BANKRUPTCY PROCESS ARE A PART OF PLAINTIFFS' GENERAL DAMAGES, NOT "CONSEQUENTIAL DAMAGES" AS DEFENDANTS CLAIM.

Plaintiffs made accurate and sufficient disclosures to Defendants. In the Complaint, the initial disclosures and interrogatory responses, Plaintiffs have consistently indicated that they seek to be compensated for their out-of-pocket losses – compensatory damages. The costs and fees associated with the bankruptcy process is a necessary part of those compensatory damages. Defendants' attempts to mischaracterize the costs of the bankruptcy process as "consequential damages" and, thus, argue that such "consequential damages" were not disclosed, are without merit.

"The general rule for measuring damages for breach of contract has long been settled. It is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." *Adams v. Linblad Travel, Inc.*, 730 F.2d 89, 92 (2d Cir. 1984). General, or direct, damages are those damages that occur as the natural and probable consequence of the breach. *See, e.g., Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 200 (S.D.N.Y. 2006).

Here, the breach of contract is of a warranty contained in the contract.

> Under New York law, an express warranty is part and parcel of the contract containing it and an action for its breach is grounded in contract. A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms. It follows that [Plaintiffs are]

entitled to the benefit of its bargain, measured as the difference between the value of [policies] as warranted by [Defendants] and [their] true value at the time of the transaction.

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184-85 (2d Cir. 2007) (internal citations omitted).

Of course, "[i]n a breach of contract action, a plaintiff ordinarily has a duty to mitigate the damages that he incurs. If the plaintiff fails to mitigate his damages, the defendant cannot be charged with them. This duty applies to those damages that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense." *U.S. Bank N.A. v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440-41 (S.D.N.Y. 2010)

Here, such general damages are measured by the out-of-pocket losses of Plaintiffs. Plaintiffs paid approximately $761,301,442 to purchase the policies and keep them in force. Plaintiffs were able to mitigate these damages through selling the policies and because some of the policies matured.[7] Due to the threat of rescission created by the NYAG's Complaint and the bad acts of Defendants described therein, such a sale process involved Plaintiffs clearing title of the policies through bankruptcy. Plaintiffs were able to mitigate $468,770,391.13 of the damages caused by Defendants' breach through the bankruptcy.

The sale process was obviously not free for Plaintiffs. To conduct the bankruptcy auction, Plaintiffs had to pay several professionals to provide services such as: valuing the policies, filing for bankruptcy and other filings, conducting the auction, performing actuarial functions, and providing accounting services.

---

[7] This figure does not include policies that matured prior to the bankruptcy auction. Those policies, as well as the remaining ones, are reflected in Plaintiffs' Second Amended Objections and Responses to Defendants' Second Set of Interrogatories.

It appears that Defendants expect the benefit of the mitigation but do not expect to reimburse Plaintiffs for the cost of their mitigation efforts.

Contrary to Defendants' assertion that Plaintiffs' bankruptcy costs are "consequential damages," the bankruptcy costs and fees are part of the general damages to which Plaintiffs are entitled. This is not a case where a breach of contract caused a party to lack the necessary funding to function and drove the party to bankruptcy. In fact, the testimony from one of Plaintiffs' funding sources is that Plaintiffs could have obtained a "significant amount" of funding if required. (Halter Decl. Ex. F at 337:20-338:11.) Here, the bankruptcy process was solely a function of recouping as much of Plaintiffs out-of-pocket losses as possible.

In addition to being clearly defined under the law, Plaintiffs fully disclosed that they were and are seeking their out-of-pocket losses, netted against the proceeds from the bankruptcy process, in the Complaint.[8] Presumably, Defendants conducted extensive discovery as a result of this belief.

Thus, Plaintiffs did not fail to disclose their damages and, as such, Defendant's motion to preclude should be denied.

## II. EVEN IF THE DEFENDANTS COULD DEMONSTRATE A DEFICIENCY IN PLAINTIFFS' DISCLOSURES, ANY SUCH DEFICIENCY WOULD BE JUSTIFIED AND HARMLESS SO DEFENDANTS ARE NOT ENTITLED TO A REMEDY.

Rule 37(c)(1) of the Federal Rules of Civil Procedure indicates that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, **unless the failure was substantially justified or harmless.**" FED. R. CIV. P. 37(c)(1)

---

[8]     Plaintiffs are also seeking the profits they lost due to Defendants' breach. (Compl. ¶56-57.)

(emphasis added). Defendants motion must be denied if the alleged deficiency is either "substantially justified" or if the alleged deficiency was harmless. Both exceptions apply.

Defendants are not entitled to any remedy – much less the severe remedy of preclusion – because any deficiency in Plaintiffs disclosures was both substantially justified and harmless.

A.  Any Alleged Deficiency in Disclosure of Plaintiffs' Damages Was Justified as Plaintiffs Provided the Information Available to Them and Were Unaware of Defendants' Purported Misunderstanding Regarding Plaintiffs' Damages.

Rule 37(c)(1) is designed to avoid "gamesmanship" and "to provide a strong inducement for disclosure of Rule 26(a) material." *CSC Holdings, Inc. v. Berube*, No. 01-1650 (DRH)(MLO), 2004 WL 3541331, at *3 (E.D.N.Y. July 7, 2004). As such, "[s]ubstantial justification means 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.' Substantial justification exists if 'there exists a genuine dispute concerning compliance.'" *Jockey Int'l, Inc. v. M/V "Leverkusen Express,"* 217 F. Supp. 2d 447, 452 (S.D.N.Y. 2002) (quoting *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D. Kan. 1995)) (internal citations and other internal quotations omitted). Plaintiffs have not engaged in gamesmanship and, in fact, provided the information available to them to Defendants during the course of discovery. They had no reason to believe that there could be any confusion regarding the proper measure of damages.

While the theory of damages relevant to Defendants' breach of contract is straightforward, Plaintiffs' damages in this case are difficult to calculate. There are numerous factors one must examine to determine Plaintiffs' damages. For each of the over 1,000 policies, the calculation involves: (1) the amount paid for the policy, (2) the premiums paid for the policy, (3) loans taken against the policy, and (4) other costs to keep the policies in force. In addition, there are death benefits to add to the calculation and the proceeds of the sale during the

bankruptcy auction.   Plaintiffs will and are relying on their experts to provide accurate calculations of these damages.

Expert discovery has not started yet and Plaintiffs' experts have not completed their analysis.   Thus, Plaintiffs have provided to Defendants the information they had available to them at the various stages of discovery.

In addition, Plaintiffs were not aware of any purported misunderstanding by Defendants. The costs and fees of the bankruptcy process are part of a standard general damages analysis to compensate Plaintiffs for Defendants' breach and put them in the same economic position had Defendants not breached.   Thus, it is an element of the "compensatory damages" claimed in the Complaint and each iteration of Plaintiffs' responses to Defendants' Contention Interrogatories.

Further, the Complaint makes clear that Plaintiffs' mitigation was through a bankruptcy auction and that Plaintiffs filed for bankruptcy to avoid the threat of rescission posed by the NYAG's complaint and to quiet title.   Plaintiffs were justified in relying on these representations to believe they had satisfied any disclosure obligations regarding damages.

In addition, it appears that Defendants understood the role of the bankruptcy process in Plaintiffs' damages as Defendants took ample discovery regarding the bankruptcy process. Despite Defendants claimed reliance on a statement in a footnote to a letter by prior counsel that documents created after the Plaintiffs filed for bankruptcy "are mostly either irrelevant – because they do not concern the events at issue in the lawsuit – or [are] overwhelmingly protected by privilege and work-product doctrine" (Brown Decl. Ex. 2 at 1 n.2.), Defendants did, in fact, take discovery regarding the bankruptcy process.[9]

---

[9]     It bears noting that the letter Defendants allegedly relied upon actually argues that "with the bankruptcy filing, Plaintiffs' financial condition, their attempts to mitigate damages, the attempted and actual sale of the policies – indeed, every category of document highlighted by

Thus, any alleged deficiency in the Rule 26(a) disclosures of Plaintiffs was substantially justified in light of the fact that expert discovery, which Plaintiffs will and are relying on to calculate their damages, has not yet begun.   Further, Plaintiffs justifiably believe that the following disclosures satisfy their obligations:

- the July 5, 2007 initial disclosures from the First Ritchie Suit (Halter Decl. Ex. K);

- Plaintiffs' letter by prior counsel to the Court dated March 13, 2008 indicating that Plaintiffs had mitigated their damages through bankruptcy (Halter Decl. Ex. J);

- the Complaint in the present matter seeking "compensatory damages," "transaction costs," and discussing the bankruptcy process (Compl., at pg. 22, ¶¶ 50-57, and ¶ 66);

- Plaintiffs' March 25, 2010 Responses to Defendants' Contention Interrogatories reiterating that they were seeking compensatory damages (Halter Decl. Ex. H); and

- Plaintiffs' March 14, 2011 Amended Responses to Defendants' Contention Interrogatories providing an approximation of the damages, including the costs and fees related to the bankruptcy process (Halter Decl. Ex. I).

Any alleged deficiency in Plaintiffs' damages disclosure was justified in light of the actual disclosures Plaintiffs did make and by Plaintiffs' reliance on expert discovery to supplement those disclosures.

---

Defendants – became the subject of a voluminous public record.  Moreover, the Policies were sold in a court-supervised public auction early this year, so the 'floor' in Plaintiffs' damages calculation is now established.  Accordingly, this is – as we have explained to defense counsel, who have not actually disputed the point – a situation in which the burden of discovery, especially in light of other available sources, greatly outweighs any conceivable benefit." (Halter Decl. Ex. J at 1-2.)   As evidenced by her oral ruling, Judge Cote apparently agreed. (Declaration of Dane Butswinkas at ¶4.)

B.  Any Alleged Deficiency in Disclosure of Plaintiffs' Damages Was Harmless as Defendants Still Have Ample Time to Prepare for Trial, Defendants Did Take Extensive Fact Discovery Regarding the Bankruptcy Process, and the Parties Have Not Yet Engaged in Expert Discovery Which Will Include Plaintiffs' Damages.

In addition to being justified, any purported deficiency in Plaintiffs' damages disclosure is harmless. "Rule 37(c)(1) is designed to prevent the 'sandbagging' of an opposing party with new evidence." *Fleming v. Verizon N.Y., Inc.*, No. 03 Civ. 5639 (WHP), 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006).

This is not a case like a majority of the cases cited by Defendants where a plaintiff sought to proceed on a new damages theory on the eve of trial. *See, e.g., Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 635 (2d Cir. 2005) (addressing a circumstance where "the trial date ha[d] already been postponed once"); *Patterson v. Balsamico.* 440 F.3d 104, 116-17 (2d Cir. 2006) (precluded witnesses were disclosed 10 days before trial); *Rienzi & Sons, Inc. v. N. Puglisis & F. Industra Paste Alietari S.P.A.*, 08-CV-2540 (DLI)(JMA), 2011 WL 1239867, at *1 (E.D.N.Y. Mar. 30, 2011) (addressing attempts to amend a disclosure "on the eve of trial"). *See also Allstate Ins. Co. v. Nassiri*, No. 08-cv-00369 (JCM)(GWF), 2010 WL 5248111, at *5 (D. Nev. Dec. 16, 2010) ("[T]he cases in which courts have excluded evidence based on the failure to provide a damages computation have involved 'extreme situations' in which the plaintiff did not provide a damages computation until shortly before trial or until well after the close of discovery.").

Instead, here, Plaintiffs have provided an amended interrogatory response prior to the start of expert discovery. No trial date has yet been set and Plaintiffs anticipate that the schedule for expert discovery and dispositive motions will require several months. Therefore, Plaintiffs have not engaged in "sandbagging." To the extent Defendants were confused about Plaintiffs' damages theory, Defendants still have sufficient time to prepare to address the proper theory at

trial. *Allstate, Inc.*, 2010 WL 524811, at *5 ("The Court finds that the circumstances in this case do not warrant the imposition of evidence preclusion or the more serious sanctions sought by Defendants. Although Plaintiffs did not provide a computation of damages prior to August 17, 2010, Defendants were not in the dark regarding the theory or nature of Plaintiffs' damage claims or that they were substantial in view of the factual allegations and number of claims at issue.")

In addition, despite their purported reliance on alleged representations that actions after Plaintiffs filed for bankruptcy were irrelevant, Defendants engaged in substantial fact discovery regarding the bankruptcy process. This included subpoenas to third parties involved in the bankruptcy and depositions related to the bankruptcy.

Defendants subpoenaed and received over 800,000 pages of documents from Houlihan Lokey, the investment bank that conducted the bankruptcy auction on behalf of Plaintiffs. Defendants subpoenaed and received more than 180,000 pages of documents from DSI, the company that provided Plaintiffs' Chief Restructuring Officer and otherwise assisted in the bankruptcy. Defendants subpoenaed and received documents from ABN AMRO in response to their request for "[a]ll documents and communications concerning Potential Purchases from June 20, 2007, through the date on which final Conveyed Life Settlement Policy was sold in the Ritchie I and II Bankruptcy. This includes all documents and communications with or concerning Potential Purchasers" and other requests related to the bankruptcy process. (Halter Decl. Ex. D at 11.)[10] Defendants subpoenaed and received documents from Lewis & Ellis, the actuarial firm that assisted Plaintiffs during the bankruptcy process.

---

[10]    Defendants served this subpoena specifically requesting documents after the date Plaintiffs filed for bankruptcy, June 20, 2007, despite purportedly relying on the statement of prior counsel that documents after the date of the bankruptcy were "mostly . . . irrelevant." (*See, e.g.*, Defs.' Mem. of Law at 24.)

Defendants deposed a representative of ABN AMRO pursuant to Rule 30(b)(6) extensively regarding the bankruptcy process and its role in financing Plaintiffs leading up to the bankruptcy process. (*See, e.g.*, Halter Decl. Ex. F at 76:25 – 80:24; 189:10 – 197:10; 206:23 – 215:16; 264:13 – 265:23; 329:13 – 344:11; 359:22 – 361:3.) Defendants deposed Fred Caruso, Plaintiffs' Chief Restructuring Officer, extensively regarding the bankruptcy process. (Halter Decl. Ex. E at 111:5 – 121:8; 142:8 – 159:9; 185:23 – 195:6; 267:17 – 269:22; 304:3 – 307:5 (███████████████████████████████████████).) Defendants deposed Plaintiffs' Rule 30(b)(6) representative extensively regarding the bankruptcy process as well. (Halter Decl. Ex. G at 44:25 – 52:13 (██████████████████); 303:6 – 318:13; 335:8 – 339:4; 343:7 – 349:4; 546:8 – 550:14; 686:14 – 693:8.)

Further, expert discovery has not yet begun. Plaintiffs will use an expert witness to discuss their damages. Therefore, Defendants will have ample opportunity to review a report of Plaintiffs' damages and depose the expert regarding the calculations, should they wish.

Thus, any deficiency in Plaintiffs damages disclosures was harmless. Defendants request for a remedy from that purported deficiency should be denied.

## III.    THE SANCTION OF PRECLUSION IS NOT WARRANTED HERE.

Rule 37(c)(1) gives a court discretion to order "other appropriate sanctions" "[i]n addition to or instead of" preclusion. FED. R. CIV. P. 37(c)(1). Courts apply a four-factor test when assessing what sanction to order pursuant to Rule 37(c): "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the . . . precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440

F.3d 104, 114 (2d Cir. 2006).[11]   Preclusion is a severe remedy and is not warranted here.  *See* FED. R. CIV. P. 37(c) advisory committee's notes ("Limiting the automatic sanction to violations 'without substantial justification,' coupled with the exception for violations that are 'harmless' is needed to avoid unduly harsh penalties in a variety of situations.")).  *See also Hein v. Cuprum, S.A., de C.V.*, 53 Fed. Appx. 134, 137 (2d Cir. 2002) (described preclusion as an "extreme remedy"); *Fleming*, 2006 WL 2709766, at *7 ("Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with caution.").

As discussed above, Plaintiffs' purported failure to disclose an aspect of its damages was not intentional.  In fact, Plaintiffs believed they had disclosed their theory of damages on several occasions.  Thus, preclusion is not appropriate.

In addition, the proper measure of damages are important to Plaintiffs, now-bankrupt entities.  While $12,718,973 represents less than 5% of the compensatory damages that Plaintiffs seek, it is a large sum that Plaintiffs should be reimbursed for – the efforts were made, after all, to mitigate Defendants' damages.  Defendants appear to concede this as they do not argue that the second factor favors preclusion.

Defendants will not suffer any prejudice in having to prepare to address Plaintiffs' damages from the bankruptcy process.  As discussed above, Defendants have already taken substantial discovery regarding the bankruptcy process.  Further, as Judge Cote found during the First Ritchie Suit, the relevant documents were made public during the bankruptcy process itself.

---

[11]   The "four-factor test" is usually applied in the context of witnesses disclosed shortly before trial.  Here, Defendants merely allege Plaintiffs failed to disclose an aspect of their damages with ample time to prepare to address the element at trial.  Such a deficiency, should one even exist, prejudices the Defendants substantially less than the witness scenario, if at all, so Defendants should be held to even higher standard than the "four-factor test" before a sanction is warranted.

(See Halter Decl. Ex. J at 1-2, Declaration of Dane Butswinkas at ¶4.) Defendants have shown substantial familiarity with the documents from Plaintiffs' bankruptcy process. *See also Allstate Ins.*, 2010 WL5248111 at *6 ("While the value of a preliminary damages computation is limited, it does provide the defendants with information about their potential exposure and may assist them in making more informed decisions as the case progresses. Beyond that, the value of an early and preliminary computation of damages is debatable.") (internal citations omitted).

Finally, a "continuance" is not necessary as no trial date is set. Defendants will have substantial time to prepare to address Plaintiffs' damages, including the costs and fees of the bankruptcy process prior to trial and will be able to take expert discovery to assist them. *See, e.g.*, *Exo-Pro, Inc. v. Seirus Innovative Accessories*, No. CV 05-3629 (LDW)(AKT), 2008 WL 4878513, at *4 (S.D.N.Y. Feb. 19, 2008) (denying preclusion where "there remain[ed] sufficient time before trial to cure any prejudice that Defendant might suffer as a result of Exo-Pro's late service of Dr. Grayson's expert report.").

Thus, to the extent any deficiency is found, preclusion is not appropriate. If the Court is inclined to provide a remedy to Defendants, an additional two hours of deposition by a Rule 30(b)(6) witness on behalf of Plaintiffs, limited to the topic of damages and mitigation from the bankruptcy process, would be sufficient.

## IV. DEFENDANTS HAVE FAILED TO ESTABLISH THAT EQUITABLE ESTOPPEL APPLIES HERE.

To establish that equitable estoppel applies, Defendants must prove that " 1) [Plaintiffs] ma[de] a misrepresentation of fact to the other party with reason to believe that the other party [would] rely upon it; 2) and [Defendants] reasonably relie[d] upon it; 3) to [Defendants'] detriment." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). Further, with respect to the reliance element, "[a] party claiming equitable estoppel 'must

have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should have known that its adversary's conduct was misleading." *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 447 (2d Cir. 2006) (quoting *In re Becker*, 407 F.3d 89, 99 (2d Cir. 2005) (quoted by Defendants). Defendants have failed to establish any of the elements of equitable estoppel, much less all of them.

First, as discussed in greater detail above, Plaintiffs have not made a misrepresentation of fact. The costs and fees associated with Plaintiffs' bankruptcy are an element of the general contract damages which have always been a part of Plaintiffs' allegations. (*See, e.g.*, Compl., at pg. 22, ¶¶ 50-57, and ¶ 66 (seeking "compensatory damages," "transaction costs," and describing same), Halter Decl. Ex. H at 15 ("Compensatory damages").)

While Defendants make much of a letter from prior counsel to Judge Cote, claiming Plaintiffs indicated activites after Plaintiffs filed for bankruptcy are irrelevant, the full letter actually said "with the bankruptcy filing, Plaintiffs' financial condition, their attempts to mitigate damages, the attempted and actual sale of the policies – indeed, every category of document highlighted by Defendants – became the subject of a voluminous public record. Moreover, the Policies were sold in a court-supervised public auction early this year, so the 'floor' in Plaintiffs' damages calculation is now established. Accordingly, this is – as we have explained to defense counsel, who have not actually disputed the point – a situation in which the burden of discovery, especially in light of other available sources, greatly outweighs any conceivable benefit." (Halter Decl. Ex. J at 1-2.) Put plainly, there is no misrepresentation here and, to the extent the language should induce action by Defendants, it would be to prepare to discuss Plaintiffs' mitigation efforts, not ignore them.

Second, also as discussed in greater detail above, Defendants did not fail to take discovery of Plaintiffs' bankruptcy process. They requested and received several hundred thousand pages related to the bankruptcy and spent pages of depositions transcript on the subject. Therefore, Defendants do not appear to have relied on any statements of Plaintiffs.

Also, given that the bankruptcy process was discussed significantly in the Complaint and Defendants should have known the relevance to damages, any such reliance by Defendants would not be reasonable.

Third, Defendants have not sufficiently demonstrated that they relied on Plaintiffs' representations to their detriment. Expert discovery has not yet begun – Defendants will have ample time during that process to explore and prepare to address Plaintiffs' damages, including the costs and fees related to the bankruptcy. In addition, as Plaintiffs argued through prior counsel and Judge Cote apparently agreed, Defendants have access to all of the documents necessary for discovery of the bankruptcy process through the records of the bankruptcy process itself. (See Halter Decl. Ex. J at 1-2, Declaration of Dane Butswinkas at ¶4.) Such documents would be in addition to the extensive fact discovery Defendants have already taken regarding this topic.

As such, Defendants have not, and cannot, establish that equitable estoppel applies.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion to

Preclude Plaintiffs' Request for "Costs and Fees Related to the Bankruptcy Process" be denied.

Dated: June 17, 2011
        New York, New York

Respectfully submitted,

LIDDLE & ROBINSON, L.L.P.

James W. Halter
Jeffrey L. Liddle
James R. Hubbard
800 Third Avenue, 8th Floor
New York, NY 10022
Tel: (212) 687-8500
Fax: (212) 687-1505
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 17th day of June, 2011, I caused true and correct copies of the unredacted version of the foregoing to be served, by e-mail and by overnight delivery, on:

> David A. Forkner, Esq.
> Kenneth J. Brown, Esq.
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C. 20005
> dforkner@wc.com
> kbrown@wc.com
> *Counsel for Defendants*

On this 17th day of June, 2011, Counsel for Defendants were also served with a redacted version of the foregoing by ECF.

Dated: June 17, 2011
         New York, New York

                                        James W. Halter