LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

DAVID A. FORKNER
(202) 434-5316
dforkner@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

February 9, 2012

**Via Federal Express**

The Honorable Debra Freeman
United States Magistrate Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

      Re:    *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. et al. v. Coventry First LLC et al.*, Civil Action No. 1:09-cv-01086-VM-DCF

Dear Judge Freeman:

      I write in response to Plaintiffs' February 2, 2012 letter. Plaintiffs have delayed this case for nearly two years through a pattern of disregarding scheduling orders and evading discovery obligations. *See* Dkt. 68 at 5 ("Plaintiffs have failed to demonstrate good cause to re-open fact discovery."); *id.* at 4 n.2 ("Plaintiffs have not shown good cause for their failure to make their new request prior to the close of fact discovery in March 2010."); *id.* at 6 ("Plaintiffs have not . . . shown that they could not have earlier anticipated the need for any of the depositions they now seek . . . ."); Dkt. 80 at 4 (Plaintiffs "barely even attempt to justify their three-month delay in requesting to reopen fact discovery."); Dkt. 91 (requiring Plaintiffs to provide adequate responses to contention interrogatories approximately 16 months after they were due). One month ago, the Court sanctioned Plaintiffs for failing to timely disclose a damages theory. *See* Dkt. 97 at 25 ("Plaintiffs[] lack . . . an adequate excuse for their failure to comply with the discovery rules[.]").

      Now, at the close of expert discovery—and on Groundhog Day—Plaintiffs again seek to disregard the Court's scheduling order. This time they request 30 days to identify "one or two" new experts to testify regarding damages, an issue on which they bear the burden of proof. This request comes 85 days after Plaintiffs were required to submit their expert reports, *see* Dkt. 93, and more than 40 days after Plaintiffs received Defendants' expert reports. Plaintiffs' request also is timed to permit them to identify new experts under the guise of "rebuttal reports" after Defendants have provided all of their expert reports and all of Defendants' experts have been deposed.

The Honorable Debra Freeman
February 9, 2012
Page 2

      Plaintiffs cannot show the requisite "good cause" for failing to comply with the Court's scheduling order. Plaintiffs unequivocally told the Court that they "will use an expert witness to discuss their damages." Dkt. 87 at 20. They also made numerous similar representations to Defendants and the Court, and specifically told Defendants less than two weeks prior to their expert disclosure deadline that they had a damages expert. *See infra.* They then made a deliberate, strategic decision not to submit any reports regarding damages. The law is clear: Plaintiffs' strategic decision does not establish good cause. That should be the end of the Court's analysis. But there is more.

      Plaintiffs' stated justification for seeking additional experts is contrary to the record. Plaintiffs say that they need such experts to rebut the opinions of Donald Behan and Geoff Chaplin – Defendants' experts on the valuation of life settlement portfolios purchased by Plaintiffs. *See* February 2, 2012 Letter James Hubbard to Hon. Debra Freeman ("Hubbard Ltr.") at 1-2. They assert that the opinions of Behan and Chaplin are significant because "Defendants' proffered damages expert, [Jonathan] Walker, relies on this opinion from Behan and Chaplin to opine that Plaintiffs suffered no damages . . . ." *Id.* But Dr. Walker testified that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Moreover, Plaintiffs were well aware that the value of the life insurance policies they purchased—indeed, of any life insurance policy—is actuarially-derived, and that Defendants would contest that value. Finally, Plaintiffs' request would be highly prejudicial to Defendants. After Plaintiffs made the strategic decision to forgo expert testimony regarding damages, Defendants submitted their own expert reports as required by the scheduling order. The effect of granting Plaintiffs' request would be to allow them to submit their expert opinions on matters on which they have the burden of proof in response to Defendants' reports. In practical terms, Plaintiffs are asking the Court to modify its scheduling order to permit them to sit idly while Defendants present their defense to Plaintiffs' claims, and only then say exactly what it is they are claiming. Plaintiffs seek to tailor their *prima facie* case to Defendants' defense. This tactic (deliberate or not) is well-known, and improper. For all of these reasons, Plaintiffs' request should be denied.

    **A.**    **Background**

      Plaintiffs seek to "disclose one or . . . two rebuttal expert reports . . . discussing fair value of the policies on the date of purchase." Hubbard Ltr. at 4. Plaintiffs say that these reports would rebut Defendants' actuarial experts, Donald Behan and Geoffrey Chaplin. *Id.* at 1. But, Plaintiffs' initial deadline for submitting expert reports in this case was April 23, ***2010***, nearly two years ago. *See* Dkt. 27 at 1. On April 19, 2010, four days before that deadline, Plaintiffs requested "a brief stay of the expert discovery deadlines set by Judge Cote in this case until the parties' conference with the Court on May 14, 2010." Dkt. 52 at 1. The case then stalled while Plaintiffs sought to revisit Judge Cote's discovery orders, to reopen fact discovery, *see generally* Dkt. 68 (rejecting these efforts), and to avoid responding to Defendants' contention interrogatories, *see* Dkt. 91 (compelling adequate responses). During this period, Plaintiffs repeatedly informed Defendants and the Court that they would present expert testimony on their claimed damages. In fact, they made that claim to justify their failure to accurately compute each category of damages claimed. In their interrogatory answers, they stated: "Since Plaintiffs'

The Honorable Debra Freeman
February 9, 2012
Page 3

experts have not yet completed their review and analysis of the damages in this case, Plaintiffs cannot, at this time, provide an accurate damages calculation." Plfs.' Resp. & Obj. to Defs.' 2d Set of Interrogatories at 14 (March 25, 2010) (attached as Ex. 1); Plfs.' Amended Resp. & Obj. to Defs.' 2d Set of Interrogatories at 14 (June 16, 2010) (attached as Ex. 2) (same).[1] Similarly, Plaintiffs sought to justify their failure to disclose bankruptcy costs as a theory of damages on the ground that they required expert testimony to calculate them. Plaintiffs stated that they "*will use an expert witness to discuss their damages*." Dkt. 87 at 20 (emphasis added). They repeated that contention at length. *See id.* at 11 ("Plaintiffs anticipate using an expert to testify regarding the damages calculations and to further refine them."); *id.* at 16 ("Plaintiffs will and are relying on their experts to provide accurate calculations of these damages. Expert discovery has not started yet and Plaintiffs' experts have not completed their analysis."); *id.* at 17 ("[A]ny alleged deficiency in the Rule 26(a) disclosures of Plaintiffs was substantially justified in light of the fact that expert discovery, which Plaintiffs will and are relying on to calculate their damages, has not yet begun."); *id.* at 24 ("Expert discovery has not yet begun – Defendants will have ample time during that process to explore and prepare to address Plaintiffs' damages, including the costs and fees related to the bankruptcy.").

On August 2, ***2011***, one week after the Court rejected for the last time Plaintiffs' efforts to avoid providing meaningful responses to Defendants' contention interrogatories, the Court endorsed a scheduling order proposed by the parties. *See* Dkt. 92. Under that order, Plaintiffs' expert reports were due on October 28, 2011, Defendants' reports were due on December 9, 2011,[2] and Plaintiffs' amended reports were due by December 23, 2011. *See id.* Expert discovery was ordered to close on February 10, 2012. *See id.*

Subsequently, as Plaintiffs' deadline for submitting expert reports neared, they sought multiple additional extensions. On October 25, 2011, they asked the Court for "a brief extension of the deadline for the close of expert discovery, and a similar extension of the interim [expert disclosure] deadlines." Dkt. 93. During a telephone conversation at that time, Plaintiffs informed Defendants that they were meeting with their experts, including a damages expert. Under the revised schedule, Plaintiffs' expert reports were due on November 9, 2011,

---

[1] Some of the materials cited in this letter have been designated "Confidential" or "Attorneys' Eyes Only" pursuant to the Stipulation of Confidentiality and Protective Order in this case. *See* Dkt. 28. If the Court is inclined to make this letter publicly available, Defendants respectfully request an opportunity to provide the Court with a redacted copy for that purpose.

[2] Contrary to Plaintiffs' suggestion, Defendants' reports were not "essentially contemplated" to be "rebuttal disclosures to the Plaintiff's designation." Hubbard Ltr. at 3. The agreed-upon Scheduling Order establishes a deadline for Plaintiffs' expert reports followed by a date for Defendants' expert reports. That is consistent with Judge Marrero's standard "Civil Case Management Plan and Scheduling Order" ("Form Order"). Here, Plaintiffs elected not to have expert testimony on damages or the actuarial value of the life insurance policies purchased. As is standard practice, Defendants were free to present expert opinions on matters on those issues. Plaintiffs cannot now game the scheduling order by (1) not submitting expert reports in the first instance, (2) waiting to see what Defendants experts say, and then (3) seeking to identify new experts under the guise of "rebuttal."

The Honorable Debra Freeman
February 9, 2012
Page 4

Defendants' reports were due on December 21, 2011, Plaintiffs' amended reports were due on January 9, 2012, and expert discovery closed on February 22, 2012. *See id.*

On November 9, 2011, notwithstanding their previous representations, Plaintiffs produced two expert reports, neither of which concerned damages. Forty-two days later, on December 21, 2011, Defendants timely produced six expert reports, including one from an economist regarding Plaintiffs' claimed damages, and a joint report from two actuaries regarding the value of the life insurance policies at issue. Nineteen days later, on January 9, 2012, Plaintiffs sought an extension of their deadline for submitting amended expert reports until January 17, 2012. They informed the Court that "the parties do not, at this time, see a reason to alter the remainder of the expert discovery schedule." Jan. 9, 2012 Hubbard Ltr. to Hon. Debra Freeman (attached as Ex. 3). In the ensuing days, Defendants specifically asked whether Plaintiffs intended to submit reports from additional experts. Plaintiffs responded that they did not. The January 17, 2010 deadline came and went without the submission of any reports.

The parties subsequently scheduled individual expert depositions, and requested a two-day extension of the February 22, 2012 cutoff in order to complete the last of them. The Court "So Ordered" that request on February 1, 2012. *See* Dkt. 99. The next day – after Plaintiffs had noticed all of Defendants' experts' depositions – Plaintiffs submitted their letter seeking to upend this schedule by adding new experts following the completion of those depositions.

**B.     Legal Standard**

As the Court repeatedly has recognized in this case, Plaintiffs must show "good cause" to modify the Court's scheduling order. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009) (noting "the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause" (quotation omitted)); *Ball v. Kotter*, 2009 WL 3824709, at *3 (N.D. Ill. Nov. 12, 2009) ("Plaintiffs' motion to reopen expert discovery . . . essentially seeks to modify a scheduling order, which is governed by Rule 16(b)(4)."); Ex. 4 (6/24/10 Hr'g Tr.) at 11:23–12:2 ("If a discovery deadline was set by the court and it was not met then the part[y] that seeks to extend it has to satisfy the burden set forth in Rule 16 which is to show good cause as to why the scheduling order could not have been adhered to.").[3]

"'Good cause' requires a greater showing than 'excusable neglect.'" *Scott v. City of New York Dep't of Correction*, 2007 WL 4178405, at *4 (S.D.N.Y. Nov. 26, 2007). "Whether good cause exists turns on the diligence of the moving party." *Holmes*, 568 F.3d at 335 (quotation omitted); *see also Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (same). A "party seeking modification [of a scheduling order] must demonstrate that, despite its diligent efforts, the schedule could not have reasonably been met." *Eng-Hatcher v. Sprint Nextel Corp.*,

---

[3] Plaintiffs do not address the Rule 16(b)(4) standard and it is too late for them to do so in reply. *See, e.g., PrecisionIR Inc. v. Clepper*, 693 F. Supp. 2d 286, 297 (S.D.N.Y. 2010) (Marrero, J.) ("[T]he Court will not consider new arguments in reply papers.").

The Honorable Debra Freeman
February 9, 2012
Page 5

2008 WL 4104015, at *1 (S.D.N.Y. Aug. 28, 2008); *see also Scott*, at *4 ("At a minimum, good cause requires a showing by the moving party of an objectively sufficient reason for extending a deadline such that the deadlines cannot reasonably be met despite the diligence of the party needing the extension."); *Murray v. Roadway Exp., Inc.*, 2010 WL 3023905, at **1-2 (E.D.N.Y. July 30, 2010) (no good cause for modifying schedule to permit untimely expert reports); *Goss v. Long Island R. Co.*, 1996 WL 743350, at *1 (E.D.N.Y. Dec. 12, 1996) (same); Ex. 4 (6/24/10 Hr'g Tr.) at 12:2–4 ("If the parties could have done things sooner and didn't it's going to be difficult to show that there's good cause to extend the dates.").

Plaintiffs suggest that the Court should apply the Rule 37(c)(1) standard for imposing discovery sanctions rather than Rule 16(b)(4)'s "good cause" standard. *See* Hubbard Ltr. at 3. This is incorrect. Although the interaction between Rules 16(b)(4) and 37(c)(1) is sometimes blurred, courts that have decided the issue confirm that where, as here, a scheduling order is implicated, Rule 16's "good cause" standard controls. *See Siegel-Robert, Inc. v. United Inventory Servs., Inc.*, 2009 WL 2613702, at *1 (W.D. Tenn. Aug. 24, 2009) ("The court has reviewed the instant motion [to designate additional experts] under both Rule 16 and Rule 37, primarily considering Rule 16 because the relief sought . . . relates to the court's scheduling order."); *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4809441, at *2 (N.D. Cal. Oct. 28, 2008) (explicitly rejecting application of Rule 37 and stating: "Rule 16(b)(4)'s 'good cause' standard for modifying a case scheduling order . . . is the proper standard for reviewing Tele Atlas' request, as Tele Atlas is seeking to fundamentally alter the case management order by creating an additional round of expert disclosure where none existed before. Put simply, Tele Atlas wants to change how the case management order determined which party gets to have the last word on expert testimony."). The hook for Rule 37(c)(1)'s application, by contrast, would be the general provision of Rule 26(a)(2)(D) that "[a] party must make these [expert] disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D); *see also* Fed. R. Civ. P. 37(c)(1) (setting forth sanctions for violations of Rule 26(a)). As the above courts recognized, Rule 16(b)(4)'s specific provision regarding scheduling orders trumps Rule 37(c)(1)'s general provision regarding the failure to provide any information "as required by Rule 26(a)." Fed. R. Civ. P. 37(c)(1). Indeed, the deadline for Plaintiffs' expert disclosures came from the Court's scheduling order, not Rule 26(a). *See* Dkt. 93. In any event, Plaintiffs' request should be denied under either standard.

### C. Plaintiffs' Request Should Be Denied

Plaintiffs cannot satisfy the "good cause" standard for six reasons. First, Plaintiffs made a deliberate, strategic choice to have no expert on damages. Plaintiffs told Defendants and the Court that they "will use an expert witness to discuss their damages." Dkt. 87 at 20; *see also supra* (more, materially identical representations by Plaintiffs). In fact, Plaintiffs told Defendants less than two weeks prior to their November 9, 2011 deadline for submitting expert reports that they had a damages expert. They decided not to do so, as they admitted during the deposition of Defendants' damages expert:



Ex. 5 at 201:17-202:4.

This strategic decision—that is, to allow the expert disclosure deadline to pass with a damages expert in hand, but to not submit any opinion from that person—is the opposite of "good cause." *See Bruce v. County of Rensselaer*, 2003 WL 22436281, at *3 (N.D.N.Y. Oct. 20, 2003) ("litigation strategy cannot be deemed 'good cause'" (quoting *Downing v. Am. Airlines, Inc.*, 1988 WL 49211 at *1 n.1 (E.D.N.Y. May 9, 1988))); *see also La Gorce Palace Condo. Assoc., Inc. v. QBE Ins. Corp.*, 2011 WL 1522566, at *3 (S.D. Fla. Feb. 28, 2011) (same); *Procter & Gamble Co. v. McNeil-PPC, Inc.*, 615 F. Supp. 2d 832, 839 (W.D. Wis. 2009) ("The failure to address these issues in the initial expert reports was plaintiff's choice. It was not dictated by defendant or this court. Plaintiff cannot now seek to alter its strategy without a showing of good cause, which it has failed to make."); *In re Adelphia Comms. Corp.*, 452 B.R. 484, 492-93 (Bankr. S.D.N.Y. 2011) (tactical decision to omit affirmative defense from answer, and later change of heart, "cannot be regarded as consistent with reasonable diligence"). Plaintiffs can hardly claim that, "despite [their] diligent efforts, the schedule could not have reasonably been met." *Eng-Hatcher*, 2008 WL 4104015, at *1.

Second, Defendants' confidentiality designations under the parties' stipulated protective order does not establish good cause. Plaintiffs claim they have been unable "to discuss Defendants' expert reports with [their] client in any meaningful way" due to the fact that Defendants identified their reports as containing "Attorneys' Eye's Only" information. *See* Hubbard Ltr. at 3. This is at least the fifth time Plaintiffs have rehashed this argument. More than two years ago, on January 6, 2010, Plaintiffs claimed they "are severely hampered by [the Protective Order] as [they] take depositions and prepare for trial." Dkt. # 32 at 2. On January 8, 2010, Judge Cote rejected that claim. *See id.* at 3. On March 3, 2010, Plaintiffs argued that the Protective Order significantly hampered their ability to keep [their] clients updated regarding the case." Judge Cote rejected that claim on March 8, 2010. Dkt. # 33 at 3. On June 18, 2010 and August 23, 2010, Plaintiffs asserted that they were "unable to provide verified responses to contention interrogatories served by Defendants . . . as a result of a Stipulated Protective Order previously issued in this case." Dkt. # 68 at 1. On November 5, 2010, the Court rejected that argument. *Id.* at 2; *see also* Dkt. # 80 at 3. Plaintiffs' attack on the protective order has not become more meritorious over time, nor do Plaintiffs begin to explain how it provides "good cause" for unwinding their strategic choice regarding experts.

Third, Plaintiffs' stated justification is inconsistent with the record. Plaintiffs assert that Defendants' damages expert, Jonathan Walker, is relying on the actuarial opinions of Messrs. Behan and Chaplin in concluding that Plaintiffs suffered no damages. *See* Hubbard Ltr. at 1-2. That is incorrect. Dr. Walker has testified as follows: ▮

Ex. 5 at 34:19-35:6; *see also id.* at 35:15-20

▮). Dr. Walker explained that ▮ *Id.* at 30:21-22. The fact that Defendants' damages analysis is corroborated by, but does not depend on, the opinions of Behan and Chaplin cuts strongly against the relief Plaintiffs seek.

Fourth, Plaintiffs cannot credibly claim surprise that Defendants designated an actuary to testify about the value of life insurance policies. Plaintiffs knew that the value of life insurance policies is determined by mortality assumptions calculated by an actuary. Plaintiffs' lead negotiator on the underlying contracts in this case was an actuary. Plaintiffs also hired an actuarial consultant, Lewis & Ellis, Inc., to value the life insurance policies in bankruptcy. Plaintiffs filed a declaration with the Bankruptcy Court in which Lewis & Ellis stated that "[t]he value of the life settlement policy as an asset completely hinges on the life expectancy and medical condition of the insured." Ex. 6 ¶ 14. Plaintiffs' witnesses in this case confirmed as much. *See* Ex. 7 (T. Ritchie Tr.) 29:7-8 ▮; Ex. 8 Murphy Tr. 30:22-31:6 ▮.

Plaintiffs also retained an actuarial expert to testify about the policies' value in *Huizenga Managers Fund, LLC v. A.R. Ritchie, et al.*, No. 07 CH09626 (Cook County, Illinois) ("*Huizenga*"), a related action concerning the same life settlement policies at issue herein.[4] That expert – whose opinions, deposition, and trial testimony was produced in this case – stated during his August 2010 trial testimony that ▮. *See* Ex. 9 at 4756:20-4757:5. One of Plaintiffs' two experts in this case, Mr. Beloreshki, agreed that ▮. Ex. 10 at 63:3-25. The other, Mr. Glowacki, concurred that, ▮,

---

[4] Due to the "strongly overlapping" issues in this case and *Huizenga*, Judge Cote ordered Plaintiffs to produce the deposition transcripts in *Huizenga*. *See* Ex. 12 (3/19/10 Hr'g Tr.) at 3. Plaintiffs responded by producing the transcripts, but no exhibits. Judge Cote then ordered Plaintiffs to produce the deposition exhibits. *See id.* at 12. That pattern repeated when Plaintiffs produced the trial testimony in the *Huizenga* matter, but not exhibits. With assistance from the Court, Plaintiffs ultimately produced the exhibits, which contained multiple actuarial expert reports regarding the value of the life insurance policies at issue in this case.

███████████████████████████████████████████████████████. Ex. 11 at 53:2-25. Plaintiffs' deliberate decision not to designate an expert on an issue that they knew was significant in this case does not establish "good cause."

Fifth, Plaintiffs cannot credibly claim they were unaware that Defendants were contesting the value of the policies they purchased. Plaintiffs opaquely acknowledge that "there was reference to the potential for overpayment in the discovery." Hubbard Ltr. at 2. That is an understatement. Defendants' Rule 30(b)(6) notice dedicated a topic to "[t]he value of the Conveyed Life Settlement Policies," Ex. 13 ¶ 12, which was immediately followed by one concerning "[t]he use of any mortality table, morality rating, mortality rating provider, life expectancy, or other actuarial information in connection with any transaction involving any Conveyed Life Settlement Policy," id. ¶ 13. Defendants similarly issued third-party subpoenas seeking, *inter alia*, "[a]ll documents and communications concerning the value of any Conveyed Life Settlement Policy[, including all] modeling and underwriting analyses[.]" *See* Dkt. 88 at 21, 39. One of these subpoenas was directed to Lewis & Ellis, the actuarial firm that Plaintiffs themselves hired in their bankruptcy proceeding (and whom Plaintiffs' counsel represented in responding to the subpoena). It sought, among other things, "[a]ll documents and communications concerning the use of any mortality table, mortality rating, mortality rating provider, life expectancy, medical underwriting, or other actuarial information in connection with any transaction involving any Conveyed Life Settlement Policy." Dkt. 88 at 58.

If there was any doubt about whether Plaintiffs were aware of Defendants' focus on these valuation issues, Defendants cross-examined Plaintiffs' witnesses for hours regarding the actuarially-derived value of the policies.[5] Plaintiffs could not reasonably have believed these were idle conversations, or that this would not be pursued in expert discovery. The following exchange from Plaintiffs' Rule 30(b)(6) designee on the foregoing topics is illustrative:



Ex. 14 (Hobbs Tr.) 35:22-36:24 (emphasis added); *see also id.* at 37:20-38:24 ███████

---

[5] For the sake of judicial efficiency, Defendants have not attached these voluminous deposition excerpts as exhibits to this letter. We would be happy to provide them, however, if the Court would find them helpful.

The Honorable Debra Freeman
February 9, 2012
Page 9



) (emphasis added). It is true, of course, that Defendants did not precisely quantify the actuarial value of the policies prior to expert discovery. That is because, as Plaintiffs repeatedly recognized, an actuarial expert is needed to do that. Plaintiffs cannot be surprised that this quantification came in Defendants' expert reports.

Sixth, Plaintiffs cannot credibly claim they were unaware that "the value of the policies, when purchased was a fraction of the agreed-upon purchase price." Hubbard Ltr. at 2. Plaintiffs claim Defendants' position "was never expressed by any witness or expert[.]" *Id.* But, Plaintiffs' own actuaries in the bankruptcy proceeding concluded that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 15 (LST 107).[6] Adjusting for this and other mistakes made by Plaintiffs, calculations performed by Lewis & Ellis demonstrated that ▉▉▉▉ *See* Ex. 16 (LST 7). ▉▉▉▉▉▉▉▉▉▉▉ Plaintiffs' claim that "no discovery revealed . . . the alleged overpayment to the vast degree Defendants now assert" is untrue and cannot establish good cause.

If Plaintiffs were truly surprised by Defendants' decision to contest the value of the policies, or to use an actuarial expert in that effort—or if the reports Plaintiffs now seek were as essential as they claim—Plaintiffs would not have allowed the deadline for submitting amended expert reports to pass by without raising this issue. Nor would they have waited more than 40 days after receiving Defendants' actuarial expert report to approach the Court. But they did

---

[6] The documents cited herein that bear an "LST" number were exhibits used by Defendants when deposing fact witnesses in this litigation prior to April 2010.

The Honorable Debra Freeman
February 9, 2012
Page 10

precisely that, notwithstanding that Defendants agreed to a one-week extension of that deadline so that Plaintiffs could fully review Defendants' reports. Plaintiffs also responded in the negative when Defendants asked prior to that extended deadline whether they planned to submit reports from any new experts.

\* \* \* \* \*

For all of these reasons, Plaintiffs cannot show "good cause" for failing to comply with the Court's scheduling order. As such, the Court need not reach the issue of whether Defendants would be prejudiced by Plaintiffs' request (they would be, *see infra*). Prejudice to Defendants is not pertinent to whether Plaintiffs acted with diligence—or instead made a strategic choice—in failing to comply with the scheduling order. *See Woodworth v. Erie Ins. Co.*, 2009 WL 3671930, at \*3 (W.D.N.Y. Oct. 29, 2009) ("[T]he absence of prejudice to a nonmoving party does not alone fulfill the good cause requirement of Rule 16(b).") (emphasis omitted); *Augustine v. AXA Fin., Inc.*, 2008 WL 5025017, at \*2 (S.D.N.Y. Nov. 24, 2008) (same). That is because "Rule 16(b) serves an important function in ensuring fairness, certainty, and expedition of litigation," and "[a]llowing parties to disregard the instructions of a scheduling order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 2009 WL 3467756, at \*6 (S.D.N.Y. Oct. 28, 2009) (quotations omitted).

### D. Defendants Would Be Prejudiced If Plaintiffs Were Allowed to Submit Untimely Expert Reports.

The prejudice to Defendants is easily understood. Defendants would be harmed by the further delay Plaintiffs request would occasion. Plaintiffs first sued Defendants for breach of contract on May 2, 2007. *See* Case No.1:07-cv-03494-DLC, Dkt. No. 1 *("First Ritchie Lawsuit")*. The *First Ritchie Lawsuit* ended with a voluntary dismissal. *See* Dkt. No. 77 *(First Ritchie Lawsuit)*. That dismissal came ten days before the close of fact discovery. Plaintiffs then re-filed their breach of contract claim in this case. *See* Case No. 1:09-cv-01086-DLC. Judge Cote entered a scheduling order requiring all expert discovery to be completed by June 25, 2010 with a joint pre-trial order filed by July 23, 2010. *See* Dkt. No. 27. Plaintiffs subsequently sought to recuse Judge Cote, and notwithstanding the fact that "defendants' opposition strongly suggests that plaintiffs' reasons for seeking recusal may be tactical" Judge Cote recused herself on April 8, 2010. See Dkt. No. 41. Now, nearly two years later (and nearly 5 years since Plaintiffs first sued Defendants), Plaintiffs seek to postpone the case even further.

The pendency of this case is not favorable for Defendants or their businesses. *See Holman v. ICN Pharmaceuticals, Inc.*, 2000 WL 231084, at \*1 (S.D.N.Y. Feb. 29, 2000) ("There can be no serious dispute that the continued pendency of litigation is, in itself, prejudicial and that the parties have a right to as prompt a resolution of disputes as is possible."). Every time during the past two years that Plaintiffs have delayed it due to their discovery violations (both completed and attempted), Defendants have been prejudiced. This pattern must stop, especially

The Honorable Debra Freeman
February 9, 2012
Page 11

given that the delay Plaintiffs now seek would be attributable to a strategic decision that they apparently wish to change. Moreover, Defendants have diligently litigated this matter and Plaintiffs should not be regularly relieved of the consequences for their failure to do the same.

But in this instance the prejudice extends beyond delay. The effect of Plaintiffs' request would be to impermissibly shift the order of proof on the damages element of their breach of contract claim. This is a well-known tactic, and it is prohibited. The expert reports that Plaintiffs strategically decided to forego—like those they now ask to submit—concerned their claimed damages, an issue on which they bear the burden of proof. *See J.R. Loftus, Inc. v. White*, 85 N.Y.2d 874, 877 (1995) (plaintiff bears burden of proving breach of contract damages); *see also Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (same); Hubbard Ltr. at 3 ("The Behan and Chaplin report impacts a substantial issue – the existence of damages for breach of contract."). In particular, Plaintiffs have asserted that "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms. It follows that [Plaintiffs are] entitled to the benefit of [their] bargain, measured as the difference between the value of [the policies] as warranted by [Defendants] and [their] true value at the time of the transaction." Dkt. 87 at 12-13 (quoting *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007). Plaintiffs, however, have offered no expert opinion regarding either the policies' value "as warranted" (*i.e.*, without the alleged breach), or their "true value at the time of the transaction" (*i.e.*, with the alleged breach).[7] *Id.*

---

[7] Plaintiffs have suggested that they may simply rely on the price at which they purchased the policies to establish their fair market value "as warranted." In particular, they have cited *Schonfeld v. Hilliard* for the proposition that "a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value." 218 F.3d 164, 178 (2d Cir. 2000). *Schonfeld* goes on to say that "[o]nce a plaintiff has produced such evidence, the burden is on the defendant to demonstrate special circumstances which would negate [the relevance] of a prior arm's-length purchase price." *Id.* at 179 (quotation omitted). For three reasons, however, this principle does not help Plaintiffs here. First, even under Plaintiffs' view, the contract price has nothing to do with the value of the policies **with the alleged breach**, *i.e.*, their "true value at the time of the transaction." *Merrill Lynch*, 500 F.3d at 185. Plaintiffs bear the burden of establishing that value. *Schonfeld* did not address that issue because the claim in that case (unlike this one) concerned a lost asset, meaning no asset was received at all, rather than an asset that allegedly was diminished in value. *See* 218 F.3d at 177 ("[S]o long as the lost asset has a determinable market value, a plaintiff may seek to recover that value . . . ."). Second, Plaintiffs bear the burden of proving that their claimed damages were proximately caused by the alleged breaches. *See Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525-26 (2d Cir. 2004). Plaintiffs cannot do that, however, without showing a diminution in the policies' value that was caused by the breach. The testimony Plaintiffs ask to submit bears directly on this issue. And third, Plaintiffs cannot possibly claim that the contract price in this case reflects the price of the asset "as warranted," *Merrill Lynch*, 500 F.3d at 185, because, among other reasons, the contract expressly disclaims any warranty regarding the policies' value. *See* Ex. 18 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████.

To forego those reports was Plaintiffs' decision to make. But it had consequences. One of those consequences was that Defendants proceeded to submit their reports on both of these issues pursuant to the Court's scheduling order. Thus, Plaintiffs' request, if granted, would also allow them to prepare their expert reports with Defendants' reports in hand. That is improper. On issues on which Plaintiffs bear the burden of proof, they are required to make a *prima facie* showing, to which Defendants then respond. They are not permitted to lie in wait to see how Defendants will defend a claim, and only then say what exactly they are claiming.

As the Seventh Circuit explained in affirming the exclusion of an alleged "rebuttal" expert, "[t]he plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief. Otherwise the plaintiff could reverse the order of proof, in effect requiring the defendants to put in their evidence before the plaintiff put in his." *Braun v. Lorillard Inc.*, 84 F.3d 230, 237 (7th Cir. 1996) (citation omitted). This concern is amplified in this case because Plaintiffs already have deposed Defendants' damages expert and one of their two actuarial experts, and are set to depose the remaining actuarial expert on February 24th. If the Court grants Plaintiffs' request, Defendants' experts will not have the chance to review the opinions of Plaintiffs' experts, and to take those opinions into account in forming their own opinions. Instead, Defendants' experts already will be "locked down" into their opinions both in writing and by testimony by the time Plaintiffs submit their first expert report regarding their alleged damages. Plaintiffs' experts will, no doubt, tailor their opinions on this aspect of Plaintiffs' *prima facie* case to those already offered by Defendants' experts. That is improper. *See Madison Capital Co. v. S & S Salvage*, 2011 WL 195639, at *4 (W.D. Ky. July 18, 2011) ("party cannot introduce experts 'merely by sticking the label "rebuttal" on a neglected part of its affirmative case'"). As the court said in *Madison Capital*: "Plaintiff bears the burden of proving its damages . . . . If Plaintiff wished to advance an argument that the fair market value of the Shields was different than the price paid . . ., it should have included an expert qualified to testify as such in its case-in-chief. It cannot now use the opportunity for rebuttal to introduce evidence it failed to account for in its case-in-chief. . . . Therefore, the Court finds that Defendants' motions to exclude [experts'] testimony as rebuttal experts should be granted, and [their] expert testimony is excluded." *Id.*; *see also In re Trasylol Prods. Liab. Litig.*, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010) (expert's "report appears to support Plaintiff's case-in-chief and is not proper rebuttal testimony. . . . I find that Plaintiff did not designate him as an expert until two months after the expert disclosure deadline had passed, [and therefore expert's] testimony is untimely and properly excluded . . . ."); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 2005 WL 1300763, at **1-2 (N.D. Ill. Feb. 22, 2005) (striking rebuttal report: "A party presents its arguments as to the issues for which it has the burden of proof in its initial expert report. And in its rebuttal expert report, it presents expert opinions refuting the arguments made by the opposing party in its initial expert report. . . . Defendant had the burden to prove that the patents-in-suit are invalid for obviousness or anticipation, if it chose to pursue those arguments, and arguments to that extent should have been included in its initial report. . . . There is no disruption of trial, but discovery has now closed and defendant's belated disclosure comes when depositions are soon to commence. . . . Defendant deliberately chose not to challenge the

The Honorable Debra Freeman
February 9, 2012
Page 13

validity of the '976 patent or the anticipation of the Re '976 patent in its initial report, just as it purposefully chose to in its rebuttal report.").

This case is similar to *La Gorce*, in which the court denied the plaintiff's request to supplement its expert reports, stating: "La Gorce's 'good faith' reason for needing to supplement is that after La Gorce's counsel saw QBE's strategy they decided to change their approach to this litigation. . . . This is not excusable neglect, substantial justification or good cause, but either a strategic choice or just poor planning. Furthermore, having the benefit of observing QBE's experts and reviewing QBE's experts' reports, La Gorce would have an unfair advantage if allowed to file untimely expert reports. ***That is the harm***." 2011 WL 1522566, at *3 (emphasis added). The court further observed that the plaintiff's inadequate expert disclosures "impact[ed] case management": "At this time, the parties' focus should be on drafting summary judgment and *Daubert* motions, not expert discovery." *Id.*

Plaintiffs' only argument in their effort to establish a lack of prejudice is that the Court permitted Defendants to take certain fact discovery regarding Plaintiffs' request for Bankruptcy Costs as a sanction for their previous discovery violations. Hubbard Ltr. at 3. Plaintiffs suggest that they should be rewarded for those previous violations, contending that because that remedial discovery will proceed, they should be allowed simultaneously to undertake a new round of untimely expert disclosures. This argument is not well-taken for two reasons (beyond its general audacity): First, the additional discovery regarding Bankruptcy Costs does not concern matters that Defendants will address in summary judgment briefing, and thus will not delay that briefing. But Defendants obviously cannot file their summary judgment briefs if Plaintiffs have expert reports outstanding, which they could then attempt to use to create a factual issue in opposition to summary judgment. Instead, Defendants would be forced to delay filing their motion until any additional reports were filed and those experts deposed. Second, the parties agreed several weeks ***after*** the Court issued its recommendation regarding Bankruptcy Costs that expert discovery would close on February 24, 2012. The Court "So Ordered" that agreement the day before Plaintiffs submitted their letter. *See* Dkt. 99. The parties also agreed that, following the February 24th deadline, they would proceed to summary judgment. That long-overdue step should not be further delayed based on Plaintiffs' reconsideration of their own tactical decision.

      **E.**      **The Result is The Same Under Rule 37(c)(1).**

For the same reasons, Plaintiffs' request would be inappropriate if Rule 37(c)(1) applied. Under that rule, the Court would consider "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med & Sci. Comm., Inc.*, 118 F.3d 955, 961 (2d Cir. 1997).[8] Moreover, Plaintiffs must show that their failure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). First, as explained, Plaintiffs'

---

[8] *Softel* did not consider the applicability of Rule 16(b)(4)'s "good cause" standard.

The Honorable Debra Freeman
February 9, 2012
Page 14

failure to submit any expert report regarding their damages was both tactical and indefensible. Second, Plaintiffs do not need an expert to rebut Messrs. Behan and Chaplin because the opinions of Defendants' damages expert do not depend on those of Behan and Chaplin. *See supra*. Moreover, Plaintiffs obviously did not believe that they needed the testimony they now seek either as principal or rebuttal testimony, as both deadlines came and went without its submission. Third, Defendants would be significantly prejudiced by Plaintiffs' request as set forth at length above. And finally, contrary to Plaintiffs' assertions, a continuance would be necessary. If Plaintiffs' request is denied, then the parties will proceed to summary judgment briefing promptly following the agreed February 24, 2012 conclusion of expert discovery. But if the Court were to grant it, that would be impossible.

Moreover, for the same reasons, Plaintiffs' request to violate the Court's scheduling order is neither substantially justified nor harmless. As the Court held in *La Gorce*, "La Gorce's failure to provide timely, adequate expert disclosures . . . is neither substantially justified nor harmless. La Gorce's 'good faith' reason for needing to supplement is that after La Gorce's counsel saw QBE's strategy they decided to change their approach to this litigation. . . . This is not excusable neglect, substantial justification or good cause, but either a strategic choice or just poor planning." 2011 WL 1522566, at *3.

Plaintiffs' own lead Second Circuit authority confirms that this is the appropriate result under Rule 37(c)(1). In *Softel*, the Court of Appeals affirmed the denial of the plaintiff's request to submit a rebuttal expert report. It analyzed the Rule 37(c)(1) factors based on the specific facts of that case, and concluded its analysis with an especially pertinent observation, which applies almost perfectly here (the exception being that a continuance would be required in this case):

> [N]o trial date had been set, and a continuance was available. However, expeditious management of discovery schedules is especially important in cases of this nature because they require extensive expert involvement over lengthy periods of time. Therefore, the burden on the trial court of granting a continuance is greater than in some other cases. Softel points to the fact that this case did not go to trial for many months after the preclusion order as evidence of the propriety of a continuance. This of course is 20/20 hindsight. Had the court granted a continuance for Softel, it probably would have had to grant additional time for Dragon to respond. When trial courts permit deadline slippage of this sort, trials cannot be scheduled when they ought to be, resulting in the backup of other cases and eventual scheduling chaos as a series of bottlenecks builds. Additionally, the enormous length of every step of the proceedings in this case militated against any more continuances. Denial of a continuance in the circumstances was certainly within the sound discretion of the trial judge.

The Honorable Debra Freeman
February 9, 2012
Page 15

118 F.3d at 962-63.[9] The same result is appropriate here.

### F. Conclusion

Deadlines matter. As one court recently observed, "[t]he Magistrate's Scheduling Order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Eng-Hatcher*, 2008 WL 4104015, at *1. That is because "a scheduling order is the critical path chosen by the [court] and the parties to fulfill the mandate of [Federal Rule of Civil Procedure] 1 in 'secur[ing] the just, speedy, and inexpensive determination of every action.'" *Hnot v. Willis Group Holdings Ltd.*, 2006 WL 2381869, at *3 (S.D.N.Y. Aug.17, 2006)). The victims, when that critical path is disrupted by Plaintiffs, are not only Defendants, but also the Court, its docket, and the administration of justice. That is why prejudice to Defendants is not a part of the "good cause" analysis. But to be sure, deadlines especially matter when a party's violation of them would prejudice its adversary. Here, Defendants would be harmed by both the delay Plaintiffs' request would occasion and the advantage Plaintiffs would gain if the request were granted. Plaintiffs should not be permitted to tailor their *prima facie* case to Defendants' defense. Contrary to Plaintiffs' suggestions, *see* Hubbard Ltr. at 2 and 3, that is only potential unfairness that exists here. As the court observed in *Hnot v. Willis Group Holdings Ltd.*, there is nothing "remotely unreasonable or unjust in holding plaintiffs to major deadlines in a case management plan to which they themselves consented even *before* the Court's endorsement of the [plan] made those deadlines binding." 2006 WL 2381869, at *5. For all of these reasons, this case must now move to dispositive motions. Plaintiffs' request should be denied.

---

[9] Plaintiffs' other authorities are inapposite to the facts of this case. In *Exo-Pro, Inc. v. Seirus Innovative Accessories, Inc.*, the court held that the witness in that case was "essential to [that] litigation." 2008 WL 4878513, at *3 (E.D.N.Y. Feb. 19, 2008). That is the opposite of the testimony of Defendants' expert in this case. *See* Ex. 5 (opinions do not depend on those of Behan and Chaplin). Moreover, there was no indication that the defendant in that case would have been prejudiced by the plaintiff's untimely designation as Defendants would here. And, the court noted that any prejudice the defendant did experience was "partially attributable to Defendant's lack of action in objecting (prior to the instant motion) to such delay." *Id.* at *4. Here, by contrast, Defendants have proceeded diligently in every respect. Similarly, there was no discussion in *S.W. v. City of New York* of anything like the prejudice at issue here. 2011 WL 2224976 (E.D.N.Y. June 3, 2011). And it appears that the expert in that case was much more necessary that the proposed rebuttal experts would be here. Nor did either of these cases consider the Rule 16(b)(4) "good cause" standard or describe a pattern of seriatim discovery violations such as those in which Plaintiffs have engaged in this case. In this context the facts are important, and the facts in this case counsel strongly against Plaintiffs' request.

The Honorable Debra Freeman
February 9, 2012
Page 16

                                     Respectfully submitted,

                                     */s/ David A. Forkner*
                                     David A. Forkner

cc:      Counsel of Record