# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED and RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED,<br><br>                              Plaintiffs,<br><br>             v.<br><br>COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., and LST I LLC,<br><br>                              Defendants. | Case No. 09 CV 1086 (DLC)<br>ECF Case |

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' SECOND SET OF INTERROGATORIES

Plaintiffs, Ritchie Risk-Linked Strategies Trading (Ireland), Limited and Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited, through their attorneys, Liddle & Robinson, L.L.P., provides the following Responses to Defendants' Second Set of Interrogatories, dated February 23, 2010.

These responses are made without waiver of and with preservation of:

(1)     all questions as to competency, relevancy, materiality, privilege and admissibility of the response and its subject matter as evidence for any purpose in any further proceeding (including trial) in this and any other action;

(2)     the right to object to the use of any of the responses, or the subject matter of any of the interrogatories, on any ground in any further proceeding (including trial) in this and any other action;

*10 (S.D.N.Y. Oct. 23, 2003).

Plaintiffs also object to Interrogatory No. 9 on the grounds that it is improper for an interrogatory to seek all facts supporting a particular allegation. *See Clean Earth Remediation And Construction Services, Inc. v. American International Group, Inc.*, 245 F.R.D. 137, 141 (S.D.N.Y. 2007); *Grynberg v. Total S.A.*, Case No. 03-01280, 2006 WL 1186836, *6 (D. Colo. May 3, 2006); *Thompson v. United Transp.*, Case No. 99-2288, 2000 WL 1375293, *1 (D. Kan. Sept. 15, 2000). Additionally, Plaintiffs object to Interrogatory No. 9 on the grounds that it seeks an answer to questions of pure law. *See Trueman v. New York State Canal Corp.*, Case No. 09-049, 2010 WL 681341, *2 (N.D.N.Y. Feb. 24, 2010); *Sheehy v. Ridge Tool Co.*, 05-01614, 2007 WL 102074, *1 (D. Conn. April 2, 2007); *Bishop v. Nat'l Account Sys., Inc.*, Case No. 91-132, 1991 WL 11675888, *2 (D. Conn. Sept. 4, 1991).



Plaintiffs continue to search for documents and information responsive to this Interrogatory and will amend the Response as necessary

**Interrogatory No. 10**

**For each and every cause of action alleged against Defendants, explain in detail how each Plaintiff has been injured by the alleged wrongful conduct; state the amount of damage claimed by each Plaintiff; and explain how that damage amount was calculated, including but not limited to providing specific calculations identifying the total dollar amounts of damages allegedly owed to each Plaintiff.**

13

Response and Specific Objections to Interrogatory No. 10

        In addition to the General Objections, Plaintiffs object on the grounds that Interrogatory No. 10 is improper because it is not a more practical means of obtaining this information than document requests and depositions. *See Tribune Co. v. Purcigliotti*, Case No. 93-7222, 1997 WL 540810, *1 (S.D.N.Y. Sept. 3, 1997); *Chiquelin v. Efunds Corp.*, Case No. 02-51521, 2003 WL 21459581, *1 (S.D.N.Y. June 24, 2003). Additionally, Plaintiffs object to Interrogatory No. 10 on the grounds that the interrogatory is improper because it would require Plaintiffs' to reiterate evidence previously provided in discovery. *See Convolve Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 173 (S.D.N.Y. 2004); *Rahman v. Smith & Wollensky Restaurant Group, Inc.*, Case No. 06-6198, 2007 WL 1521117, *13 (S.D.N.Y. May 24, 2007); *Tribune Co. v. Purcigliotti*, Case No. 93-7222, 1997 WL 540810, *1 (S.D.N.Y. Sept. 3, 1997). Plaintiffs further object to Interrogatory No. 10 on the grounds that it is not sufficiently specific to allow a focused response. *See Melendez v. Greiner*, Case No. 01-07888, 2003 WL 22434101, *10 (S.D.N.Y. October 23, 2003).

        Plaintiffs also object to "explain[ing] in detail how each Plaintiff has been injured by the alleged wrongful conduct" as requested in a subpart of Interrogatory No. 10 on the grounds that it is improper for an interrogatory to seek all facts supporting a particular allegation. *See Clean Earth Remediation And Construction Services, Inc. v. American International Group, Inc.*, 245 F.R.D. 137, 141 (S.D.N.Y. 2007); *Grynberg v. Total S.A.*, Case No. 03-01280, 2006 WL 1186836, *6 (D. Colo. May 3, 2006); *Thompson v. United Transp.*, Case No. 99-2288, 2000 WL 1375293, *1 (D. Kan. Sept. 15, 2000).

        Notwithstanding the General Objections and the Specific Objections to Interrogatory No. 10, Plaintiffs do not possess the answer to Interrogatory No. 10 at this time. Fact discovery is not closed as there are additional depositions to be taken. Furthermore, expert reports have not yet been submitted, nor has the deadline for their submission passed. Federal Rule of Civil Procedure 33 requires that the party responding to an Interrogatory swear to the veracity of the response. *See Trueman v. New York State Canal Corp.*, Case No. 09-049, 2010 WL 681341, *5 (N.D.N.Y. Feb. 24, 2010); *Life Music, Inc. v. Broadcast Music, Inc.*, 41 F.R.D. 16, 26 (S.D.N.Y. 1966); *Kenneth v. Nationwide Mutual Fire Ins.*, Case No. 03-521F, 2007 WL 3533887 (W.D.N.Y. Nov. 13, 2007). Since Plaintiffs' experts have not yet completed their review and analysis of the damages in this case, Plaintiffs cannot, at this time, provide an accurate damages calculation. Plaintiffs will be seeking the following categories of damages:

- Compensatory damages;
- Expectation damages, including lost profits;
- Prejudgment and post-judgment interest; and
- Attorney's fees

Dated: New York, New York
    March 25, 2010

LIDDLE & ROBINSON, L.L.P.

By: _____
    James R. Hubbard
    Jeffrey L. Liddle
    James W. Halter
800 Third Avenue
New York, New York 10022
Tel:    (212) 685-8500
Fax:    (212) 685-1505
jhubbard@liddlerobinson.com
*Attorneys for Plaintiff*

15

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED and RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 09 CV 1086 (DLC) ECF Case |
| v. | ) ) ) | |
| COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., and LST I LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' SECOND SET OF INTERROGATORIES

Plaintiffs, Ritchie Risk-Linked Strategies Trading (Ireland), Limited and Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited, through their attorneys, Liddle & Robinson, L.L.P., provides the following Amended Responses to Defendants' Second Set of Interrogatories, dated February 23, 2010.

These responses are made without waiver of and with preservation of:

(1)     all questions as to competency, relevancy, materiality, privilege and admissibility of the response and its subject matter as evidence for any purpose in any further proceeding (including trial) in this and any other action;

(2)     the right to object to the use of any of the responses, or the subject matter of any of the interrogatories, on any ground in any further proceeding (including trial) in this and any other action;

*10 (S.D.N.Y. Oct. 23, 2003).

Plaintiffs also object to Interrogatory No. 9 on the grounds that it is improper for an interrogatory to seek all facts supporting a particular allegation. *See Clean Earth Remediation And Construction Services, Inc. v. American International Group, Inc.*, 245 F.R.D. 137, 141 (S.D.N.Y. 2007); *Grynberg v. Total S.A.*, Case No. 03-01280, 2006 WL 1186836, *6 (D. Colo. May 3, 2006); *Thompson v. United Transp.*, Case No. 99-2288, 2000 WL 1375293, *1 (D. Kan. Sept. 15, 2000). Additionally, Plaintiffs object to Interrogatory No. 9 on the grounds that it seeks an answer to questions of pure law. *See Trueman v. New York State Canal Corp.*, Case No. 09-049, 2010 WL 681341, *2 (N.D.N.Y. Feb. 24, 2010); *Sheehy v. Ridge Tool Co.*, 05-01614, 2007 WL 102074, *1 (D. Conn. April 2, 2007); *Bishop v. Nat'l Account Sys., Inc.*, Case No. 91-132, 1991 WL 11675888, *2 (D. Conn. Sept. 4, 1991).



Plaintiffs continue to search for documents and information responsive to this Interrogatory and will amend the Response as necessary

**Interrogatory No. 10**

**For each and every cause of action alleged against Defendants, explain in detail how each Plaintiff has been injured by the alleged wrongful conduct; state the amount of damage claimed by each Plaintiff; and explain how that damage amount was**

13

**calculated, including but not limited to providing specific calculations identifying the total dollar amounts of damages allegedly owed to each Plaintiff.**

Response and Specific Objections to Interrogatory No. 10

In addition to the General Objections, Plaintiffs object on the grounds that Interrogatory No. 10 is improper because it is not a more practical means of obtaining this information than document requests and depositions. *See Tribune Co. v. Purcigliotti*, Case No. 93-7222, 1997 WL 540810, *1 (S.D.N.Y. Sept. 3, 1997); *Chiquelin v. Efunds Corp.*, Case No. 02-51521, 2003 WL 21459581, *1 (S.D.N.Y. June 24, 2003). Additionally, Plaintiffs object to Interrogatory No. 10 on the grounds that the interrogatory is improper because it would require Plaintiffs' to reiterate evidence previously provided in discovery. *See Convolve Inc. v. Compaq Computer Corp.*, 223 F.R.D. 162, 173 (S.D.N.Y. 2004); *Rahman v. Smith & Wollensky Restaurant Group, Inc.*, Case No. 06-6198, 2007 WL 1521117, *13 (S.D.N.Y. May 24, 2007); *Tribune Co. v. Purcigliotti*, Case No. 93-7222, 1997 WL 540810, *1 (S.D.N.Y. Sept. 3, 1997). Plaintiffs further object to Interrogatory No. 10 on the grounds that it is not sufficiently specific to allow a focused response. *See Melendez v. Greiner*, Case No. 01-07888, 2003 WL 22434101, *10 (S.D.N.Y. October 23, 2003).

Plaintiffs also object to "explain[ing] in detail how each Plaintiff has been injured by the alleged wrongful conduct" as requested in a subpart of Interrogatory No. 10 on the grounds that it is improper for an interrogatory to seek all facts supporting a particular allegation. *See Clean Earth Remediation And Construction Services, Inc. v. American International Group, Inc.*, 245 F.R.D. 137, 141 (S.D.N.Y. 2007); *Grynberg v. Total S.A.*, Case No. 03-01280, 2006 WL 1186836, *6 (D. Colo. May 3, 2006); *Thompson v. United Transp.*, Case No. 99-2288, 2000 WL 1375293, *1 (D. Kan. Sept. 15, 2000).

Notwithstanding the General Objections and the Specific Objections to Interrogatory No. 10, Plaintiffs do not possess the answer to Interrogatory No. 10 at this time. Expert reports have not yet been submitted, nor has the deadline for their submission passed. Federal Rule of Civil Procedure 33 requires that the party responding to an Interrogatory swear to the veracity of the response. *See Trueman v. New York State Canal Corp.*, Case No. 09-049, 2010 WL 681341, *5 (N.D.N.Y. Feb. 24, 2010); *Life Music, Inc. v. Broadcast Music, Inc.*, 41 F.R.D. 16, 26 (S.D.N.Y. 1966); *Kenneth v. Nationwide Mutual Fire Ins.*, Case No. 03-521F, 2007 WL 3533887 (W.D.N.Y. Nov. 13, 2007). Since Plaintiffs' experts have not yet completed their review and analysis of the damages in this case, Plaintiffs cannot, at this time, provide an accurate damages calculation. Plaintiffs will be seeking the following categories of damages:

- Compensatory damages;
- Expectation damages, including lost profits;
- Prejudgment and post-judgment interest; and
- Attorney's fees

Dated: New York, New York
      June 16, 2010

LIDDLE & ROBINSON, L.L.P.

By: _____

    James R. Hubbard
    Jeffrey L. Liddle
    James W. Halter
800 Third Avenue
New York, New York 10022
Tel:   (212) 685-8500
Fax:  (212) 685-1505
jhubbard@liddlerobinson.com
*Attorneys for Plaintiff*

## VERIFICATION

I hereby certify that I have read the foregoing Amended Responses to Defendants' Second Set of Interrogatories that the facts asserted in the "Response and Specific Objections to Interrogatory No. 9" are true and accurate to the best of my knowledge and belief.

William B. Hobbs

Dated: June 10, 2010.

# EXHIBIT 3

# LIDDLE & ROBINSON, L.L.P.

800 THIRD AVENUE
NEW YORK, N.Y. 10022

(212) 687-8500
FACSIMILE: (212) 687-1505
www.liddlerobinson.com

E-mail: jhubbard@liddlerobinson.com

MIRIAM M. ROBINSON (RETIRED)

JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
DAVID I. GREENBERGER
MICHAEL E. GRENERT
JAMES R. HUBBARD
JEFFREY L. LIDDLE
DAVID M. MAREK
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

JAMES W. HALTER
ANDREA M. PAPARELLA
DANIEL S. JO
SHERRY M. SHORE
JESSICA H. SAVAGE
MATTHEW J. MCDONALD
MARIA W. WONG
JENNIFER RODRIGUEZ
SAMANTHA L. PLESSER

January 9, 2012

**BY HAND**

The Honorable Debra Freeman
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re:   *Ritchie Risk-Linked Strategies Trading (Ireland), Limited et al. v. Coventry First LLC et al.*, No. 09-CV-1086 (VM) (DCF)

Dear Judge Freeman:

We represent the Plaintiffs in the above-referenced matter. We write to request a brief extension of the deadline for the parties' amended expert reports from January 9, 2012 to January 17, 2012. The extension is requested to due to the fact that Plaintiffs are still in the process of reviewing Defendants' six expert reports which totaled over 1,000 pages and was served in the evening on December 21, 2011. Defendants consent to the requested extension and the parties do not, at this time, see a reason to alter the remainder of the expert discovery schedule.

The entire expert discovery schedule has been altered by the Court twice previously at Plaintiffs' request, however, neither party has previously requested a change to the amended expert report date specifically.

Respectfully submitted,

James R. Hubbard

cc:   Kenneth J. Brown, Esq. and David A. Forkner, Esq. (by e-mail and overnight delivery)

# EXHIBIT 4

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3    ------------------------------------X
                                         :
 4    RITCHIE RISK-LINKED STRATEGIES     :   09-CV-1086
      TRADING (IRELAND), LIMITED, et al.,:
 5                                       :
                          Plaintiffs,    :   June 24, 2010
 6                                       :
                     v.                  :   500 Pearl Street
 7                                       :   New York, New York
      COVENTRY FIRST L.L.C., et al.,     :
 8                                       :
                          Defendants.    :
 9    ------------------------------------X

10
            TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY DISPUTES
11              BEFORE THE HONORABLE DEBRA C. FREEMAN
                  UNITED STATES MAGISTRATE JUDGE
12

13    APPEARANCES:

14
      For the Plaintiff:        JEFFREY L. LIDDLE, ESQ.
15                              Liddle & Robinson LLP
                                800 Third Avenue
16                              New York, New York 10022

17
      For the Defendant:        DAVID FORKNER, ESQ.
18                              KENNETH J. BROWN, ESQ.
                                Williams & Connolly LLP
19                              725 Twelfth Street N.W.
                                Washington, DC 20005
20

21

22    Court Transcriber:        SHARI RIEMER
                                TypeWrite Word Processing Service
23                              211 N. Milton Road
                                Saratoga Springs, New York 12866
24

25


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

11

1  We're entitled to our answer [inaudible] address just because

2  of our letter [inaudible] prior issue [inaudible].

3          THE COURT: Let's take a deep breath and a step back.

4  I am although familiar with this case from a different

5  perspective as you know.  I'm not familiar with all the

6  discovery disputes that may or may not exist in the case.  The

7  first thing I'll say is that I"m not going to undo any ruling

8  that was previously made by any judge of the court.  If this

9  case was before Judge Cote and she made a ruling on any

10  discovery issue that's law of the case and I'm not going to

11  start revisiting it.  I don't know whether she said no to

12  additional depositions.  I don't know whether she said anything

13  about extending the discovery deadline.  I don't know whether

14  she said anything about privilege or whether there was anything

15  raised in comments before her but anything that she previously

16  ruled that's ruled upon.  I'm not going to revisit it.  I have

17  to find out -- educate myself as to what she already ruled but

18  if she did she did.  If she didn't, she didn't.  If she didn't

19  Judge Marrero has now put this case in front of me for general

20  pretrial supervision which includes the question of whether

21  discovery should be extended because it would include discovery

22  deadlines.

23          If a discovery deadline was set by the court and it

24  was not met then the parties that seeks to extend it has to

25  satisfy the burden set forth in Rule 16 which is to show good

12

1   cause as to why the scheduling order could not have been

2   adhered to.  If the parties could have done things sooner and

3   didn't it's going to be difficult to show that there's good

4   cause to extend the dates.  But, again, I'm new to this. I

5   don't know whether in fact there were efforts to raise issues

6   prior to the close of discovery and Judge Cote was busy trying

7   to decide whether or not she should be recused and left certain

8   issues open that were duly raised in a timely fashion I'd have

9   to understand that as well.

10          If issues are now being raised for the first time two

11   months or more, three months, whatever it is after the

12   discovery deadline it's going to be a tough sell.  If the

13   issues were raised previously and left open and just never were

14   resolved I'm not going to penalize any party who timely raised

15   an issue and just been waiting for a decision from the court.

16   I'm not going to say well, too bad, the clock now ran out on

17   you.  So I'll look at any issue that was appropriately raised

18   during the discovery period and if it's still an open issue

19   I'll decide it. If it's being raised for the first time after

20   the close of discovery then the party raising the issue is

21   going to have to show good cause to obtain more discovery.

22          With respect to the contention interrogatories,

23   contention interrogatories are expressly contemplated by the

24   rules.  They are generally appropriate under the rules. There

25   can be misused but in general they're perfectly appropriate

# EXHIBIT 5

**TREAT AS CONFIDENTIAL AND ATTORNEYS' EYES ONLY**
**INFORMATION UNTIL FURTHER DESIGNATION**

1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | SOUTHERN DISTRICT OF NEW YORK |
| 3 | --------------------------------x |
| 4 | RITCHIE RISK-LINKED STRATEGIES  : |
| 5 | TRADING (IRELAND), LIMITED and  : |
| 6 | RITCHIE RISK-LINKED STRATEGIES  : |
| 7 | TRADING (IRELAND) II, LIMITED,  : No. 09-cv-1086 |
| 8 | Plaintiffs,     : |
| 9 | v.              : TREAT AS CONFIDENTIAL |
| 10 | COVENTRY FIRST LLC, THE        : AND ATTORNEYS' EYES |
| 11 | COVENTRY GROUP, INC.,          : ONLY INFORMATION |
| 12 | MONTGOMERY CAPITAL, INC., and  : UNTIL FURTHER |
| 13 | LST II LLC,                    : DESIGNATION |
| 14 | Defendants.     : |
| 15 | --------------------------------x |
| 16 | Videotaped Deposition of JONATHAN WALKER, Ph.D. |
| 17 | Washington, DC |
| 18 | Friday, February 3, 2012 |
| 19 | 9:27 a.m. |
| 20 | |
| 21 | |
| 22 | Reported by: Alda Mandell, RPR, CRR |

**REDACTED**

# EXHIBIT 6

UNITED STATES BANKRUPTCY  COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | ) Chapter 11 |
| | ) Case No.: 07-11906 (BRL) |
| RITCHIE RISK-LINKED STRATEGIES | ) Jointly Administered |
| TRADING (IRELAND), LIMITED, RITCHIE | ) |
| RISK-LINKED STRATEGIES TRADING | ) |
| (IRELAND) II, LIMITED | ) |
| | ) Adv. Pro. No. 1-07-AP-03197 |
| | ) |
| | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ` |
| COVENTRY FIRST LLC, LST I LLC, SANDY | ) |
| RUN, LTD. and MONTGOMERY LIMITED | ) |
| Defendants. | ) |

**DECLARATION OF S. SCOTT GIBSON IN SUPPORT OF DEBTORS'
COMPLAINT**

STATE OF TEXAS           )
                                        ) ss:
COUNTY OF DALLAS      )

S. Scott Gibson, being duly sworn, deposes and states:

      1.     I am a Senior Vice President of Lewis & Ellis, Inc., Actuaries &

Consultants.  I submit this Declaration in Support of Debtors' Complaint For Declaratory

Judgment Regarding Its Assets, For Application Of The Stay To The Coventry Parties,

For Approval Of The Modified Asset Purchase Agreement And For Turnover Of

Property Of The Estate Pursuant To Sections 105, 362, 363, 541 And 542 Of The

Bankruptcy Code (the "Complaint").[1]  Except as otherwise noted, I have personal

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the
Complaint.

knowledge of the matters set forth herein and if called as a witness would testify to the facts and opinions stated herein.

2.      Lewis & Ellis was founded in 1968.  Lewis and Ellis currently has over 25 actuaries serving clients coast-to-coast in all facets of life, health and property & casualty insurance operations, regulatory compliance, employee benefits, expert testimony, and life settlements.

3.      I have been a consultant to the insurance industry since graduation from the University of Texas in 1981.  Since 2003, I have been involved in the Life Settlements market.  My client base ranges from individual policyholders to multinational bank investors.  In November 2005, I was elected to the Board of Directors of the Life Insurance Settlement Association (LISA), the leading industry association with regard to the secondary market for life insurance policies and life settlements.  I continue to serve as a member of the Board of Directors.  A copy of my professional resume is attached as Appendix A hereto.

4.      I am familiar with the secondary market for life insurance policies, including the sale and purchase of life settlement policies, their ownership and management and related servicing and monitoring activities based upon my experience in the industry.  The sale and purchase of a life settlement policy includes conveyance of rights integral to ownership that a purchaser of a life insurance policy would expect and require in order to, among other things, obtain a prompt death certificate for the insured as is necessary in order to collect the death benefit under the policy from the issuing

insurance company.  These rights and privileges are fundamental to a purchaser's ability to value a life settlement policy for subsequent resale.

5.      A "life settlement" transaction occurs when the owner of a life insurance policy (who is generally the person insured under the policy but may also be a trust established by the insured or a corporation that has purchased insurance on the life of a key executive) sells the policy and grants certain rights relating to the policy and information regarding the insured to a third-party buyer.  For example, in the case of an insured that is also the owner of a life insurance policy, the insured may be a wealthy individual 65 years of age or older, who has determined that they prefer (a) an immediate, lump-sum payment as opposed to (b) a payment to their beneficiaries when they die, along with the ongoing expense of premium payments.  The life settlement payment will be more than the "surrender value" of the policy – the contractual price at which a policy owner can return the policy to the insurance company that issued it – but less than the death benefit.  The buyer of the policy continues to pay premiums to keep the policy in force until the insured's death, at which point the buyer claims the death benefit.  Thus the buyer (who will have made its own estimation of the insured's life expectancy) is making an investment in the expectation that the value of the future death benefit will exceed the sum of the life settlement payment and the costs of paying premiums until the insured's death.  In many cases, the initial buyer does not retain ownership of policies thus acquired, but sells them into the secondary market.  Coventry is one such buyer.  It is a leading player in the secondary market for life insurance policies.

6.      An owner of a life insurance policy can enter into a life settlement transaction typically in one of two ways.  First, the owner (typically through a

representative such as a financial advisor or planner, insurance agent, accountant or attorney) might hire a life settlement broker to mount the equivalent of an auction, collecting bids on the policy from buyers (or from other brokers who in turn represent buyers). Second, the owner (again through a representative) might make direct contact with a buyer.

7.    The transaction by which life insurance polices and the associated rights and privileges are purchased and created as "life settlement policies" is commonly known as an "origination."  The origination of a life settlement policy includes the execution and delivery of numerous disclosures, releases, powers of attorney and related consents, acknowledgements, waivers and similar documents.  Such documents are integral to, and often required by regulation for, the ownership, management, servicing and monitoring of life settlement policies.  In addition to the rights and privileges set forth in a life insurance policy, these documents govern the relationship of the buyer and the subsequent owners of a life insurance policy with the insured and other third parties such as medical providers.  The rights and privileges established as part of the "origination" process are essential to collecting promptly the death benefit under the policy and otherwise optimizing the value of the acquired life insurance policy and transforming it into an asset that can be purchased and sold in the secondary market for life insurance. Further, the rights and privileges established at origination are essential to assessing the value of a life settlement policy to participants in the secondary market at any time after origination.

8.    Without these rights and privileges, a purchaser of a life settlement policy could not expect to receive full value for the life settlement policy as part of a subsequent

transaction because purchasers would not have access to current information regarding the health status and life of the insured as required to analyze the life expectancy of the insured.  Current health and medical information regarding an insured is commonly considered in the life settlement industry as a necessary requirement for a proper valuation of a life settlement policy for any transaction in the secondary market.  Absent such information, the sale price of the asset is likely to be depressed.

9.     These documents, as described further below, govern the relationship of the buyer and the subsequent owners of a life insurance policy with the insured and other third parties such as medical providers.  They allow the purchaser, among other things, to monitor the policy and health status of the insured, update the life expectancy of the insured, exercise its right to collect proceeds, defend its right to receive death benefits against claims by others claiming to be beneficiaries, and perform essential valuations of the policies which depend upon medical underwriters and actuaries up to date information on each insured.

10.     Life settlement policies can be valued using dated information; however, the more dated the information, the less confident one is in its results.  With lower confidence comes a lower value estimate, because in the absence of information, one typically assumes a less desirable occurrence of events.   Simply, the use of overly dated health information in valuing a life settlement policy could substantially decrease the amount a purchaser is willing to pay for it.

11.     A purchaser obtains these rights of ownership through various documents it receives at the time of purchase including the policy itself as well as numerous powers

of attorney, disclosures, releases and related consents, acknowledgements, waivers and similar documents which allow the purchaser to exercise ownership over the policy.

12.     I have reviewed sample origination documents by which Coventry "originated" the purchase of life insurance policies in this matter, including Coventry's "Policy Purchase Agreement," examples of which are attached to the Complaint as Exhibit D.  The Policy Purchase Agreement expressly incorporates the transfer and assignment to Coventry of the following documents:  (a) the policy and policy application; (b) funding method request; (c) disclosure statement and seller acknowledgment; (d) disclosure statement and insured acknowledgment; (e) insured's authorization to release medical records and special irrevocable durable power of attorney; (f) seller's authorization to release policy information and special irrevocable power of attorney; (g) insured's list of primary designated contacts; (h) spouse's release and consent to change beneficiary of life insurance policy; (i) beneficiary's release and consent to change beneficiary of life insurance policy; (j) attending physician's statement; (k) life settlement application; (l) IRS from W-9; (m) viatical settlement application and (n) escrow agreement.  The Policy Purchase Agreement provides that it is freely assignable without the consent of the seller of the life insurance policy, as do most of the consents, authorizations, releases and various documents referred to above.  These documents are included in what are defined as the Life Settlement Files in the Debtors Modified Asset Purchase Agreement.

13.     The Policy Purchase Agreement, along with the documents incorporated therein by reference, is an absolute necessity to prove that an owner in fact owns the policies as opposed to the original policy owner.  To purchase life settlement policies

without such a document would be like purchasing a car without receiving the title. Indeed, without the rights granted at origination to a buyer of a policy, and assignable to subsequent purchasers, an owner of a policy could not promptly obtain a death certificate for the insured as is required to collect the death benefit under the policy from the issuing insurance company.

14.     The Insured's Authorization to Release Medical Records and Special Irrevocable Durable Power of Attorney is a broad power of attorney which allows the owner of a life settlement policy to manage the life settlement policy as an asset through communicating with the insured and third parties regarding the policy and the insured. This document authorizes, among other things, the owner to update the medical status of the insured for asset valuation and to track the life of the insured.  The value of the life settlement policy as an asset completely hinges on the life expectancy and medical condition of the insured.  Without this information, neither the actuaries nor medical underwriters can perform valuation analyses for the owner.  Similarly important is the Insured's List of Primary Designated Contacts which confirms the owner's authority to contact the insured and its designees regarding the insured's life and medical condition.

15.     The Seller's Authorization to Release Policy Information and Special Irrevocable Durable Power of Attorney allows the current owner of the policy to interact with the insurance company, among others, to update the current status of the policy (including conversion the policy to a different type of coverage) with regard to amounts due under the policy to maintain it in force.  The minimum premium payments made to keep the policy in force are dependent on the current state, credits, charges, and expenses being assessed to the policy.  These items are discretionary (with certain maximum

- 7 -

limits) decisions made by the issuing insurance company and can change at any time. Without access to such information, the owner of a policy could be forced to make unnecessary payments, or miss necessary payments thereby threatening continued coverage under the policy.

16.     The Spouse's Release and Consent to Change Beneficiary of Life Insurance Policy and the Beneficiary's Release and Consent to Change Beneficiary of Life Insurance Policy allow the owner of a life settlement policy to change the beneficiary of a policy upon purchase or subsequent sale.  If the owner is not the designated beneficiary under the policy, it will not be able to collect the death benefit due upon death of the insured and policy ownership would have no value for the owner.  The owner (new purchaser) must have this paper trail for its investment to yield any value.  It must also have these documents in the event of any third party challenge from a spouse or previously-named beneficiary to the purchaser's right to collect death benefits.  Likewise, the owner must have this ability in order to be able to sell the life settlement policy to a third party prior to maturation.

17.     Based on my expertise and familiarity with transactions in the secondary market, when parties buy and sell Life Settlement Policies, the Life Settlement Files are considered part of the assets being purchased and sold.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  Dallas, Texas
        December 21, 2007

_____
            /s/
S. SCOTT GIBSON

- 8 -

# S. Scott Gibson, F.S.A. M.A.A.A.
**Senior Vice President & Principal**
**Consulting Actuary, Dallas office since 1987**

**Prior Positions**

1984-1987: Rudd & Wisdom, Inc.; Consulting Actuary

1982-1984: Texas State Board of Insurance, Austin, Texas; Assistant Life Actuary

1981-1982: American National Insurance Company, Galveston, Texas; Actuarial Student

**Responsibilities and Experience**

- Evaluation and assistance in life insurance company acquisitions and mergers
- Financial projections and forecasting
- Statutory valuation actuary
- Development and pricing of new insurance products
- Development and pricing of debt protection programs
- Life settlement pricing & administration
- Asset/liability projections
- Financial reporting
- Mortality and Lapse Studies
- Insurance systems conversion
- Computer programming and operations
- Policy forms filing with state insurance departments

**Education**

University of Texas,
B.B.A., Actuarial Science

**Professional**

Fellow, Society of Actuaries
Member, American Academy of Actuaries

# EXHIBIT 7

A.R. THANE RITCHIE                                      MARCH 26, 2010
                          CONFIDENTIAL



**Page 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
RITCHIE RISK-LINKED STRATEGIES    )
TRADING (IRELAND), LIMITED, and   )
RITCHIE RISK-LINKED STRATEGIES    )
TRADING (IRELAND) II, LIMITED,    ) Civil Action No:
          Plaintiffs,             ) 09-cv-01086-DLC
     vs.                          )
COVENTRY FIRST LLC, THE COVENTRY  )
GROUP, INC., MONTGOMERY CAPITAL,  )
INC., and LST I LLC,              )
          Defendants.             )

          The confidential videotaped deposition of
A.R. THANE RITCHIE, called for examination, taken before
LISA SCHWAM, CSR No. 84-004650, a Notary Public within
and for the County of Cook, State of Illinois, and a
Certified Shorthand Reporter of said state, at 55 East
Monroe Street, Chicago, Illinois, commencing on the 26th
day of March, A.D. 2010, at 9:12 a.m.

**Page 2**

1   APPEARANCES:
2
3        LIDDLE & ROBINSON, L.L.P.,
4        (800 Third Avenue, 8th Floor,
5        New York, New York  10022,
6        212-687-8500), by:
7        MR. JAMES R. HUBBARD,
8        jhubbard@liddlerobinson.com,
9            appeared on behalf of the Plaintiffs;
10
11       RITCHIE CAPITAL,
12       (747 Third Avenue, 38th Floor,
13       New York, New York  10017
14       212-351-2993), by:
15       MR. BILL HOBBS,
16       bhobbs@ritchiecapital.com,
17           appeared on behalf of the Plaintiffs;
18
19
20
21
22
23
24

**Page 3**

1   APPEARANCES (CONTINUED):
2
3        WILLIAMS & CONNOLLY LLP,
4        (725 Twelfth Street, N.W.,
5        Washington, D.C.  20005,
6        202-434-5818), by:
7        MR. KENNETH J. BROWN,
8        kbrown@wc.com, and
9        MS. RACHEL RODMAN,
10       rrodman@wc.com,
11           appeared on behalf of the Defendants;
12
13       ALSO PRESENT:  Kevin Dailey, Videographer.
14
15
16
17
18
19
20
21
22
23
24



Toll Free: 800.708.8087
Facsimile: 312.673.8138

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**REDACTED**

# EXHIBIT 8

1

* * * C O N F I D E N T I A L * * *

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Ritchie Risk-Linked Strategies    )

Trading (Ireland), Limited, and   )

Ritchie Risk-Linked Strategies    )

Trading (Ireland) II, Limited,    )

                  Plaintiffs,     )

        Vs.                       )   CONTAINS CONFIDENTIAL
                                            AND
COVENTRY FIRST, LLC, THE COVENTRY)    ATTORNEYS' EYES ONLY
                                           INFORMATION
GROUP, INC, MONTGOMERY CAPITAL,  )    Designated parts not to
                                        be used, copied or
INC., and LST I, LLC,            )     disclosed except as
                                      authorized by Court Order
                  Defendants.    )

--------------------------------)

    VIDEOTAPE DEPOSITION OF BRIAN MURPHY

        New York, New York

          March 19, 2010

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  18896

# REDACTED

# EXHIBIT 9

STATE OF ILLINOIS )

                    )   SS:

COUNTY OF C O O K )

   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

       COUNTY DEPARTMENT - CHANCERY DIVISION

HUIZENGA MANAGERS FUND, LLC,       )

           Plaintiff,              ) Case No.

       vs.                         ) 07 CH 9626

A. R. THANE RITCHIE, et al.,       )

           Defendants.             )



           RESUMED TRANSCRIPT OF PROCEEDINGS had

in the above-entitled cause on the 25th day of

August, A.D. 2010, at 10:38 a.m.



BEFORE:  HONORABLE PETER A. FLYNN.

# REDACTED

# EXHIBIT 10

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x
RITCHIE RISK-LINKED STRATEGIES
TRADING (IRELAND), LIMITED, and
RITCHIE RISK-LINKED STRATEGIES
TRADING (IRELAND) II, LIMITED,

        Plaintiffs,

                            CIVIL ACTION NO.
    vs.                      09-cv-01086-DLC

COVENTRY FIRST LLC, THE COVENTRY
GROUP, INC., MONTGOMERY CAPITAL,
INC., and LST I LLC,

        Defendants.
--------------------------------x

VIDEOTAPED DEPOSITION OF

TSVETAN N. BELORESHKI

Tuesday, December 20, 2011

New York, New York

8:57 a.m.

Reported By:
Josephine H. Fassett
Job No: 23202

# REDACTED

# EXHIBIT 11

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

RITCHIE RISK-LINKED STRATEGIES
TRADING (IRELAND), LIMITED, and
RITCHIE RISK-LINKED STRATEGIES
TRADING (IRELAND) II, LIMITED,


        Plaintiffs,


  -vs-                       Civil Action No.
                              1:09-cv-01086-VM-DCF


COVENTRY FIRST LLC, THE
COVENTRY GROUP, INC.,
MONTGOMERY CAPITAL, INC.,
and LST I LLC,


        Defendants.

- - - - - - - - - - - - - - - - X

      VIDEOTAPED DEPOSITION of KEVIN GLOWACKI,

taken pursuant to Notice, held at the law offices of

LIDDLE & ROBINSON, LLP, 800 Third Avenue, New York,

New York, 10022, on Wednesday, January 25, 2012, at

9:00 a.m. before JEANNETTE MCCORMICK, a Certified

Shorthand Reporter, License No. XI00920, and a

Notary Public.


Job No: 23661

**REDACTED**

# EXHIBIT 12

3-19-10 Transcript of Proceedings by Telephone with Judge Cote.txt

```
                                                                            1
     03JAARITC                    Conference
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   -----------------------------x
 2
 3   RITCHIE RISK-LINKED STRATEGIES
 3   TRADING (IRELAND) LIMITED and
 4   RITCHIE RISK-LINKED STRATEGIES
 4   TRADING (IRELAND) II LIMITED,
 5
 5                    Plaintiffs,
 6
 6          v.                              09 CV 1086 (DLC)
 7
 7   COVENTRY FIRST LLC, THE
 8   COVENTRY GROUP, INC.,
 8   MONTGOMERY CAPITAL, INC. and
 9   LST I LLC,
 9
10                    Defendants.
10
11   -----------------------------x
11                                        New York, N.Y.
12                                        March 19, 2010
12                                        2:30 p.m.
13
13   Before:
14
14                        HON. DENISE L. COTE,
15
15                                        District Judge
16
16                        APPEARANCES
17
17   LIDDLE & ROBINSON, LLP
18        Attorneys for Plaintiffs
18   BY:  JAMES R. HUBBARD MATT MCDONNELL
19
19   WILLIAMS & CONNOLLY LLP
20        Attorneys for Defendants
20   BY:  DAVID FORKNER
21
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                            2
     03JAARITC                    Conference
 1            (Case called)
 2            THE COURT:  Please identify yourselves before you
 3   speak and the second thing is let's be careful not to interrupt
 4   each other because it makes it very difficult to conduct a
 5   telephone conversation.  I'll make sure everybody has an
 6   opportunity to be heard before the end of the conference.
 7            For the plaintiffs?
 8            MR. HUBBARD:  Good afternoon, your Honor.
 9            This is Jim Hubbard at Liddle & Robinson, and with me
10   is Max McDonald.
11            THE COURT:  For the defendants?
                            Page 1
```

3-19-10 Transcript of Proceedings by Telephone with Judge Cote.txt
```
12              MR. FORKNER:  Your Honor, it's David Forkner, with
13    Williams & Connolly.
14              THE COURT:  Thank you so much.
15              Before beginning and this conference is being held to
16    address the March 17th letter from Williams & Connolly, let me
17    just describe very previously what happened at our last
18    conference which wasn't on the record and, counsel, I'll
19    describe what my notes reflect but I'll give each of you an
20    opportunity to add something if you think something material
21    has been left out.
22              We had a telephone conference on March 12th and
23    recusal issues were discussed and I invited counsel to submit
24    letters with respect to that issue.  I want to note, I've
25    received those letters and we'll be addressing that issue
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    3
```
      03JAARITC              Conference
 1    shortly.
 2              A second topic was whether or not the defendants would
 3    get access to deposition transcript from what we referred to as
 4    the Chicago case understanding that the issues in that case and
 5    this litigation are at least strongly overlapping.  Witnesses
 6    who will appear for the plaintiffs in this case were deposed in
 7    the Chicago action and the argument by defense counsel was,
 8    they should not be permitted to give contradictory testimony
 9    between the two sets of depositions.  The plaintiffs did not
10    object to making the disclosure if I determined that the
11    materials were discoverable.  I did so determine and required
12    the deposition transcripts to be turned over I believe on March
13    12th because I think the relevant deposition was to be
14    occurring shortly thereafter, maybe even on March 15th.
15              Another topic that we addressed were document
16    subpoenas made to an institution called DSI and a second one to
17    Houlihan and the documents were relevant to a March 24th
18    deposition of a DSI witness named Caruso and I ordered that the
19    documents be produced by March 17th or the defendants would be
20    able to retake the depositions if that was appropriate.  If the
21    documents were produced after March 17th then the plaintiff and
22    redeposition was ordered, that would be at the plaintiff's
23    expense as to DSI.
24              With respect to Houlihan, it was a more nuanced
25    discussion and decision.  I ordered a rolling production on the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    4
```
      03JAARITC              Conference
 1    Houlihan discovery and would address at a later time if the
 2    production was too late or past March 17th whether or not the
 3    expenses would be shifted.
 4              And finally, I was asked to give the parties some
 5    guidance with respect to performance at depositions.  I
 6    reiterated the common instruction that there should be no
 7    speaking objections, no instructions not to answer except for
 8    privileged and only scheduled breaks.
 9              Mr. Hubbard, is there anything else material discussed
10    at that March 12th conference you want to add to this record?
11              MR. HUBBARD:  Your Honor, I don't think so.  I think
12    that is a very accurate report of the converse we had and I
13    would not add any correction to what the Court has indicated.
14              THE COURT:  Thank you.  And, Mr. Forkner?
15              MR. FORKNER:  No corrections, your Honor.
16              THE COURT:  Thank you.  Okay.  So let's turn to the
```
                                Page 2

3-19-10 Transcript of Proceedings by Telephone with Judge Cote.txt
17  matter at hand.
18          What happened with respect to the production of the
19  transcript that is of the depositions taken in the Chicago case
20  is that the transcripts were produced but not the documents
21  that were used at those -- and I should say -- exhibits used at
22  the depositions.  And so on March 17th defense counsel wrote
23  asking that I require the production of the exhibits and
24  raising the issue of whether or not depositions would have to
25  be reopened because of that late production if I ordered the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    5
        03JAARITC               Conference
1  production.
2          So, Mr. Hubbard, I want to give you an opportunity to
3  respond to Mr. Brown's letter of March 17.
4          MR. HUBBARD:  Your Honor, may I ask -- thank you for
5  that opportunity.  May I ask you if you received our letter
6  which we sent done by hand, albeit late, it may have been
7  midday before my letter got down to the court and I am not sure
8  that you've gotten it or had a chance to see it.
9          THE COURT:  Are you talking about a letter you sent to
10  the Court today?
11          MR. HUBBARD:  Yes, your Honor.
12          THE COURT:  No, I don't have it.
13          MR. HUBBARD:  All right.  And that's certainly my
14  fault because the letter was not -- we did not get it out of
15  here until 11 or 11:30 this morning and so that is my fault.
16  But anyway I wanted you to know that we did not ignore
17  counsel's letter and we had tried to respond as quickly as we
18  could.
19          THE COURT:  Well, guess what?  My law clerk just
20  retrieved it.  It was just delivered.  I want to advise
21  counsel -- and I'll take a moment to read this -- I want to
22  advise counsel that if you ever have a late hand delivery like
23  this, feel free to call our chambers ahead of time, give us a
24  heads up that one being made and then call up when it's at the
25  front desk down at the Worth Street entrance with the CSOs and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    6
        03JAARITC               Conference
1  one of my law clerks will come down and pick it up after the
2  CSOs run it through the mail inspection system.  But in any
3  event let, me take a moment and just read this.
4          MR. HUBBARD:  Thank you, your Honor.
5          (Pause)
6          THE COURT:  Thank you very much, counsel.  I've read
7  Mr. Hubbard's letter of March 19th.
8          Mr. Forkner, did you get a copy of the March 19
9  letter?
10          MR. FORKNER:  I did, your Honor.
11          THE COURT:  Okay.  Good.  So, Mr. Hubbard, now that
12  I've read your letter, is there anything else you wanted to add
13  orally before I turn to Mr. Forkner?
14          MR. HUBBARD:  I don't think so, your Honor.  I just
15  would like to emphasize if I may just one point and that is
16  that there are basically three depositions left.  There's one
17  going on today that is being taken by the defendants and one of
18  our former employees and then there is one of our three
19  depositions next week that Mr. Forkner and his colleagues are
20  taking.  Two of them relate essentially to the bankruptcy
21  office and then Mr. Ritchie who was the chief executive of this
                            Page 3

3-19-10 Transcript of Proceedings by Telephone with Judge Cote.txt
22    Ritchie Capital Management affiliated with the plaintiffs in
23    this case is being deposed next Friday.  And that's why I, at
24    least, mentioned it in my letter to your Honor that I believe
25    Mr. Ritchie is the only remaining person who was one of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    7
        03JAARITC                Conference
1    deponents in Hyzinga to be deposed in our case and I was doing
2    that for an obvious reason.  And that was I was trying to see
3    if I could limit the amount of material that would need to be
4    reviewed and obtained and forwarded in the event that your
5    Honor ordered it.  So I just wanted to mention the fact that at
6    this point in time the only one -- there were actually, your
7    Honor, I also wanted to mention to you that we produced after
8    your order of last Friday we produced 12 electronic
9    transcripts.  We produced all the transcripts that we had from
10   the Hyzinga case.  Almost all of them were of former associates
11   of Ritchie Capital Management.  A couple of names I don't
12   recognize.  But there were 12 transcripts and we produced them
13   as you ordered that afternoon or evening.
14             THE COURT:  Thank you so much.
15             Okay.  So let me hear from you, Mr. Forkner.
16             MR. FORKNER:  Thank you, your Honor.
17             The issue about the depositions and their transcripts
18   has been percolating in this case and going back to November of
19   2009.  The history was in that timeframe plaintiffs' deposition
20   with the transcripts and the exhibits were not in their
21   possession, custody and control.  Responding to that position
22   defendants issued a subpoena to one of the parties in the
23   Chicago action on November 20, 2009.  That subpoena was served.
24   The affiliates to the plaintiffs in this case interposed
25   objections and ultimately we were forced to move to compel on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    8
        03JAARITC                Conference
1    that subpoena in the Federal District Court of Delaware.  That
2    action remains pending there.  We contacted the court but given
3    their schedule I don't know that they will be able to rule on
4    it in advance of our discovery deadline.  That said, the
5    position taken in Delaware was that the protective order
6    entered in the Chicago state court precluded production.
7             Defendants then went to the state court to seek
8    clarification or modification of that order which they finally
9    got.  And within days of obtaining that clarification we sought
10   the documents from plaintiffs now that they could be produced.
11   We didn't believe that their argument on possession, custody
12   and control would be valid.  That was on or about March 12th so
13   that brings the Court up to speed.  It is true that when the
14   Court ordered production on March 12th plaintiffs did provide
15   to us via e-mail 12 transcripts.  At the time of receipt we
16   contacted plaintiff and asked where were the exhibits to the
17   transcript and they took the position that they did not have
18   them and they weren't going to produce them.
19             Monday, March 15th I discussed this matter again with
20   Mr. Hubbard asking him about what the position was with
21   plaintiffs regarding producing the exhibits.  He said he would
22   get back to me on the 16th.  The next time we spoke was on
23   March 17th in the morning at which time they indicated that
24   they did not have them and they would not ask for them.  We
25   then filed our letter of March 17th that same afternoon.  I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                                Page 4

3-19-10 Transcript of Proceedings by Telephone with Judge Cote.txt
(212) 805-0300

9

03JAARITC                    Conference
1   spoke to Mr. Hubbard about this matter briefly today.  Prior to
2   the call and at which time he indicated that there were, there
3   was volume involved in the exhibits and that if he needed to
4   produce it he would be able to do so by producing a disk to us
5   and that he believed that if it was ordered by the Court he
6   could have that to us by Monday.
7        I think the exhibits having read the transcripts it's
8   obviously difficult to follow what is happening in many of the
9   passages of this transcript without having the documents to
10  which they're referring.  It is unclear whether the versions
11  that are entered into as exhibits in the Chicago matter are
12  exact replicas of the subset of the ones we have either through
13  documents that were produced in this underlying case or
14  documents that were produced by some of the Chicago litigants
15  in this case.  And in any event trying to match them all up
16  trying to figure out which documents go with which transcripts
17  would be immensely time consuming.  So we thought it would be
18  easiest to simply ask for copies of exhibits believed that the
19  Court's order on March 12th contemplated that the transcripts
20  would include the exhibits which are still hand and hand and we
21  believe that the exhibits would fairly set the testimony
22  therein.  So we are simply asking for the Court to allow us
23  access to those exhibits.  Plaintiffs have no longer,
24  apparently, are taking the position that they cannot obtain
25  them upon request and so at this point we would ask the Court
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

03JAARITC                    Conference
1   to do so.  And should there be an exhibit that wasn't provided
2   to us that was there materially on the testimony of the
3   witnesses who have gone before us, we would ask the Court to
4   give us an opportunity to revisit that issue with the Court as
5   to whether we would need to have limited openings and
6   depositions.
7        THE COURT:  Mr. Hubbard, could you answer one question
8   for me?  And that is, explain the burden on the production.  If
9   these exhibits are on a single disk what is the burden in
10  producing the exhibits?
11       MR. HUBBARD:  Well, your Honor, they are not on a
12  single disk.  That I did tell counsel that I did in
13  anticipation of this conference I did call counsel in the
14  Hyzinga case or RCM and was told that this material could be
15  loaded on, that it would be hard to transmit it electronically
16  because of the volume but that it could be loaded onto a disk
17  and could be as David says sent by Overnight over the weekend.
18       The burden that we see here, your Honor, is simply
19  taking all of these exhibits from witnesses -- there's only one
20  going to be deposed next week -- taking this vast volume of
21  exhibits now and adding them to the production in this case.
22  Many of these documents are produced by unrelated parties or 0
23  that is by other parties in the Chicago action.  I have no idea
24  what the privilege implications are.  I assume that, I have
25  looked at the transcripts and there are many document here that
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

03JAARITC                    Conference
1   are Ritchie productions and that is they have the Ritchie, they
2   have, actually, they are documents that our clients in this
Page 5

3-19-10 Transcript of Proceedings by Telephone with Judge Cote.txt
3    case produced the first time around when Mr. Ruggio was
4    representing them.  And so they have our RITC or RITI Bates
5    number, so obviously we assumed that those documents have been
6    vetted for privilege.  But, again, my view is and I take it
7    seriously is that unloading a vast volume of documents, some of
8    which, many of which we have never seen and we have never had
9    those documents available to us for example to use in this
10   case.
11           We have not gone that route and so now we are adding
12   to the fact discovery base.  I certainly have to concede that
13   all of the documents that are either Ritchie documents or all
14   the documents that were attached and there are, almost all of
15   them probably which goes to your Honor's point, almost all of
16   them really the important ones are attached to the motion for
17   summary judgment by RCM in the Chicago case and that set of
18   pleadings has been provided to Mr. Forkner and in fact some of
19   them have been, in fact, used, if my memory serves me
20   correctly, in the depositions.  But unloading all of them into
21   the system steam seems to me to place a burden upon us in the
22   last few days of the fact discovery.
23           Mr. Forkner and I were talking this morning about how
24   to finish the depositions.  We have one issue to raise with you
25   but that's my view.  I certainly don't claim that in terms of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                  12
     03JAARITC               Conference
1    resources, funds or time that this material in the event your
2    order, your Honor's order release cannot be quickly produced
3    because, in fact, I made that call and made those arrangements
4    this morning so that I'd be able to tell your Honor just that
5    on this call.
6           THE COURT:  Well, thank you so much, Mr. Hubbard, for
7    that additional background.  Greatly appreciated.
8           I am going to order that the exhibits be produced.  I
9    don't think I am quite confident that we didn't talk,
10   specifically, about the issue of the exhibits at our last phone
11   call but I think one would normally understand that if an
12   exhibit is used to question a witness during a deposition it
13   becomes integral to the deposition and it's really hard,
14   typically, to understand the purport of witnesses answers with
15   without an examination of the document that was used in the
16   questioning.
17           And I appreciate very much, Mr. Hubbard, that you've
18   already taken steps to ease that production and it sounds like
19   the delivery on a single disk that would be sent by Overnight
20   mail would be the way to proceed and I'd ask you to make those
21   arrangements.
22           And, Mr. Forkner, then as I understand it, you will
23   have those exhibits by Monday.  We have a confidentiality
24   agreement in this case.  It should cover these documents along
25   with everything else.  If there was no privilege that kept
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                  13
     03JAARITC               Conference
1    those documents from being used as exhibits at the other
2    deposition there should be no privilege issue here as well.  It
3    would have been waived and so I think we'll proceed with that.
4           I am not going to rule right now on reopening any
5    other deposition.  I am hopeful that that will be unnecessary.
6    I think it would be a high burden to show if a document that
7    was used as an exhibit in a prior deposition was already in the
                            Page 6

3-19-10 Transcript of Proceedings by Telephone with Judge Cote.txt
 8    defendant's custody through discovery in this case.  But,
 9    again, if counsel believe they can make the appropriate showing
10    I'll give defense counsel an opportunity.
11            Now, Mr. Hubbard, was it you who said that you had one
12    additional issue to raise?
13            MR. HUBBARD:  Yes.
14            Mr. Forkner, should we raise the issue of the two
15    outstanding depositions with the Court very briefly?
16            MR. FORKNER:  Yes.
17            Your Honor, Mr. Hubbard and I were speaking this
18    morning and as you know we have a March 26th fact discovery
19    cut-off.  There have been two depositions that we're having
20    difficulty scheduling within that time, one for each side.  And
21    the parties were willing to agree that those depositions could
22    be by agreement taken outside of the March 26th timeframe.
23            THE COURT:  That's fine with me as long as there's
24    agreement.
25            MR. FORKNER:  I think that's the issue.  I will, your
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                    14
      03JAARITC            Conference
 1    Honor, give you a brief update on the status of the production
 2    of the DSI document.
 3            THE COURT:  Yes.
 4            MR. FORKNER:  Presently plaintiffs' counsel has
 5    indicated they were able to produce actually one half of those
 6    documents.  So we're still waiting on the other half.
 7            MR. HUBBARD:  That is correct, your Honor.  We've
 8    produced about 20,000 pages.  I am not sure how much it was but
 9    all the hard copy that we had, I believe we have produced most
10    of that.  I am sitting here with Mr. McDonald.  He is nodding
11    at me and shaking his head at the same time.  But I believe we
12    did produce about half of it.  Some of it is in electronic
13    form.  I can tell you that Mr. McDonald has been burning the
14    midnight oil and reviewing those documents for privilege.  So
15    we're cognizant of your Honor's, of the water fall effect of
16    your order and we are hustling as first as we can.  We have
17    been shuttling back and forth the depositions all week and we
18    are reviewing that material as fast as we can.  And I can't
19    tell you as I sit here whether or not I can send any of that
20    additional information by today but I certainly am willing to
21    report back to Mr. Forkner early Monday and let him know what
22    additional documents we're prepared to release and we can
23    report to the Court and we'll report to the Court if counsel
24    feels that we are unduly delaying that delivery.
25            THE COURT:  Okay.  Well, thank you for that report and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                    15
      03JAARITC            Conference
 1    I am sure counsel will try to cooperate with each other to
 2    reach agreement with respect to the impact of this late
 3    discovery but if you need to reach me you can.
 4            Have a nice weekend, counsel.  Thank you very much.
 5            MR. HUBBARD:  Thank you, your Honor.
 6            MR. FORKNER:  Thank you, your Honor.
 7                    (Adjourned)
 8
 9
10
11
12
                            Page 7

3-19-10 Transcript of Proceedings by Telephone with Judge Cote.txt
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RITCHIE RISK-LINKED STRATEGIES )
TRADING (IRELAND), LIMITED, and RITCHIE )
RISK-LINKED STRATEGIES TRADING )
(IRELAND) II, LIMITED, )
)
)   Civil Action No. 09-cv-01086-DLC
Plaintiffs, )
)   (ECF)
v. )
)
COVENTRY FIRST LLC, THE COVENTRY )
GROUP, INC., MONTGOMERY CAPITAL, INC., )
and LST I LLC, )
)
Defendants. )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>NOTICE OF DEPOSITION</u>

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30(b)(6) of the Federal Rules of

Civil Procedure, Defendants will take the deposition of Plaintiff Ritchie Risk-Linked Strategies

Trading (Ireland), Limited at 9:00 a.m. on March 11, 2010 at the law offices of Hodgson Russ

LLP, One Grand Central Place, 60 East 42nd Street, 37th Floor, New York, NY 10165.  The

deposition will continue from day to day until complete.  The deposition will be recorded

stenographically and on videotape.  Under the provisions of Rule 30(b)(6), Ritchie Risk-Linked

Strategies Trading (Ireland), Limited is required to identify and produce for deposition one or

more officers, directors, managing agents, or other agents or employees who consent to testify on

its behalf and are the officers, directors, managing agents, or other agents or employees most

knowledgeable as to each of the matters set forth in Attachment A.  *See* Fed. R. Civ. P. 30(b)(6).

WILLIAMS & CONNOLLY LLP

_Kat O'Con_

Katherine L. O'Connor (0902)
Dane H. Butswinkas
David A. Forkner
Kenneth J. Brown

725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000
(202) 434-5029 (facsimile)

*Attorneys for Defendants*

February 15, 2010

## ATTACHMENT A

### DEFINITIONS

The following terms shall have the meaning set forth and described below:

A.     As used herein, the terms "all" and "each" shall have the full meanings ascribed to them by Local Civil Rule 26.3(d)(1).

B.     As used herein, the terms "and" and "or" shall have the full meanings ascribed to them by Local Civil Rule 26(d)(2).

C.     As used herein, the term "concerning" shall have the full meaning ascribed to it by Local Civil Rule 26.3(c)(7).

D.     As used herein, the term "communication" shall have the full meaning ascribed to it by Local Civil Rule 26.3(c)(1).

E.     As used herein, the term "document" shall have the full meaning ascribed to it by Local Civil Rule 26.3(c)(2).

F.     As used herein, the term "identify" shall have the full meaning ascribed to it by Local Civil Rules 26.3(c)(3) & (c)(4).

G.     As used herein, the term "person" shall have the full meaning ascribed to it by Local Civil Rule 26.3(c)(6).

H.     As used herein, the term "ABN" means ABN Amro Bank, N.V. and ABN Amro Trustees, Limited, and includes their officers, directors, employees, partners, corporate parents, subsidiaries and affiliates.

I.     As used herein, the term "Complaint" means the complaint filed in the civil action captioned *Ritchie Risk-Linked Strategies Trading (Ireland), Limited, et al. v. Coventry First LLC, et al.*, 09-cv-01086-DLC, in the United States District Court for the Southern District of New York, and any amendments thereto.

J.     As used herein, the term "Conveyed Life Settlement Policy" means any Life Settlement Policy or insurance policy that was sold by LST I to Ritchie I or Ritchie II.

K.     As used herein, the term "Coventry First" means Coventry First LLC.

L.      As used herein, the term "Defendants" means all Defendants named in the Complaint, *i.e.*, Coventry First, The Coventry Group, Inc., Montgomery Capital, Inc. and LST I, and includes their officers, directors, employees, partners, corporate parents, subsidiaries and affiliates.

M.      As used herein, the terms "includes" and "including" mean "including without limitation." Under no circumstances shall the use of the words "includes" or "including" in any topic be construed to limit the scope of that topic or any other topic.

N.      As used herein, the term "Life Settlement Policy" means a policy of life insurance.

O.      As used herein, the term "LST I" means LST I LLC.

P.      As used herein, the term "Moody's" means Moody's Investor Services, Inc., and includes its officers, directors, employees, partners, corporate parents, subsidiaries and affiliates.

Q.      As used herein, the term "NYAG" means the New York Attorney General and all of the NYAG's assistants, deputies, and other employees.

R.      As used herein, the terms "Originate" or "Origination" mean the process of purchasing or attempting to purchase Life Settlement Policies.

S.      As used herein, the term "Petition Date" means June 20, 2007.

T.      As used herein, the term "Plaintiffs" means Ritchie I and Ritchie II collectively, individually, or in any combination as necessary to bring within the scope of the topic all information that might otherwise be construed to be outside of its scope.

U.      As used herein, "Potential Financing" means any actual, attempted, proposed, or contemplated financing, credit, debt, equity, or liquidity for, in, or of (a) Ritchie I, Ritchie II, Ritchie III, or Ritchie IV; and (b) the purchase, sale, securitization, or monetization of any Conveyed Life Settlement Policy. "Potential Financing" includes any actual, attempted, proposed, or contemplated purchase or sale of any derivative or synthetic concerning Ritchie I, Ritchie II, Ritchie III, or Ritchie IV.

V.     As used herein, the term "Potential Financier" means any person that considered being a source of Potential Financing or with whom Plaintiffs communicated concerning being a source of Potential Financing.

W.     As used herein, the term "Potential Investment" means any actual, attempted, potential, or contemplated investment in—or purchase, issuance, undertaking, transfer, conveyance, or assumption of—any security or debt obligation or other economic interest in any Conveyed Life Settlement Policy or in Ritchie I, Ritchie II, Ritchie III, or Ritchie IV.  This includes any actual, attempted, potential, or contemplated investment in—or purchase, issuance, undertaking, transfer, conveyance, or assumption of—senior notes, junior notes, contingent notes, securities, subordinated securities, debt, debt facilities, or stock in any Conveyed Life Settlement Policy or in Ritchie I, Ritchie II, Ritchie III, or Ritchie IV.

X.     As used herein, the term "Potential Investor" means any person that considered making a Potential Investment or with whom Plaintiffs communicated concerning a Potential Investment.

Y.     As used herein, the term "Potential Purchase" means any actual, attempted, proposed, or contemplated purchase or receipt of any interest in any Conveyed Life Settlement Policy or in Ritchie I, Ritchie II, Ritchie III, or Ritchie IV.  This includes any actual, attempted, proposed, or contemplated purchase, contribution, or receipt of notes, junior notes, contingent notes, securities, subordinated securities, debt, debt facilities, equity, or stock in any Conveyed Life Settlement Policy or in Ritchie I, Ritchie II, Ritchie III, or Ritchie IV.

Z.     As used herein, the term "Potential Purchaser" means any person that considered making a Potential Purchase or with whom Plaintiffs communicated concerning a Potential Purchase.

AA.     As used herein, the term "RCM" refers to the corporation Ritchie Capital Management, LLC, and includes its officers, directors, employees, partners, corporate parents, subsidiaries, and affiliates.

3

BB.     As used herein, the term "Ritchie-ABN Sharing Agreement" means the sharing agreement by and between Plaintiffs, ABN, Ritchie Risk-Linked Strategies Trading, Ltd., Walkers SPV Limited, in its capacity as trustee of Ritchie Risk-Linked Life Strategies Trust I, Ritchie Life Strategies Master Trust, and RCM.

CC.     As used herein, the term "Ritchie I" refers to the corporation Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.

DD.     As used herein, the term "Ritchie II" refers to the corporation Ritchie Risk-Linked Strategies Trading (Ireland) II, Ltd.

EE.     As used herein, the term "Ritchie III" means Ritchie Risk-Linked Strategies Trading III, LP.  The term "Ritchie III" also means any other entity commonly known as "Ritchie III" that was intended to purchase Conveyed Life Settlement Policies from Ritchie I and Ritchie II as part of any proposed securitization.

FF.     As used herein, the term "Ritchie IV" means Ritchie Risk-Linked Strategies Trading (Ireland) IV, Ltd.

GG.     As used herein, the term "Ritchie I and II Bankruptcy" means bankruptcy petition numbers 07-11906-brl and 07-11907-brl, filed on or about June 20, 2007 in the United States Bankruptcy Court for the Southern District of New York, and all proceedings concerning those petitions.

HH.     As used herein, the term "Ritchie I Asset Purchase Agreement" means all Asset Purchase Agreements executed by Ritchie I from June 20, 2007, through the date on which the final Conveyed Life Settlement Policy was sold in the Ritchie I and II Bankruptcy, including those entered into by and between Ritchie I and ABN or its assignees, as the same may have been amended, modified or supplemented from time to time.

II.     As used herein, the term "Ritchie II Asset Purchase Agreement" means all Asset Purchase Agreements executed by Ritchie II from June 20, 2007, through the date on which the final Conveyed Life Settlement Policy was sold in the Ritchie I and II Bankruptcy, as the same may have been amended, modified or supplemented from time to time.

4

JJ.    As used herein, the term "Ritchie I Debtor-In-Possession Credit Agreement" means all Debtor-In-Possession Credit Agreements executed by Ritchie I from June 20, 2007, through the date on which the final Conveyed Life Settlement Policy was sold in the Ritchie I and II Bankruptcy, including those entered into by and between Ritchie I and ABN, as the same may have been amended, modified or supplemented from time to time.

KK.    As used herein, the term "Ritchie II Debtor-In-Possession Credit Agreement" means all Debtor-In-Possession Credit Agreements executed by Ritchie II from June 20, 2007, through the date on which the final Conveyed Life Settlement Policy was sold in the Ritchie I and II Bankruptcy, including those entered into by and between Ritchie II and Ritchie Risk-Linked Strategies Trading, Ltd., or by a direct or indirect subsidiary of Ritchie Risk-Linked Strategies, Ltd., as the same may have been amended, modified or supplemented from time to time.

LL.    As used herein, the term "Ritchie II Intercreditor Agreement" means the Intercreditor Agreement entered into by Ritchie II et al. on or about December 15, 2005, and all amendments thereto.

MM.    As used herein, the term "Ritchie I MPPA" means the Master Policy Purchase Agreement entered into by LST I on the one hand and Ritchie I on the other, and all amendments thereto.

NN.    As used herein, the term "Ritchie II MPPA" means the Master Policy Purchase Agreement entered into by LST I on the one hand and Ritchie II on the other, and all amendments thereto.

OO.    As used herein, the term "Ritchie I Pre-Petition Loan Facility" means the pre-Petition Date loan and financial accommodation facility as evidenced by the Senior Term Loan and Liquidity Agreement.

PP.    As used herein, the term "Senior Term Loan and Liquidity Agreement" refers to the Senior Term Loan and Liquidity Agreement dated as of October 21, 2005 entered into by and

between Ritchie I and ABN, as the same may have been amended, modified or supplemented from time to time.

QQ.    As used herein, the term "Transaction Documents" has the meaning set forth in the Senior Term Loan and Liquidity Agreement and the Ritchie II Intercreditor Agreement.

RR.    As used herein, the terms "you" and "your" refer to Ritchie I.

## TOPICS FOR TESTIMONY

Ritchie Risk-Linked Strategies Trading (Ireland), Limited is requested to designate one or more 30(b)(6) witnesses who is(are) knowledgeable and prepared to testify regarding the following topics:

1.    The formation, structure, control, management, and financing of Plaintiffs.

2.    Plaintiffs' knowledge of, and due diligence concerning, Defendants, the secondary market for life insurance, the manner in which Life Settlement Policies are Originated and sold, and Coventry First's Origination and sale of Life Settlement Policies, including the use of "gross offers," co-broker payments, commissions paid to life settlement brokers and other intermediaries, and alleged misconduct of any kind.

3.    The Ritchie I MPPA and Ritchie II MPPA, including their negotiation, formation, and termination, and any representations or warranties therein. This includes each basis on which you claim any Defendant breached the Ritchie I MPPA or the Ritchie II MPPA.

4.    All Transaction Documents not listed in Topic 3, including their negotiation, formation, and termination, and any representations or warranties therein.

5.    The identification of each Life Settlement Policy you contend Coventry First Originated contrary to the representations and warranties in the Ritchie I MPPA or the Ritchie II MPPA and the bases of each such contention. This includes each law, statute, or regulation you claim Defendants violated for each Conveyed Life Settlement Policy.

6.    The purchase or planned purchase of Conveyed Life Settlement Policies by Ritchie I and Ritchie II, including each date of purchase.

7.      All facts supporting your contention that "Defendants likely acquired most if not all of the life insurance policies sold to Ritchie I . . . through a pattern of bribes, bid-rigging, fraud, and falsification of documents in the 45 states in which the policies were purchased." Complaint ¶ 43.

8.      Potential Investments and Potential Investors from January 1, 2005, through the date on which the final Conveyed Life Settlement Policy was sold in the Ritchie I and II Bankruptcy.

9.      Potential Purchases and Potential Purchasers from January 1, 2005, through the date on which the final Conveyed Life Settlement Policy was sold in the Ritchie I and II Bankruptcy.

10.     Potential Financing and Potential Financiers from January 1, 2005, through the date on which the final Conveyed Life Settlement Policy was sold in the Ritchie I and II Bankruptcy.

11.     The sale, securitization, or monetization—including any attempted or contemplated sale, securitization, or monetization—of Conveyed Life Settlement Policies (or any subset thereof). This includes the value or anticipated value or profits associated therewith, and the likely success or failure of that sale, securitization, or monetization. This also includes the negotiation, formation, or termination of any agreement for the sale, securitization, or monetization of any Conveyed Life Settlement Policy.

12.     The value of the Conveyed Life Settlement Policies. This includes all profit and loss statements, market and cash flow analyses, modeling and underwriting analyses, accounting (*e.g.*, mark-to-market and mark-to-model) analyses, and projected returns concerning any such Conveyed Life Settlement Policy. This also includes all documents and communications reflecting that Plaintiffs had any concerns regarding the purchase or marketability of any Conveyed Life Settlement Policy.

13.     The use of any mortality table, mortality rating, mortality rating provider, life expectancy, or other actuarial information in connection with any transaction involving any Conveyed Life Settlement Policy.

14.     Any services, ratings, or other work performed by any rating agency, including Moody's, concerning Ritchie I, Ritchie II, Ritchie III, Ritchie IV, or any Conveyed Life Settlement Policy, including the issuance of any rating, provisional rating, or presale report for any sale, securitization, or monetization of any Conveyed Life Settlement Policy.

15.     The NYAG's investigation of, issuance of any subpoena to, or civil suit against, Coventry First.  This includes all communications concerning the investigation, subpoena(s), or civil suit, and the impact, if any, of the investigation, subpoena(s), or civil suit on the Conveyed Life Settlement Policies or any effort to sell, monetize, or securitize the Conveyed Life Settlement Policies.

16.     Any other legal or regulatory conduct or inquiry that you claim affected the Conveyed Life Settlement Policies or any effort to sell, monetize, or securitize the Conveyed Life Settlement Policies.

17.     Rescission, the threat of rescission, or the potential for rescission of Life Settlement Policies Originated by Coventry First, including Plaintiffs' communications with third-parties regarding the threat or potential threat of rescission.

18.     Plaintiffs' efforts to sell Conveyed Life Settlement Policies after October 26, 2006.

19.     Bankruptcy protection for Plaintiffs, including preparations or plans to seek bankruptcy protection.

20.     The following documents executed in the Ritchie I and II Bankruptcy:  The Ritchie I Pre-Petition Loan Facility; the Ritchie I Debtor-In-Possession Credit Agreement; the Ritchie II Debtor-In-Possession Credit Agreement; the Ritchie I Asset Purchase Agreement; the Ritchie II Asset Purchase Agreement; and the Ritchie-ABN Sharing Agreement.

21.    The basis, calculation, and amount of Plaintiffs' alleged damages and any mitigation thereof, including lost profits, out-of-pocket expenses or losses, premium payments, consequential damages, special damages, transaction costs, and/or opportunity costs.

22.    The existence, custodian, location, collection, and general description of documents responsive to Defendants' discovery requests to Plaintiffs or RCM in this case or in *Ritchie Capital Management, LLC, et al. v. Coventry First LLC et al.*, No. 07-CV-3494-DLC (S.D.N.Y.), including any electronically stored information.

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2010, I caused true and correct copies of the

foregoing to be served via email and FedEx on the following counsel:

Jeffrey L. Liddle, Esq.
James R. Hubbard, Esq.
James W. Halter, Esq.
Liddle and Robinson, LLP
800 Third Avenue, 8th Floor
New York , NY 10022
(212) 687-8500
(212) 687-1505 (telecopy)
jliddle@liddlerobinson.com
jhubbard@liddlerobinson.com
jhalter@liddlerobinson.com

*Attorneys for Plaintiffs*

Katherine L. O'Connor

# EXHIBIT 14

1

* * * C O N F I D E N T I A L * * *

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Ritchie Risk-Linked Strategies   )

Trading (Ireland), Limited, and  )

Ritchie Risk-Linked Strategies   )   Civil Action No.

Trading (Ireland) II, Limited,   )   09-cv-1086-DLC

　　　　　　　　Plaintiffs,   )

　　　　Vs.　　　　　　　　)   CONTAINS CONFIDENTIAL
　　　　　　　　　　　　　　　　　　　AND
COVENTRY FIRST, LLC, THE COVENTRY)   ATTORNEYS' EYES ONLY
　　　　　　　　　　　　　　　　　INFORMATION
GROUP, INC, MONTGOMERY CAPITAL,  )   Designated parts not to
　　　　　　　　　　　　　　　　be used, copied or
INC., and LST I, LLC,            )    disclosed except as
　　　　　　　　　　　　　　　authorized by Court Order
　　　　　　Defendants.   )

--------------------------------)


VIDEOTAPE DEPOSITION OF WILLIAM HOBBS

New York, New York

March 11, 2010


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO:  18886

# REDACTED

# EXHIBIT 15

# REDACTED

# EXHIBIT 16

**REDACTED**

# EXHIBIT 17

**REDACTED**

# EXHIBIT 18

# REDACTED