**REDACTED VERSION – ORIGINAL FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED and RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 09 CV 1086 (VM)(DLC) ECF Case |
| v. | ) ) | |
| COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., and LST I LLC, | ) ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) ) ) | |

**PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S
FEBRUARY 17, 2012 ORDER DENYING PLAINTIFFS' REQUEST
TO DISCLOSE REBUTTAL EXPERT TESTIMONY**

## TABLE OF CONTENTS

**Page No.**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

SUMMARY OF PLAINTIFFS' ALLEGATIONS ..................................................... 6

PROCEDURAL HISTORY OF EXPERT DISCOVERY ........................................... 9

ARGUMENT ............................................................................................................. 13

I.  Standard of Review ......................................................................................... 13

II.  The February 17, 2012 Magistrate Judge's Order Denying Plaintiffs' Request to Disclose Rebuttal Expert Testimony Is Clearly Erroneous and Contrary to Law ................................................ 14

    A.  The Magistrate Judge Mistakenly Adopted Defendants' Contention that the Rebuttal Testimony Plaintiffs Seek to Disclose Is Damages Testimony on Which Plaintiffs Have the Burden of Proof, and Should Have Been Disclosed by November 9, 2011 under the Expert Disclosure Scheduling Order ................................................................................... 14

    B.  Plaintiffs Did Not Make a Tactical Decision to Withhold Any Expert Actuarial Report or Testimony .......................................... 18

    C.  Plaintiffs Did Not Delay in Making Their Rebuttal Request ................ 21

    D.  Permitting the Rebuttal Disclosure Requested Will Not Delay the Progress of this Case to Dispositive Motions and Trial, and Defendants Will Not Be Prejudiced By Providing Plaintiffs An Opportunity to Disclose Limited Rebuttal Testimony ...................................................................................... 22

    E.  Plaintiffs Have Demonstrated Good Cause for the Relief Sought ....................................................................................... 23

CONCLUSION ........................................................................................................ 24

## TABLE OF AUTHORITIES

**Page No.**

**Cases**

Avila-Blum v. Casa De Cambio Delgado, Inc., 236 F.R.D. 190 (S.D.N.Y 2006) ....................... 13

Baldwin Graphic Sys., Inc. v. Siebert, Inc., No. 03 C 7713, 2005 WL 1300763
    (N.D. Ill. Feb. 22, 2005) ................................................................................................. 18

Braun v. Lorillard Inc., 84 F.3d 230 (7th Cir. 1996) ................................................................. 18

Byas v. Doe, No. 93 Civ. 8965 (PKL), 1994 WL 225462 (S.D.N.Y. May 26,
    1994) ................................................................................................................................. 13

Cartier, Inc. v. Four Star Jewelry Creations, Inc., No. 01 Civ. 11295, 2003 WL
    22471909 (S.D.N.Y. Oct. 31, 2003) ................................................................................ 22

Clearview Concrete Prod. Corp. v. Gherardi, Inc., 453 N.Y.S. 2d 750 (2d Dept.
    1982) ................................................................................................................................. 15

Exo-Pro, Inc. v. Sierus Innovative Accessories, Inc., No. No. CV 05-
    3629(LDW)(AKT), 2008 WL 4878513 (E.D.N.Y Feb. 19, 2008)................................... 24

Huizenga Managers Fund, LLC v. A.R. Ritchie et al., No. 07 CH09626 (Cook
    County, Ill. 2007)........................................................................................................ 4, 19

In re Trasylol Prods. Liab. Litig., No. 1:09-MD-01928, 2010 WL 4065436 (S.D.
    Fla. Aug. 6, 2010) ............................................................................................................ 18

J&W Seligman & Co. v. Spitzer, No. 05 Civ. 7781 (KMW), 2007 WL 2822208
    (S.D.N.Y. Sept. 26, 2007)................................................................................................ 16

La Gorce Palace Condo. Assoc., Inc. v. QBE Ins. Corp., No. 10-20275-CIV, 2011
    WL 1522566 (S.D. Fla. Feb. 28, 2011) ........................................................................... 18

Madison Capital Co. v. S & S Salvage, No. 4:08-CV-00134-JHM, 2011 WL
    195639 (W.D. Ky. Jan. 19, 2011)..................................................................................... 18

McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584 (W.D.N.Y. 1995)........................... 23

Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 500 F.3d 171 (2d Cir. 2007)............. 15, 17

Northington v. Gospel Volunteers, Inc., No. 04 CIV 7589 (RMB)(DFE), 2007
    WL 1175292 (S.D.N.Y. Apr. 18, 2007) ........................................................................... 23

Potter v. Phillips, No. CV 03-4942, 2004 WL 3250122 (E.D.N.Y. Mar. 28, 2004) ................... 24

ii

S.W. v. City of New York, No. CV 2009–1777(ENV)(MDG), 2011 WL 2224976
    (E.D.N.Y June 3, 2011) ............................................................................... 24

Schonfeld v. Hilliard, 218 F.3d 164 (2d Cir. 2000) ....................................... 3, 4, 15 17

Scientific Components Corp. v. Sirenza Microdevices, Inc., No. 03 CIV 1851
    (NGG) (RML), 2008 WL 4911440 (E.D.N.Y. Nov. 13, 2008) ............................... 23

Thompson v. Keane, No. 95 Civ. 2442, 1996 WL 229887 (S.D.N.Y. May 6,
    1996) ...................................................................................................... 13

United States v. Cartwright, 411 U.S. 546 (1973) ................................................ 3, 16

United States v. U.S. Gypsum Co., 333 U.S. 364 (1948) ........................................ 13

**Other Authorities**

F.R.C.P. 16(b)(4) ............................................................................................ 23

F.R.C.P. 26(a)(2)(D) ................................................................................... 6, 23

F.R.C.P. 37(c)(1) ............................................................................................ 23

F.R.C.P. Rule 72(a) ...................................................................................... 1, 14

John D. Calamari and Joseph M. Perillo, The Law of Contracts § 14.12,
    at 504 (6th ed. 2009) ................................................................................. 15

Local Rule 37.2 ....................................................................................... 1, 2, 13

Local Rule 72.1 ............................................................................................... 1

New York Executive Law § 63(12) ....................................................................... 7

New York General Business Law § 340 .................................................................. 7

New York General Business Law § 352 .................................................................. 8

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Rule 72.1 of the Local Rules, Plaintiffs respectfully submit these objections to the February 17, 2012 Order of Magistrate Judge Freeman denying Plaintiffs' February 2, 2012 Local Rule 37.2 request to disclose expert actuarial testimony in rebuttal to the report of Defendants' actuarial experts Behan and Chaplin, first served on December 21, 2011, and in redacted form on February 6, 2012.

## PRELIMINARY STATEMENT

The Magistrate Judge's February 17, 2012 endorsed order denies Plaintiffs' Local Rule 37.2 request to disclose expert rebuttal to the testimony of Defendants' actuarial experts. Dkt. 104. The December 21, 2011 report of those experts, Behan and Chaplin ("Behan"), included the opinion that the market value of the 1085 life insurance policies Plaintiffs purchased from Defendants in 2005 and 2006 for $760 Million, pursuant to a pricing formula contained in the parties' contracts, was between $92 and $216 Million. (Compare Halter Decl. Ex. J at 14-15 with Ex. C at 79-80.) They thus conclude that the purchase contract Defendants (alternatively "Coventry") and Plaintiffs (alternatively "Ritchie") negotiated at arm's length required Ritchie to pay Coventry over $400 Million more than the policies were worth. (Halter Decl. Ex. C.) The Behan opinion is highly suspect, and is distant hindsight. When the policies were sold by Ritchie through the bankruptcy court in early 2008, in order to clear Ritchie's title after the New York Attorney General sued Coventry in late 2006 for bid-rigging and fraud in the acquisition of the policies, they sold, even as tarnished, for $452.5 Million.

Regardless of its credibility, the Behan actuarial opinion of the market value of the pool of policies in 2005-2006 has never been disclosed by Defendants in this case, or any other, or disclosed to Plaintiffs, prior to the December 21, 2011 expert disclosures in this case. The Behan report contradicts the *prima facie* evidence, from the sales price set by the parties' contracts (the

"MPPAs"), that the market value of the pool of policies was $650 Million ($760 Million less policy loans). Under settled New York law, known as the sales price rule, the sale price of an asset, negotiated in good faith and at arm's length by a willing buyer and willing seller, is the "best evidence" of the market value of the asset. The sale price here thus establishes, for damages purposes, *prima facie* proof that the market value of the life insurance policies in issue, when purchased by Plaintiffs, was $650 Million – without need for a separate expert actuarial opinion. That the actuarially-based mortality assumptions included in the MPPA pricing formulas in part determined the sales price of the policies does not, as Defendants argue, change the primary role of the agreement of the parties in determining market value. (See Halter Decl. Ex. A at 7.)

The Magistrate Judge's February 17th denial of Plaintiffs' expert rebuttal request effectively deprived Plaintiffs of their right to brief their discovery application – Plaintiffs were allowed only their pre-motion conference letter under Rule 37.2. The February 17th order also effectively denied Plaintiffs' request to respond to Defendants' February 9, 2012, 16-page single-spaced letter opposition to Plaintiffs' request. On February 14, 2012, the Magistrate Judge's Chambers orally provided Plaintiffs until February 22, 2012 to respond to Defendants' lengthy opposition, but that opportunity was lost when the Court denied Plaintiffs' request on February 17th, five days before Plaintiffs' response was due. (Hubbard Decl. ¶11.)

Without the benefit of briefing by Plaintiffs beyond their pre-motion conference letter, the Magistrate Judge accepted Defendants' argument that Plaintiffs improperly sought permission to disclose "new experts to testify regarding damages . . . on which they bear the burden of proof" (Halter Decl. Ex. A at 1), and thus concluded that Plaintiffs sought to "serve expert reports outside of the deadline set by the Court," and to delay the proceedings. Dkt 104.

Defendants' argument, however, falsely characterized Plaintiffs' application, the rebuttal sought, and the relevant burden of proof. For this reason, the Magistrate Judge's reliance upon the "reasons stated persuasively in Defendants' opposition," without considering responsive briefing by Plaintiffs, has resulted in the prejudicial denial of Plaintiffs' right to expert rebuttal testimony, is clearly erroneous, and is contrary to settled law that a party should not be deprived of rebuttal expert testimony absent egregious circumstances that are not present here.

Plaintiffs' February 2, 2012 pre-motion conference letter did not seek to disclose a "new" expert, or an expert to calculate "damages." No expert economist testimony is needed for Plaintiffs to establish *prima facie* proof of the market value of the insurance policies on the dates they were purchased, or their out-of-pocket loss on the Coventry transaction. Under New York law, the "best evidence" of the market value of an asset is the "sale price for the . . . asset, negotiated by parties at arm's length . . . ." Schonfeld v. Hilliard, 218 F.3d 164, 178 (2d Cir. 2000).

> In determining the market value of unique or intangible assets, New York courts have embraced the hypothetical market standard enunciated by the Supreme Court in United States v. Cartwright, 411 U.S. 546, 551 . . . . (1973): 'The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.'

Id.

The "sales price rule" establishes the market value of the assets in issue in this case. The net purchase price, essentially undisputed, was $650 Million over the 2005-2006 purchase period. Plaintiffs' out-of-pocket loss is easily calculated by the lay witnesses involved in the relevant transactions from the amount recovered by Ritchie in the bankruptcy sale of the policies.

Plaintiffs requested permission to disclose rebuttal actuarial testimony regarding the pricing formula adopted by Coventry and Ritchie only *after* Defendants' Behan rendered their

December 2011 opinion that the market value of the 1085 policies in 2005-2006 was in the range of $92-$216 Million.  Neither that valuation, nor that opinion, or anything close to it had ever been offered by Coventry in this litigation, or any other to our knowledge, or in any litigation related to the pool of policies, including the *Huizenga* litigation in Chicago, prior to Defendants' expert disclosures on December 21, 2011.

Equally important, and contrary to Defendants' contention, Plaintiffs do not bear the burden of defending the pricing model and actuarial assumptions adopted by Coventry and Ritchie in the sales contracts with expert actuarial testimony.  Plaintiffs' *prima facie* proof of market value is established by the net sale price – $650 Million.  The burden of proof then shifts to Defendants, under settled New York law, to challenge the market value as established by the arm's length purchase price:

> If, fortunately, the asset at issue has a sales history, then despite the lack of a traditional market, it is easier for the Court to determine the asset's market value as of the time it was lost.  Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value. (citations omitted)
>
> * * * *
>
> Once a plaintiff has produced such evidence, the burden is on the defendant to demonstrate 'special circumstances which would negate [the relevance] of a prior arm's length purchase price.' (citations omitted).

Schonfeld, 218 F.3d at 179 (emphasis added).

The length to which Coventry's February 9, 2012 opposition letter goes to attack its own actuarial assumptions, and to place the burden of introducing that evidence on the Plaintiffs, is striking.

The record reflects that Plaintiffs long ago retained an expert economist to consider a calculation of Plaintiffs' damages, as Plaintiffs informed the Magistrate Judge and Defendants during discovery.  (Dkt. 87 at 18; Halter Decl. Ex. K.)  Plaintiffs' counsel received a full draft

report from that economist well in advance of the November 9th disclosure deadline. (Halter Decl. ¶20.) That draft report did not address the actuarial challenges to the pricing formula in the parties' MPPA contracts that are presented by Behan's December 21, 2011 report, or any challenge to that formula made by any other person. (Halter Decl. ¶20.) Plaintiffs ultimately elected not to use an economist simply to calculate the damages flowing from Defendants' breach of the warranties of the MPPAs. (Halter Decl. ¶21.)

Defendants' February 9th opposition letter repeatedly accuses Plaintiffs of "a pattern of disregarding scheduling orders," and of seeking by their rebuttal request to "violate the Court's scheduling orders" – as if Plaintiffs had unilaterally served a rebuttal disclosure rather than making a respectful request for leave to do so. (Halter Decl. Ex. A.) Not once in this case – before the rhetoric of Defendants' February 9th opposition letter – have Plaintiffs been accused of violating any court order, scheduling or otherwise.

The denial of Plaintiffs' request for rebuttal expert testimony creates a risk of serious prejudice to Plaintiffs. Defendants' Behan opinion is nothing short of startling. His opinion is that the 1085 life insurance policies Ritchie purchased from Coventry First in 2005 and 2006 were really worth only $92 to $216 Million. (Halter Decl. Ex. C at 79-80.) The result is to assert that when Ritchie was required to pursue bankruptcy in order to clear Ritchie's title to the pool of policies, and sold the policies there for $452.5 Million, Plaintiffs suffered no loss – though Ritchie's actual out of pocket loss was $259 Million. (Halter Decl. Ex. J at 14-15.) Plaintiffs do not believe that the Behan attack upon the actuarial assumptions *both Coventry and Ritchie* adopted in their MPPA sale contract is credible or admissible evidence of market value for damages purposes. To the extent such opinion testimony is allowed, however, Plaintiffs would be decidedly prejudiced by the denial of their rebuttal right. They are entitled, as a matter of

fundamental fairness, and by the rebuttal right set forth in Fed. R. Civ. P. 26(a)(2)(D), to rebut *Coventry's* actuarial experts with at least one disclosure that addresses *Coventry's* challenge to the pricing formula *both it and Ritchie* adopted at arm's length in the underlying contract.

Denial is especially harsh here, where there has been no trial or pre-trial scheduling order entered, no schedule for dispositive motions established, the deposition of one rebuttal expert will not affect the preparation and filing of any dispositive motion, and the Defendants cannot demonstrate that any material delay in the proceedings would result. Indeed, the entire month of February has been devoted by the parties to the depositions of *Defendants' eight experts*, and the review of their 1000 pages (mostly single-spaced) of expert reports. No limit was imposed or sought on Defendants' disclosures. Yet despite the time devoted to Defendants' evidence, Defendants complain that there is no room in the litigation for one rebuttal from Plaintiffs – to Defendants' contention that the life insurance policies Coventry sold Ritchie were worth over $400 Million less than the price Coventry and Ritchie negotiated at arm's length.

## <u>SUMMARY OF PLAINTIFFS' ALLEGATIONS</u>

The following paragraphs are a brief summary of the factual background of Plaintiffs' claims as asserted in the Complaint. Dkt. 1. The present dispute arises out of Plaintiffs' purchase of 1,085 life insurance policies from Defendants. In early 2005, Plaintiffs and their affiliates sought to purchase life insurance policies from Defendants that Coventry First had purchased in the secondary market for life insurance policies and transferred to Defendant LST I. Plaintiffs intended to create a diverse pool of policies to securitize and otherwise profit from their resale.

On June 30, 2005, Plaintiffs and Defendants entered into a series of contracts by which Plaintiff Ritchie Risk-Linked Strategies Trading (Ireland), Limited would purchase policies from

a special purpose vehicle, Defendant LST I LLC, established by the other Defendants. One of the contracts, the Master Policy Purchase Agreement ("MPPA"), contained representations and warranties that guaranteed that the policies sold to Plaintiffs would be purchased by Defendants in compliance with law, and that there were no proceedings pending or to Defendants' knowledge threatened that would impact the assets or the sale process. Plaintiffs contend that both aspects of these representations and warranties were false, and thus that the representations and warranties were breached by Defendants because they purchased numerous policies through bid-rigging and fraud, and because there was in fact "a proceeding" – the NYAG investigation of Coventry for those same practices – by at least July 27, 2005 (the "NYAG Investigation"), when Defendants received the first of two subpoenas from the NYAG, and the purchase program was beginning.

The June 30, 2005 Master Policy Purchase Agreement was "amended and restated" on September 8, 2005. Plaintiff Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited executed an additional Master Policy Purchase Agreement with Defendant LST I LLC on December 15, 2005. All of the Master Policy Purchase Agreements contain nearly identical representations and warranties.

After acquiring a significant number of policies from Defendants, Plaintiffs began preparing to securitize them, including receiving a provisional A(3) rating from Moody's on October 11, 2006. On October 26, 2006, the NYAG investigation became public when the NYAG filed a civil complaint against Defendants Coventry First, Montgomery Capital, The Coventry Group, and Reid S. Berger, a Vice President of Defendant Coventry First. Dkt. 1 at Ex. A. The NYAG complaint alleged that Defendants had engaged in fraudulent business practices in violation of New York Executive Law § 63(12), anti-competitive behavior in

violation of New York General Business Law § 340 *et seq.*, securities violations pursuant to New York General Business Law § 352 *et seq.*, fraud, and inducement of breach of fiduciary duty. The NYAG complaint gave specific examples of bid-rigging and falsifying documents in the purchase of life insurance policies by Defendants, and indicated the existence of additional violations. Three of the policies specifically cited by the NYAG were life insurance policies Defendants sold to Plaintiffs. In addition to disgorgement of profits and other damages, the NYAG complaint requested the court to require that every insured who had sold a policy to Defendants since 2001 be provided the option to rescind the sale to Defendants. That same day, as a result of the NYAG's complaint, Moody's withdrew the provisional rating it had issued for the securitization of the life insurance policies. Plaintiffs were, therefore, not able to complete their intended securitization.

To avoid the threat of rescission posed by the NYAG complaint, and to clear the title to the policies so Plaintiffs could resell them, Plaintiffs filed for bankruptcy and conducted a sale of the policies through the bankruptcy court. Plaintiffs were not able to mitigate all of their damages through this sale process. Plaintiffs paid over $760 million to purchase the policies from Defendants (a net of approximately $650 million after loans taken against the policies) pursuant to a pricing formula the parties negotiated in the MPPAs. At the bankruptcy auction on January 9, 2008, the policies sold for approximately $452.5 million. After taking into account premiums paid on the policies and other costs as well as death benefits received with respect to the policies, Plaintiffs suffered out-of-pocket losses of approximately $259 Million, in addition to bankruptcy fees incurred in order to sell the policies. (Halter Decl. Ex. J at 14-15.) Plaintiffs' Complaint also seeks approximately $145.5 million in lost profits because the Defendants' practices ultimately led to Moody's withdrawal of its rating for the securitization.

## PROCDEDURAL HISTORY OF EXPERT DISCOVERY

By Memo Endorsement of August 2, 2011 (Dkt. 92), Magistrate Judge Freeman scheduled the disclosure of expert reports to begin on October 28, 2011 with Plaintiffs' Expert Reports, to be followed by Defendants' Expert Reports on December 9, 2011, Amended Expert Reports on December 23, 2011, and the close of Expert Discovery on February 10, 2012, as jointly proposed by counsel by letter of July 28, 2011. That schedule was extended at Plaintiffs' request to provide for the filing of Plaintiffs' expert reports on November 9, 2011, Defendants' expert reports on December 21, 2012, amended expert reports on January 12, 2012, and for the close of expert discovery on February 22, 2012 (ultimately February 24 to accommodate the convenience of Defendants' experts in providing deposition testimony). Dkt. 93.

On November 9, 2011, Plaintiffs served two expert witness reports pursuant to this schedule, totaling 123 pages, double-spaced. The first expert, Kevin Glowacki, addressed Defendants' business practices, particularly the use by Defendant Coventry First of "co-broker" payments, a practice characterized by the New York Attorney General's October 2006 civil complaint against Coventry as "bid-rigging." (Halter Decl. Ex. D.) The second expert designated by Plaintiffs, Tsvetan Beloreshki, addressed Plaintiffs' ability to securitize the pool of life insurance policies they purchased from Coventry in a planned securitization, and the amount of profit Plaintiffs lost ($145.5 Million) when their Moody's rating, necessary for the planned securitization, was withdrawn following the publication of the NYAG complaint. (Halter Decl. Ex. E.)

On December 21, 2011, one day before the Christmas holiday period began, Defendants served Plaintiffs' counsel with six expert reports, authored by eight expert witnesses, totaling over 1000 pages, most single-spaced. Each of the 1000 pages of Defendants' expert reports was designated in blanket fashion as Attorneys' Eyes Only ("AEO") or Confidential Information

under the Protective Order.   The legend **This Report Contains Information Designated "Attorneys' Eyes Only" or "Confidential" Pursuant to Court Order"** appeared at the top of each of the 1000 pages, without any specification of the information on any page to which the designation was intended to apply.   (See, e.g., Halter Decl. Exs. B and C.)

In early January, Plaintiffs' counsel complained to Defendants' counsel, orally and in writing, that Defendants' blanket designation of the reports AEO made it impossible for them to advise their clients of the contents of Defendants' expert reports in a meaningful way.   (Halter Decl. Ex. G.)   While Plaintiffs' complaint was initially rebuffed by Defendants, ultimately Defendants agreed to redact the portions of their expert reports that reflected AEO material. (Halter Decl. ¶11.)   As a result, during the evening of January 30, 2012, the first two such redacted expert reports – including the 96 page (double spaced) report of Defendants' economist Jonathan Walker – were served on Plaintiffs' counsel, and were provided the next morning, January 31, 2012, to Plaintiffs.   (Halter Decl. ¶¶12-13.)[1]

The January 31, 2012 delivery of the redacted Walker report was the first delivery of an expert report of Defendants to the Plaintiffs in this case.   Walker's report revealed to Plaintiffs for the first time that the Behan actuarial report – 92 pages with 162 footnotes – dramatically challenged the market value of the pool of policies Plaintiffs purchased from Defendants. Walker attacked the actuarial assumptions underlying the pricing formula adopted by the parties' MPPA contracts, some six years earlier.   Walker then extensively references Behan's opinion of the actuarial market value of the policies on the dates of purchase, including the actuarial

---

[1] In the interim, Defendants proposed deposition dates between February 2 and February 24, 2012 for the depositions of their eight expert witnesses. Plaintiffs agreed to the schedule as proposed, and those depositions took place as scheduled over that 23 day period at the offices of Defendants' counsel in Washington, D.C. With preparation and travel, those eight expert depositions, most utilizing the full seven hours, consumed the entire month of February, likely for counsel for both parties.

assumptions Behan used to value the policies Plaintiffs purchased from Defendants in 2005 and 2006. He valued the policies in a range of $92,395,657 to $216,767,452.[2]

Relying in part on Behan's opinion, and the bankruptcy sale price of $452.5 Million, Defendant's economist Walker proffered the opinion that Plaintiffs suffered no out-of-pocket loss as a result of Defendants' breach of the "no violations" and "no proceedings" warranties of the MPPAs. (Halter Decl. Ex. B at 40.) Shortly after receiving the Walker report, Plaintiffs authorized their counsel to request permission to serve a rebuttal to the Behan report. (Hubbard Decl. ¶5.) Plaintiffs' request to serve a rebuttal to the Behan report followed, by pre-motion conference application to Magistrate Judge Freeman under Local Rule 37.2, on February 2, 2012, three days after the redacted Walker report, with extensive reference to the Behan opinion, was made available to Plaintiffs.

Plaintiffs' letter sought the court's permission to "supplement their expert disclosures with a rebuttal report to [Defendants' actuarial experts] Behan and Chaplin," – not to the damages calculations of Defendants' economist Walker. On Thursday, February 9, 2012, Defendants responded with a 16 page, single-spaced letter to Magistrate Judge Freeman, opposing the relief requested. (Halter Decl. Ex. A.) The letter was mailed by Federal Express to

---

[2] Plaintiffs were further able to see the actuarial assumptions Behan used from the Walker report, as he indicated that "███████████████████████████████████████████████████████████████████████████████████████████████████████." (Halter Decl. Ex. B (Walker Report) at 43 n.186).

11

the Court that date, and a copy provided to Plaintiffs' counsel by e-mail on Friday, February 10th.[3]  (Halter Decl. ¶2.)

On Monday, February 13, 2012, Plaintiffs' counsel traveled to Washington, D.C, in preparation for the deposition of Defendants' proffered expert Boris Ziser on February 14th, and depositions on February 15th and 17th of Defendants proffered experts David Babbel and Douglas Laycock.  (Halter Decl. ¶¶24-25.)  On Tuesday morning, February 14th, during a break in the Ziser deposition, Plaintiffs' counsel asked one of Defendants' counsel if he would consent to a request that Plaintiffs be given an adequate amount of time to respond to Defendants' February 9th opposition, in light of the full week commitment to depositions in Washington, D.C.  Defendants' counsel did not offer consent, but suggested that Plaintiffs' counsel contact Magistrate Judge Freeman's chambers with the request, in accordance with the parties' past practice regarding briefing.  (Hubbard Decl. ¶8.)  Mr. Hubbard then called Magistrate Judge Freemans' chambers, reached a person who identified herself as one of the Court's law clerks, and asked to have one week, until February 22, 2012, to respond to Defendants' opposition – pointing out that the parties were in deposition in Washington, D.C. all week in the case.  (Hubbard Decl. ¶9.)  The Court's clerk, after leaving the line for a few moments, advised Plaintiffs' counsel that Magistrate Judge Freeman did not expect to reach Plaintiffs' request for rebuttal disclosure before Wednesday, February 22nd, and that Plaintiff could have until that time to respond to Defendants' opposition.  (Hubbard Decl. ¶10.)  Mr. Hubbard then spoke to Defendants' counsel in the deposition room, and reported that the Magistrate Judge had provided

---

[3]  No request was made by Defendants to exceed (by over 500%) the two and three page limits on pre-motion conference letters that is the practice of the Individual Rules of the Judges of the Southern District.

Plaintiffs until February 22, 2012 to respond to Defendants' February 9th opposition letter. (Hubbard Decl. ¶11.)

On February 17, 2012, three days after the telephone call to Chambers, and five days before the deadline provided for Plaintiffs' response to Defendants' February 9th opposition, Magistrate Judge Freeman denied Plaintiffs' rebuttal request by endorsement on Plaintiffs' February 2, 2012 Local Rule 37.2 letter to the Court, without permitting the filing or consideration of Plaintiffs' response to Defendants' February 9 opposition:

> For the reasons stated persuasively in Defendants' opposition letter of February 9, 2012, Plaintiffs' request to serve expert reports outside of the deadline set by the Court is <u>denied</u>. Plaintiffs had more than ample time to prepare and serve expert reports on the subject of damages, and have not shown good cause for failing to do so within the allotted time. The Court also does not accept that Plaintiffs are somehow victims of unfair surprise. This does not appear to be a case of sand-bagging by Defendants, but rather of strategic decision and delay by Plaintiffs.

Dkt. 104, 102.

## <u>ARGUMENT</u>

### I.   <u>Standard of Review</u>

Federal Rule of Civil Procedure 72(a) permits the district court to set aside portions of a non-dispositive order of a magistrate judge that are clearly erroneous or contrary to law. <u>See</u> <u>Avila-Blum v. Casa De Cambio Delgado, Inc.</u>, 236 F.R.D. 190, 191 (S.D.N.Y 2006) (Marrero, J.). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>Byas v. Doe</u>, No. 93 Civ. 8965 (PKL), 1994 WL 225462, at *1 (S.D.N.Y. May 26, 1994) (quoting <u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364, 395 (1948)). Further, "[a]n order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." <u>Thompson v. Keane</u>, No. 95 Civ. 2442, 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996). The non-dispositive order of a magistrate judge acting on referral for pretrial supervision

is entitled to substantial deference, and may be reviewed under an abuse of discretion standard.

Avila-Blum, supra, 236 F.R.D. at 191.

II.     **The February 17, 2012 Magistrate Judge's Order Denying Plaintiffs' Request to Disclose Rebuttal Expert Testimony Is Clearly Erroneous and Contrary to Law**

A. The Magistrate Judge Mistakenly Adopted Defendants' Contention that the Rebuttal Testimony Plaintiffs Seek to Disclose Is Damages Testimony on Which Plaintiffs Have the Burden of Proof, and Should Have Been Disclosed by November 9, 2011 under the Expert Disclosure Scheduling Order

The Magistrate Judge's February 17th endorsed order concluded that Plaintiffs "had more than ample time to prepare and serve expert reports on the subject of damages, and have not shown good cause for failing to do so within the allotted time." Dkt. 104. This conclusion was a mistake, and thus is clearly erroneous, plainly generated by the erroneous contention of Defendants' February 9th opposition letter that Plaintiffs sought to identify "new experts to testify regarding damages, an issue on which they bear the burden of proof . . . under the guise of 'rebuttal reports' . . ." (Halter Decl., Ex. A at 1.) It is a mistake because Plaintiffs did not and do not have the burden of establishing the market value of the insurance policies in issue, as warranted or after Defendants' breach of warranty, by defending six years later, by expert actuarial testimony, the actuarial assumptions adopted by Coventry and Ritchie in the purchase contracts. The best and primary evidence of the market value of the policies, as warranted in 2005 and 2006, and as sold after the breach was discovered, is the actual price at which the policies were purchased and later sold.

To be sure, Defendants contend that the expert rebuttal Plaintiffs seek to disclose relates to Plaintiffs' damages, and it may – if Defendants' actuarial challenge to the contract price set by Plaintiffs and Defendants, and thus to Plaintiffs' proof of the market value of the policies, is admitted into evidence. But even if the rebuttal sought relates generally to Plaintiffs' damages

14

for breach of contract, it is not part of Plaintiffs' *prima facie* proof of damages, and there is no

requirement that such proof be established by expert testimony. Equally important, under New

York law the burden of challenging the contract price is Defendants, not Plaintiffs, and Plaintiffs

were not required to introduce that actuarial challenge into its *prima facie* proof of damages.

Under New York law, the general measure of damages for breach of warranty is the

"benefit of the bargain" rule, which is defined as "the difference between the actual value of the

property and the value which it would have had absent the breach." Clearview Concrete Prod.

Corp. v. Gherardi, Inc., 453 N.Y.S. 2d 750, 756 (2d Dept. 1982).

> The "benefit of the bargain" standard is intended to place the injured party in as
> good a position as would have been achieved had there been full performance of
> the contract, but the damages claimed must be measurable with a reasonable
> degree of certainty and must be adequately proven.

Id.; accord Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 185 (2d Cir.

2007) (defining benefit of the bargain damages in an action for breach of warranties in a

Purchase Agreement as the difference between the value of a Merrill business unit as warranted

by Merrill Lynch and its true value as delivered). Value means market value. John D. Calamari

and Joseph M. Perillo, The Law of Contracts § 14.12, at 504 (6th ed. 2009). Under New York

law, the "best evidence" of the market value of the assets in issue is the "sale price for the . . .

asset[s], negotiated by parties at arm's length . . . ." Schonfeld v. Hilliard, 218 F.3d 164, 178 (2d

Cir. 2000).

> In determining the market value of unique or intangible assets, New York courts
> have embraced the hypothetical market standard enunciated by the Supreme Court
> in United States v. Cartwright, 411 U.S. 546, 551 . . . . (1973): 'The fair market
> value is the price at which the property would change hands between a willing
> buyer and a willing seller, neither being under any compulsion to buy or sell and
> both having reasonable knowledge of relevant facts.'

Id.

The "sales price rule" establishes the market value of the life insurance policies Ritchie purchased as warranted, and thus "absent breach." The sales price of the insurance policies, and thus their market value, was established by the pricing formula in the MPPA contracts negotiated at arm's length by Coventry and Ritchie – a willing buyer and a willing seller. That net price, essentially undisputed, was approximately $650 Million. (Halter Decl. Ex. J.) The policies were purchased by Ritchie from Coventry in 2005 and 2006 while the New York Attorney General was investigating Coventry for big rigging and fraud, and thus while a "proceeding" was pending, contrary to the "no proceedings warranty" in the parties' contracts. Cf. J&W Seligman & Co. v. Spitzer, No. 05 Civ. 7781 (KMW), 2007 WL 2822208, at *5 (S.D.N.Y. Sept. 26, 2007) ("The Attorney General's issuance of the contested subpoenas as part of a Martin Act investigation constitutes an 'ongoing state proceeding'").

It is thus clear under New York law that Plaintiffs do not bear the burden of establishing the market value of the policies on the dates of purchase, and thus as warranted in 2005 and 2006, by expert actuarial testimony. Plaintiffs' *prima facie* proof of market value is established by the net sale price – $650 Million. Equally clear, no expert testimony is required for Plaintiffs to establish the "actual" market value of the policies, or their "true value." Undisputed evidence demonstrates that the policies were sold in early 2008 in a bankruptcy auction for approximately $452.5 Million – after publication of the October 2006 New York Attorney General's civil complaint charging Coventry with bid-rigging in its acquisition of the policies, and Moody's withdrawal of its rating for the planned securitization. (Halter Decl. Ex. J at 14-15.)

In the face of this non-expert evidence of the sale price of the policies when purchased from Coventry, and the price when sold in the bankruptcy, the burden of proof shifts to Defendants to challenge the market value established by these arm's length sales prices:

> If, fortunately, the asset at issue has a sales history, then despite the lack of a traditional market, it is easier for the Court to determine the asset's market value as of the time it was lost. Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value. (citations omitted)
>
> Once a plaintiff has produced such evidence, <u>the burden is on the defendant</u> to demonstrate 'special circumstances which would negate [the relevance] of a prior arm's length purchase price.' (citations omitted)

Schonfeld, 218 F.3d at 178-79 (emphasis added).

Defendants' February 9th opposition letter attempted, in a lengthy footnote, to distinguish Schonfeld. (Halter Decl. Ex. A at 11 n.7.) Their arguments are unpersuasive. Defendants argue first that Schonfeld is inapplicable because it is a "lost asset" case rather than one where the asset lost value as a result of a defendants conduct. That distinction does nothing to detract from the fundamental holding of Schonfeld regarding proof of the market value of an asset. Second, Defendants appear to argue that Plaintiffs cannot show a diminution of the value of the policies as a result of Defendants' breach. While damage causation is a different issue, it is obvious here that the market value of the pool of policies dropped from the $650 Million net purchase price to approximately $452 Million when the policies were sold by Ritchie in bankruptcy, after the quality of Ritchie's title to the policies was damaged by the NYAG's threat of rescission and Moody's withdrawal of its rating for the planned securitization. Third, Defendants openly misuse the "as warranted" language of Merrill Lynch, 500 F.3d at 185. The MPPA contracts did not warrant the market value of the policies purchased, and disclaimed any such warranty. They MPPA contracts warranted that the policies sold to Plaintiffs would be purchased by Defendants in compliance with law, and that there were no "proceedings" pending or threatened that would impact the assets or the sale process.

At pages 12-13 of their opposition letter (Halter Decl. Ex. A at 12-13), Defendants rely upon cases outside this jurisdiction that have rejected rebuttal evidence both before and during

trial.  These cases are plainly distinguishable from the facts presented here.  See Braun v. Lorillard Inc., 84 F.3d 230, 237 (7th Cir. 1996) (upholding exclusion of a lay rebuttal witness at trial where the plaintiffs had been rebuffed during their case in chief for failure to locate the witness in time to put him on the pretrial order); Madison Capital Co. v. S & S Salvage, No. 4:08-CV-00134-JHM, 2011 WL 195639, at *4 (W.D. Ky. Jan. 19, 2011) (excluding two rebuttal witnesses, finding that the proposed rebuttal was a means of bolstering the primary witness and that the testimony would have to be in the case-in-chief "[i]f [p]laintiff wished to advance an argument that the fair market value . . . was different than the price paid"); In re Trasylol Prods. Liab. Litig., No. 1:09-MD-01928, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010) (finding, after disclosure, that the rebuttal report did "not make any attempt to respond to the expert opinion of" the opposing expert); Baldwin Graphic Sys., Inc. v. Siebert, Inc., No. 03 C 7713, 2005 WL 1300763, at *1-2 (N.D. Ill. Feb. 22, 2005) (finding, in a patent infringement suit, defendants deliberately chose to assert new claims that the patents in question were invalid as rebuttal should have been asserted initially and, thus, were not proper rebuttal); La Gorce Palace Condo. Assoc., Inc. v. QBE Ins. Corp., No. 10-20275-CIV, 2011 WL 1522566, at *3 (S.D. Fla. Feb. 28, 2011) (excluding expert reports for repeated failures of counsel to provide proper disclosures).

B. Plaintiffs Did Not Make a Tactical Decision To Withhold Any Expert
   Actuarial Report or Testimony

In their submission to Magistrate Judge Freeman, Defendants portray Plaintiffs as having an actuarial analysis prepared for this case, but intentionally withholding it when they disclosed their other experts.  This depiction of events, though false, appears to have been accepted by the Magistrate Judge as accurate.  Dkt. 104.  Yet Plaintiffs had not spoken to any potential actuarial expert with respect to this case until after they received Defendants' expert reports (unredacted)

on December 21, 2011. (Halter Decl. ¶22.) Plaintiffs still have not retained an actuarial expert in this case in any capacity. (Halter Decl. ¶23.) As discussed above, the damages expert Plaintiffs retained and chose not to use as a testifying expert was an economist, and did not attempt a retroactive actuarial determination of the market value of the policies in 2005 and 2006. (Halter Decl. ¶¶20-21.)

Defendants' February 9th opposition letter also mistakenly claims that Plaintiffs "also retained an actuarial expert to testify about the policies' value in" *Huizenga Managers Fund, LLC v. A.R. Ritchie et al.*, No. 07 CH09626 (Cook County, Ill. 2007) ("*Huizenga*"). (Halter Decl. Ex. A at 7.) Plaintiffs are not parties in *Huizenga*, and Plaintiffs' counsel are not counsel and have never been counsel in that case (which is subject to a Protective Order), though a defendant in that case is a corporate relative of Plaintiffs here. (Halter Decl. ¶7.) Plaintiffs' counsel had no role in the creation of the report of the actuarial expert (Dr. Jay Vadiveloo) who was retained by the Ritchie defendants in *Huizenga*. The report of Dr. Vadiveloo was only provided to Plaintiffs' counsel here, and indeed to Defendants' counsel, when Defendants sought the expert reports and testimony in *Huizenga* in discovery in this case, and the Court ordered Plaintiffs to obtain them from Plaintiff's counsel in the Chicago action and provide copies to the Defendants. (Halter Decl. Ex. F.) [4]

Further, Dr. Vadiveloo appeared as a rebuttal expert in *Huizenga* – called by the defense to rebut the testimony of two actuaries retained by the plaintiffs there, who challenged some of the actuarial assumptions Coventry – and Ritchie – used in the pricing formula contained in their contract. At no time prior to December 21, 2011, when Behan was disclosed, had Defendants

---

[4] Ritchie Capital Management, LLC is a defendant in *Huizenga*, and is a client of Plaintiffs' counsel in this case, in part as a result of its relationship to the two special purpose LLC's that are Plaintiffs here.

here ever adopted the testimony of the Huizenga experts in this action, or warned that they would. Plaintiffs here thus had no obligation to anticipate the challenge of Defendants' actuarial expert Behan, or to rebut their imagined testimony in advance of their initial expert disclosures.

Similarly, the actuarial experts Plaintiffs retained to assist in the bankruptcy process in 2007, identified by Defendants at pages 7 and 9 of their February 9th opposition letter, were not retained to examine the market value of the pool of policies in 2005 and 2006. They were retained to determine the actuarial value of the policies in 2007, a time when the NYAG complaint and the bid-rigging and fraud allegations regarding Defendants' purchase practices were public. (Halter Decl. ¶26.)

While Defendants argue that these actuarial valuations in 2007 were lower than the 2005-2006 sales price (they were), that fact was not translated by Defendants at any time – at least until December 21, 2011 – into the absurd claim that the market value of the policies in 2005 and 2006 was between 15-20% of the $650 Million Ritchie paid Coventry to buy them. Nor did these actuarial valuations of the pool of policies for the bankruptcy put Plaintiffs on notice of the extensive actuarial assumptions Behan would use in December 2011 in an attempt to value the policies for Defendants. It is these actuarial assumptions – many newly created – that Plaintiffs now seek, in fairness, to rebut. It is obvious that Coventry now, through Behan, attempts to run from its own pricing formula in an effort to mitigate the damage it inflicted. It was Coventry, in fact, who developed the AVS2 mortality table – a significant part of the pricing formula included by Coventry and Ritchie in the pricing contracts in 2005 – that Behan, now seven years later, on Coventry's behalf, rejects as invalid. (Halter Decl. Ex. L at 11.)

C. Plaintiffs Did Not Delay in Making Their Rebuttal Request

Defendants' February 9th opposition letter to Magistrate Judge Freeman repeatedly suggests that Plaintiffs attempted to "game" the expert disclosures by holding back the expert actuarial report they now seek to use as rebuttal – "allow the expert deadline to pass with damages expert in hand, but to not submit any opinion from that person." (Halter Decl. Ex. A at 6.) That allegation is false. As indicated earlier, the economist Plaintiffs retained to calculate damages did not conduct any actuarial analysis of the pricing mechanism or the mortality tables or other actuarial tables adopted by the parties' contracts. (Halter Decl. ¶20.) Plaintiffs did not retain any actuarial expert, or talk to any actuarial expert, or request an actuarial analysis of the pricing formula in their contracts from any expert, with respect to this case prior to receiving the Defendants' expert disclosures in late December 2011. (Halter Decl. ¶22.)

Plaintiffs acted with diligence in seeking permission from the Magistrate Judge on February 2nd to serve expert rebuttal to the Behan report. On December 21, 2011, one day before the Christmas holiday period began, Defendants served six expert reports, authored by eight expert witnesses, totaling over 1000 pages, much of it single-spaced. Each of the 1000 pages of Defendants' expert reports was designated in blanket fashion as containing Attorneys' Eyes Only or Confidential Information under the Protective Order. During the first week in January, Plaintiffs' counsel sought permission to disclose Defendants' expert reports to their client, but were unable to do so until negotiations resulted in an agreement in late January, a few days before the depositions of Defendants' eight experts was to begin, for Defendants to redact the Attorneys' Eyes Only information in the reports. (Halter Decl. ¶¶8-11.) Plaintiffs received the first two redacted expert reports – Small and Walker – on January 31, 2012, immediately after they had been delivered to counsel on the evening of January 30, 2012. (Halter Decl. ¶¶12-

13.) Upon review of the Walker report, which included extensive reference to the Behan opinion on the market value of the policies purchased six years earlier, Plaintiffs' counsel received authorization from Plaintiffs to seek permission to rebut the Behan report, and moved immediately, on February 2nd, for permission to serve rebuttal expert testimony. (Hubbard Decl. ¶5.) That request was made within three days of receipt of the redacted Walker report.

D.   Permitting the Rebuttal Disclosure Requested Will Not Delay The Progress of this Case to Dispositive Motions and Trial, and Defendants Will Not Be Prejudiced By Providing Plaintiffs An Opportunity to Disclose Limited Rebuttal Testimony

Defendants will not be prejudiced if Plaintiffs are permitted to disclose a rebuttal expert. The limited rebuttal disclosure sought pertains only to the actuarial assumptions relied upon by Behan. It should not impede in any way the filing and determination of any dispositive motion once that schedule is set. If Plaintiffs are limited to one rebuttal actuary, and that report required within 30 days, the deposition of that expert can be promptly scheduled. Two teams of one partner and two associates have appeared at each of the eight depositions of Defendants experts, on Defendants' behalf, and thus one expert deposition would not unduly burden Defendants or their counsel at this stage. The case has not been scheduled for trial, and no pretrial order has been entered. While Defendants assert that they would be harmed by "further delay," there is no realistic expectation that one rebuttal disclosure by Plaintiffs will delay the trial and adjudication of this case, particularly when balanced against the importance of the evidence to Plaintiffs' in the event the Behan opinions are allowed. It is certainly recognized that "excluding expert testimony can frustrate the Federal Rules' overarching objective of doing substantial justice to litigants. . . ." Cartier, Inc. v. Four Star Jewelry Creations, Inc., No. 01 Civ. 11295, 2003 WL 22471909, at *2 (S.D.N.Y. Oct. 31, 2003).

E. <u>Plaintiffs Have Demonstrated Good Cause For the Relief Sought</u>

Regardless of whether Plaintiffs' request to disclose a rebuttal expert is assessed under the "good cause" standard of Fed. R. Civ. P. 16(b)(4), or under the "substantially justified or … harmless" standard of Fed. R. Civ. P. 37(c)(1), Plaintiffs' request satisfies both standards. Plaintiffs were diligent in seeking permission to serve their rebuttal within days of receiving the first redacted expert report that displayed Defendants' actuarial challenge to the market value of the insurance policies when purchased from Coventry. Further, their rebuttal request is substantially justified by any fair reading of the rebuttal right established by Fed. R. Civ. P. 26 (a)(2)(D). See <u>Scientific Components Corp. v. Sirenza Microdevices, Inc.</u>, No. 03 CIV 1851 (NGG) (RML), 2008 WL 4911440, at *5 (E.D.N.Y. Nov. 13, 2008) ("[i]t is unnecessary to decide whether [P]laintiff's disclosure of" a rebuttal expert should be adjudicated under the <u>Softel</u> standard or the "good cause" standard, because "preclusion of [such] report and testimony under Rules 16(f) or 37(c) would be an excessive sanction").

The absence of prejudice is an important factor when the exclusion of probative evidence is sought. "[D]istrict courts generally do not order preclusion" of expert reports where the opposing party is not prejudiced. <u>Exo-Pro, Inc. v. Sierus Innovative Accessories, Inc.</u>, No. No. CV 05-3629(LDW)(AKT), 2008 WL 4878513, at *2 (E.D.N.Y Feb. 19, 2008) (Rule 37 motion to preclude expert report served after scheduling order deadline denied where Pre-Trial Conference not yet set and ample time remained to allow deposition discovery), citing <u>McNerney v. Archer Daniels Midland Co.</u>, 164 F.R.D. 584, 587 (W.D.N.Y. 1995) ("Precluding testimony from the expert under this rule [Fed. R. Civ. P. 37] is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard of the federal rules.") "[D]istrict courts have generally not ordered preclusion of expert

witnesses even where the failure to disclose is neither 'justified' nor 'harmless.'" <u>S.W. v. City of</u> <u>New York</u>, No. CV 2009–1777(ENV)(MDG), 2011 WL 2224976, at *1 (E.D.N.Y June 3, 2011) (citations omitted), citing <u>Potter v. Phillips</u>, No. CV 03-4942, 2004 WL 3250122, at *2 (E.D.N.Y. Mar. 28, 2004) ("the imposition of sanctions under this rule [Rule 37] is discretionary, and preclusion is ordered only rarely").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court vacate or modify the Magistrate Judge's February 17, 2012 Order, and grant Plaintiffs leave to disclose expert rebuttal testimony addressed to the Behan report within 30 days of the Court's determination of these objections.

Dated:   March 2, 2012
         New York, New York

Respectfully submitted,

LIDDLE & ROBINSON, L.L.P.

James R. Hubbard
Jeffrey L. Liddle
James W. Halter

800 Third Avenue, 8th Floor
New York, NY 10022
Tel: (212) 687-8500
Fax: (212) 687-1505

BY: _____

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 2nd day of March, 2010, I caused true and correct copies of the foregoing to be served, by e-mail and by overnight delivery, on:

> David A. Forkner, Esq.
> Kenneth J. Brown, Esq.
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C. 20005
> dforkner@wc.com
> kbrown@wc.com

Dated: March 2, 2012
       New York, New York

James W. Halter

25