UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

RITCHIE RISK-LINKED STRATEGIES )
TRADING (IRELAND), LIMITED, ET AL., )
 ) Civil Action No. 1:09-cv-01086-VM-DCF
 )
          Plaintiffs, ) (ECF)
 )
     v. )
 )
COVENTRY FIRST LLC, ET AL., )
 )
          Defendants. )

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE DEBRA FREEMAN'S FEBRUARY 17, 2012 ORDER

WILLIAMS & CONNOLLY LLP

Dane H. Butswinkas
David A. Forkner
Kenneth J. Brown

725 Twelfth Street, N.W.
Washington, D.C.  20005
(202) 434-5000
(202) 434-5029 (facsimile)
*Attorneys for Defendants*

Dated:  March 15, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

BACKGROUND .......................................................................................................... 1

    A.    The *First Ritchie Suit*. .................................................................... 1

    B.    The *Second Ritchie Suit*. ................................................................ 2

    C.    Judge Freeman's Rulings Regarding Expert Discovery Deadlines ....................... 3

ARGUMENT ............................................................................................................... 5

I.    JUDGE FREEMAN DID NOT CLEARLY ERR IN CONCLUDING THAT PLAINTIFFS FAILED TO SHOW GOOD CAUSE. ........................................... 5

    A.    Plaintiffs Were Required to Show "Good Cause." ................................ 5

    B.    Plaintiffs Were Not Diligent. ........................................................... 7

    C.    Plaintiffs Made a Tactical Decision Not To Designate an Actuarial Expert. ........ 10

    D.    Plaintiffs' Burden-Shifting Argument Is Incorrect. ............................... 15

    E.    Defendants Would Be Prejudiced By Plaintiffs' Request. ...................... 18

II.    THE RESULT IS THE SAME UNDER RULE 37. .............................................. 22

III.    JUDGE FREEMAN WAS NOT REQUIRED TO AWAIT A REPLY LETTER. ........... 23

CONCLUSION .......................................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Augustine v. AXA Fin., Inc.*, 2008 WL 5025017 (S.D.N.Y. Nov. 24, 2008) ...............................18

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 2005 WL 1300763 (N.D. Ill. Feb. 22, 2005)............20

*Braun v. Lorillard Inc.*, 84 F.3d 230 (7th Cir. 1996)................................................................19, 20

*Bruce v. County of Rensselaer,* 2003 WL 22436281 (N.D.N.Y. Oct. 20, 2003)............................8

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 22471909
    (S.D.N.Y. Oct. 31, 2003) .......................................................................................................23

*Chappero v. West*, 2009 WL 2058534 (S.D.N.Y. July 15, 2009)....................................................6

*Downing v. Am. Airlines, Inc.*, 1988 WL 49211 (E.D.N.Y. May 9, 1988).......................................8

*Eng-Hatcher v. Sprint Nextel Corp.*, 2008 WL 4104015 (S.D.N.Y. Aug. 28, 2008)................5, 24

*Exo-Pro, Inc. v. Seirus Innovative Accessories, Inc.*, 2008 WL 4878513
    (E.D.N.Y. Feb. 19, 2008) ......................................................................................................23

*Goss v. Long Island R.R. Co.*, 1996 WL 743350 (E.D.N.Y. Dec. 12, 1996)..................................6

*Grochowski v. Phoenix Constr.*, 318 F.3d 80 (2d Cir. 2003) .........................................................5

*Harshaw v. Bethany Christian Servs.*, 2010 WL 1692833 (W.D. Mich. Apr. 26, 2010).............24

*Hnot v. Willis Group Holdings Ltd.*, 2006 WL 2381869 (S.D.N.Y. Aug. 17, 2006) .............24, 25

*Holman v. ICN Pharms., Inc.*, 2000 WL 231084 (S.D.N.Y. Feb. 29, 2000)................................19

*Holmes v. Grubman*, 568 F.3d 329 (2d Cir. 2009) ........................................................................5

*In re Trasylol Prods. Liab. Litig.*, 2010 WL 4065436 (S.D. Fla. Aug. 6, 2010) ....................20, 21

*La Gorce Palace Condo. Assoc., Inc. v. QBE Ins. Corp.*, 2011 WL 1522566
    (S.D. Fla. Feb. 28, 2011)................................................................................................8, 20, 21

*Levy v. Eisner LLP*, 2006 WL 2015368 (S.D.N.Y. July 12, 2006) ..............................................18

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071 (S.D.N.Y. 1990)...........23

*Madison Capital Co. v. S & S Salvage LLC*, 2011 WL 195639 (W.D. Ky. Jan. 19, 2011) ..........20

*McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584 (W.D.N.Y. 1995) .............................23

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007) ................ 15, 16

*Murray v. Roadway Exp., Inc.*, 2010 WL 3023905 (E.D.N.Y. July 30, 2010) ............................. 6

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520 (2d Cir. 2004) ................................ 16

*Potter v. Phillips*, 2004 WL 3250122 (E.D.N.Y. Mar. 28, 2004) ................................................... 23

*PrecisionIR Inc. v. Clepper*, 693 F. Supp. 2d 286 (S.D.N.Y. 2010) ....................................... 6, 24

*S.W. v. City of N.Y.*, 2011 WL 2224976 (E.D.N.Y. June 3, 2011) ............................................... 23

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) ..................................................................... 16

*Scientific Components Corp. v. Sirenza Microdevices, Inc.*, 2008 WL 4911440
    (E.D.N.Y. Nov. 13, 2008) ......................................................................................................... 23

*Scott v. City of N.Y. Dep't of Correction,* 2007 WL 4178405 (S.D.N.Y. Nov. 26, 2007) .............. 5

*Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955 (2d Cir. 1997) ......... 22, 23

*Sokol Holdings, Inc. v. BMB Munai, Inc.*, 2009 WL 3467756 (S.D.N.Y. Oct. 28, 2009) ............. 18

*Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000) ............................................................... 15

*Turner v. Hudson Transit Lines, Inc.*, 1991 WL 123966 (S.D.N.Y. July 2, 1991) ....................... 18

*United States v. Berg*, 20 F.3d 304 (7th Cir. 1993) ...................................................................... 24

*Woodworth v. Erie Ins. Co.*, 2009 WL 3671930 (W.D.N.Y. Oct. 29, 2009) ................................. 18

## STATE CASES

*Berley Indus., Inc. v. City of New York*, 385 N.E.2d 281 (N.Y. 1978) .......................................... 16

*J.R. Loftus, Inc. v. White,* 85 N.Y.2d 874 (1995) ......................................................................... 15

*Huizenga Managers Fund, LLC v. A.R. Ritchie, et al.,* No. 07 CH 09626
    (Cook County, Illinois) ............................................................................................................. 12

## OTHER AUTHORITIES

Fed. R. Civ. P. 16(b)(4) ........................................................................................................ 5, 6, 22

Fed. R. Civ. P. 26(a)(2)(D) ............................................................................................................. 7

Fed. R. Civ. P. 26(a) ................................................................................................................. 3, 25

Fed. R. Civ. P. 26(e) ................................................................................................................. 3, 25

Fed. R. Civ. P. 30(b)(6)..........................................................................................12

Fed. R. Civ. P. 37(c)(1)...............................................................................6, 22, 25

Plaintiffs' expert reports initially were due on April 23, **2010**. Plaintiffs, however, managed to delay this case until November 9, 2011, when they finally submitted their reports. Plaintiffs elected to offer no actuarial or other damages expert, notwithstanding that they had assured the Court they would do so. After then receiving Defendants' unredacted reports and seeking additional time to review them, Plaintiffs likewise allowed their final expert report deadline to pass quietly. Instead, they waited until Judge Freeman confirmed the deadline for deposing Defendants' experts, and asked to submit an actuarial report after those depositions concluded and expert discovery closed. Judge Freeman did not err (clearly or otherwise) in finding that Plaintiffs had not shown "good cause" for again modifying the scheduling order, but rather had engaged in "strategic decision and delay." Her order should be affirmed.

## BACKGROUND

Plaintiffs Ritchie Risk-Linked Strategies Trading (Ireland), Limited and Ritchie Risk-Linked Strategies Trading (Ireland) II, Limited (collectively "Plaintiffs") each entered into a contract with LST I LLC ("LST"). Pursuant to these contracts, Plaintiffs purchased 1,085 life insurance policies ("Policies") from LST. Dkt. 1 ¶¶ 26–27. On October 26, 2006, the New York Attorney General ("NYAG") filed suit against three of LST's affiliates. Plaintiffs allege that, when the NYAG's suit became public, the value of their Policies greatly diminished. These allegations have spawned two lawsuits over the past five years.

### A. The *First Ritchie Suit.*

Plaintiffs sued Defendants on May 2, 2007. *See* Case No. 1:07-cv-03494-DLC ("*First Ritchie Suit*"), Dkt. 1. Originally, the case had five plaintiffs, twelve defendants, and seven causes of action. *See id.* Judge Cote dismissed all of these claims on July 17, 2007, with a right to replead a breach of contract and two RICO claims. *See id.* Dkt. 41 at 2 ("This is essentially a breach of contract claim . . . between sophisticated parties"). Plaintiffs filed an amended complaint containing those claims (the RICO claims were subsequently dismissed, *see id.* Dkt. 75), and sought reconsideration as to the others (which was denied, *see id.*). On August 13, 2007, Judge Cote entered a scheduling order that provided an expert discovery cutoff of June 20,

2008. *Id.* Dkt. 52 ¶ 7. On March 17, 2008, Plaintiffs voluntarily dismissed the case. *Id.* Dkt. 77.

**B.    The *Second Ritchie Suit*.**

On February 6, 2009, Plaintiffs filed this action, in which they re-asserted their breach of contract claim ("*Second Ritchie Suit*"). Pursuant to Judge Cote's pre-trial scheduling order, fact discovery closed on March 26, 2010, and Plaintiffs' deadline for submitting expert reports was April 23, **2010**. *See* Dkt. 27 at 1. All expert discovery was to close on June 25, **2010**. *Id.* On April 2, 2010, Plaintiffs moved to recuse Judge Cote. *See* Dkt. 38. Six days later, Judge Cote ruled that, although "defendants' opposition strongly suggests that the [P]laintiffs' reasons for seeking recusal may be tactical," "[n]evertheless, out of an excess of caution, it is hereby ORDERED that this Court recuses itself. . . ." Dkt. 41 at 1–2. The *Second Ritchie Suit* was reassigned to this Court the next day, April 9, 2010. *See* Dkt. 46.

On April 19, 2010, four days before the deadline for submitting expert reports, Plaintiffs requested "a ***brief stay*** of the expert discovery deadlines set by Judge Cote in this case . . . ." Dkt. 52 at 1 (emphasis added). Although Defendants did not object to a "brief stay," Dkt. 53, the ensuing 18-month delay was anything but brief. The Court referred this matter to Judge Freeman for "scheduling, discovery, non-dispositive pre-trial motions, and settlement," Dkt. 60, and Plaintiffs thereafter sought to revisit Judge Cote's discovery orders and reopen fact discovery. *See* Dkt. 68, 80. On November 5, 2010, Judge Freeman rejected these efforts. *See* Dkt. 68 at 5 ("Plaintiffs have failed to demonstrate good cause to re-open fact discovery."); *id.* at 4 n.2 ("Plaintiffs have not shown good cause for their failure to make their new request prior to the close of fact discovery in March 2010."); *id.* at 6 ("Plaintiffs have not . . . shown that they could not have earlier anticipated the need for any of the depositions they now seek . . . ."); *see also* Dkt. 80 (affirming these aspects of Judge Freeman's order).

After those efforts failed, Plaintiffs sought to avoid answering Defendants' contention interrogatories, which required them to disclose their policy-specific allegations of wrongdoing. *See* Dkt. 68, 80, 91. On July 25, 2011, after Plaintiffs served several rounds of inadequate responses, which led to repeated calls with Judge Freeman, the Court rejected this effort for the

2

last time. *See* Dkt. 91 (requiring adequate responses 16 months after they were due).[1]

As recently as January 9, 2012, Judge Freeman recommended that Plaintiffs be sanctioned for violating Rules 26(a) and (e) by failing to disclose that they were seeking bankruptcy costs as damages. *See* Dkt. 97 at 25 ("Plaintiffs[] lack . . . an adequate excuse for their failure to comply with the discovery rules[.]"); Dkt. 100 (adopting that recommendation). Judge Freeman, however, declined to recommend the sanction of preclusion, which she stated would have been unduly severe under the circumstances then presented. *See* Dkt. 97 at 31-32.

During these 18 months of delay, Plaintiffs repeatedly informed Defendants and the Court that they would present expert testimony on their claimed damages.[2]  They made that claim to justify their failure to compute each category of damages claimed: "Since Plaintiffs' experts have not yet completed their review and analysis of the damages in this case, Plaintiffs cannot, at this time, provide an accurate damages calculation."  Dkt. 108, Ex. K at 14; Ex. 1 at 14 (June 16, 2010) (same).[3]  Plaintiffs likewise sought to justify their failure to disclose bankruptcy costs as a damages theory on the ground that they required expert testimony. *See* Dkt. 87 at 11, 16, 17, 24.  They specifically told Judge Freeman that they "*will use an expert witness to discuss their damages*." *Id.* at 20 (emphasis added).

### C.    Judge Freeman's Rulings Regarding Expert Discovery Deadlines

On August 2, ***2011***, Judge Freeman endorsed a modified scheduling order proposed by the parties. *See* Dkt. 92. Plaintiffs' expert reports were due on October 28, 2011, Defendants' reports were due on December 9, 2011, and Plaintiffs' amended reports were due by December 23, 2011. *See id.*  Expert discovery was to close on February 10, 2012. *See id.*

---

[1] This Court noted on December 7, 2010 that Defendants' interrogatories, taken literally, would be unduly burdensome "insofar as they seek every fact, every piece of evidence, every witness, and every application of law to fact—rather than, for example, certain principal or material facts, pieces of evidence, witnesses and legal applications—supporting the identified allegations." Dkt. 80 at 6. Defendants focused their interrogatories pursuant to the Court's directive. It was those narrower interrogatories to which Judge Freeman compelled Plaintiffs to respond.

[2] Plaintiffs' proposed actuarial opinions bear directly on their alleged damages. *See infra.*

[3] The exhibits referenced herein are appended to the Declaration of Kenneth J. Brown (Dkt. 112).

As Plaintiffs' deadline for submitting expert reports neared, they sought, and Judge Freeman granted, multiple extensions. On October 25, 2011, Plaintiffs requested "a brief extension of the deadline for the close of expert discovery, and a similar extension of the interim [expert disclosure] deadlines." Dkt. 93 at 1. Judge Freeman granted that request on October 27, 2011. *Id.* Under the revised schedule, Plaintiffs' expert reports were due on November 9, 2011, Defendants' reports were due on December 21, 2011, Plaintiffs' amended reports were due on January 9, 2012, and expert discovery closed on February 22, 2012. *See id.*

On November 9, 2011, notwithstanding their previous representations, Plaintiffs produced two expert reports, neither of which concerned damages.[4] Defendants timely produced six expert reports on December 21, 2011, including one from an economist (Dr. Jonathan Walker) and a joint report from two actuaries (Drs. Geoffrey Chaplin and Donald Behan).

Nineteen days later, on January 9, 2012, Plaintiffs sought an extension of their deadline for submitting amended expert reports until January 17, 2012. Plaintiffs stated that they needed this extension to complete their review of Defendants' reports. Ex. 3. They further stated that "the parties do not, at this time, see a reason to alter the remainder of the expert discovery schedule." *Id.* at 1. In the ensuing days, Defendants specifically asked whether Plaintiffs intended to submit reports from additional experts, as the deposition schedule would depend on their answer. Forkner Decl. ¶ 2. Plaintiffs said they did not, *id.*, and the January 17, 2012 deadline came and went without the submission of any more reports.

The parties subsequently scheduled individual expert depositions, and requested a two-day extension of the February 22, 2012 cutoff in order to complete the last of them. Judge Freeman "So Ordered" that request on February 1, 2012. *See* Dkt. 99. The very next day, Plaintiffs asked Judge Freeman to upend the scheduling order with a new round of expert

---

[4] Plaintiffs incorrectly claim that Tsvetan Beloreshki addressed "the amount of profits" Plaintiffs claim to have lost. Pls.' Objections ("Objs.") at 9. Mr. Beloreshki testified ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

disclosures long after the deadlines for submitting expert reports and concluding expert discovery. *See* Dkt. 104. Plaintiffs requested permission to identify "one or possibly two" new experts to testify regarding damages, an issue on which they bear the burden of proof. *Id.* at 1. Plaintiffs' request came 85 days after they were required to submit their expert reports, *see* Dkt. 93, and more than 40 days after they received Defendants' reports. Plaintiffs' request was timed to permit them to identify new experts under the guise of "rebuttal reports" after Defendants had provided all of their expert reports and all of Defendants' experts had been deposed.

Defendants submitted a letter to Judge Freeman opposing Plaintiffs' request. *See* Dkt. 102. After hearing from both parties, Judge Freeman denied Plaintiffs' request:

> For the reasons stated persuasively in Defendants' opposition letter of February 9, 2012, Plaintiffs' request to serve expert reports outside of the deadline set by the Court is <u>denied</u>. Plaintiffs had more than ample time to prepare and serve expert reports on the subject of damages, and have not shown good cause for failing to do so within the allotted time. The Court also does not accept that Plaintiffs are somehow victims of unfair surprise. This does not appear to be a case of sand-bagging by Defendants, but rather of strategic decision and delay by Plaintiffs.

Dkt. 104. Judge Freeman concluded that, after nearly five years of litigation, "this case must now move to dispositive motions." Dkt. 102.

## ARGUMENT

### I.   JUDGE FREEMAN DID NOT CLEARLY ERR IN CONCLUDING THAT PLAINTIFFS FAILED TO SHOW GOOD CAUSE.

#### A.   Plaintiffs Were Required to Show "Good Cause."

"A schedule may be modified only for good cause[.]" Fed. R. Civ. P. 16(b)(4); *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009) (same). "Whether good cause exists turns on the diligence of the moving party." *Holmes*, 568 F.3d at 335 (quotation omitted); *see also Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (same). A "party seeking modification [of a scheduling order] must demonstrate that, despite its diligent efforts, the schedule could not have reasonably been met." *Eng-Hatcher v. Sprint Nextel Corp.*, 2008 WL 4104015, at *1 (S.D.N.Y. Aug. 28, 2008); *see also Scott v. City of N.Y. Dep't of Correction,*

2007 WL 4178405, at *4 (S.D.N.Y. Nov. 26, 2007) ("At a minimum, good cause requires a showing by the moving party of an objectively sufficient reason for extending a deadline such that the deadlines cannot reasonably be met despite the diligence of the party needing the extension."); *Murray v. Roadway Exp., Inc.*, 2010 WL 3023905, at **1-2 (E.D.N.Y. July 30, 2010) (no good cause for modifying schedule to permit untimely expert reports); *Goss v. Long Island R.R. Co.*, 1996 WL 743350, at *1 (E.D.N.Y. Dec. 12, 1996) (same).

Plaintiffs suggested before Judge Freeman that the Rule 37(c)(1) standard for imposing discovery sanctions, rather than Rule 16(b)(4)'s "good cause" standard, applies here.[5] Dkt. 104 at 3. Plaintiffs do not renew this argument on appeal, and for good reason. Their request unquestionably would have required Judge Freeman to modify the scheduling order. First, Plaintiffs' request required the Court to extend by several months Plaintiffs' November 9, 2011 deadline for submitting expert reports. *See* Dkt. 93 at 1; Dkt. 104 at 4 (Feb. 2, 2012 request to submit expert report "within 30 days"). Even if Plaintiffs' requested actuarial report was properly considered "rebuttal"—it was not, *see infra*—Plaintiffs likewise would have needed a significant extension of the January 17, 2012 deadline for submitting additional expert reports. *See* Dkt. 99. Second, Plaintiffs' request also required an extension of the February 24, 2012 expert discovery deadline. Not only did Plaintiffs ask to submit their additional report after the close of expert discovery, but Defendants would then need time to review Plaintiffs' report, depose the still-unidentified expert, and supplement their own reports as appropriate.[6]

---

[5] Plaintiffs did not acknowledge the Rule 16(b)(4) standard before Judge Freeman, and do not meaningfully address it now. *See* Objs. at 23. Nor may they do so for the first time in reply. *See Chappero v. West*, 2009 WL 2058534, at *4 (S.D.N.Y. July 15, 2009) ("Because this argument was not raised in the briefing provided to Magistrate Judge Freeman, the Court declines to consider this argument now."); *PrecisionIR Inc. v. Clepper*, 693 F. Supp. 2d 286, 297 (S.D.N.Y. 2010) (Marrero, J.) ("[T]he Court will not consider new arguments in reply papers.").

[6] Further confirming that Rule 16(b)(4) applies here, Defendants did not seek preclusion under Rule 37(c)(1), although such a result would be appropriate. Rather, Plaintiffs made a request that would have required a modification of the scheduling order. Defendants opposed that request.

**B.**    **Plaintiffs Were Not Diligent.**

Judge Freeman did not clearly err in holding that Plaintiffs failed to establish "good cause" for identifying a new expert, whether labeled "rebuttal" or otherwise, after (1) Plaintiffs' November 9, 2011 deadline for submitting expert reports, (2) the January 17, 2012 deadline for amended expert reports, and (3) the close of all expert discovery. At a minimum, Judge Freeman recognized that Plaintiffs had Defendants' reports in hand on December 21, 2011. *See* Objs. at 9 ("On December 21, 2011 . . . Defendants served Plaintiffs' counsel with six expert reports[.]").[7] Thus, even indulging the fiction that Plaintiffs were unaware of the pervasive actuarial issues in this case prior December 21, 2011—which is untrue—they had Defendants' actuarial report in hand on that date. Plaintiffs even asked that their January 9, 2012 deadline be extended to January 17, 2012 so that they could complete their review of that report. Ex. 3. When they made that request, Plaintiffs told Judge Freeman that "the parties do not, at this time, see a reason to alter the remainder of the expert discovery schedule." *Id.*

In the ensuing days, Defendants specifically asked if Plaintiffs anticipated designating any additional experts, and Plaintiffs responded that they did not. Forkner Decl. ¶ 2. Plaintiffs then allowed the January 17, 2012 deadline for submitting amended expert reports to pass without designating an actuarial expert.[8] It was not until February 2, 2012—the day after the

---

[7] Although Plaintiffs note that these reports were served near the Christmas holiday, that deadline was set at their request. *See* Dkt. 93. The original deadline was December 9, 2011, but Plaintiffs asked that it be moved to December 21, 2011. *See id.*

[8] Plaintiffs were not deprived of any "rebuttal right" under Rule 26. *See* Objs. at 6, 23 (citing Fed. R. Civ. P. 26(a)(2)(D)). Plaintiffs' deadlines for submitting expert reports were set by the Court's scheduling order, not Rule 26, which applies only "[a]bsent a . . . court order." Fed. R. Civ. P. 26(a)(2)(D). Moreover, Plaintiffs were not "deprived" of their ability to file any report, but rather chose not to do so. And at all events, Rule 26(a)(2)(D) requires rebuttal reports to be submitted within 30 days of the other party's disclosure. *Id.* Plaintiffs did not make their request until more than 30 days after receiving Defendants' December 21, 2011 expert reports.

Plaintiffs asserted before Judge Freeman that her scheduling order "did not contemplate rebuttal expert reports from Plaintiffs, but essentially contemplated Defendants' expert reports as rebuttal disclosures to the Plaintiff[s'] designation," Dkt. 104 at 3. They do not repeat this argument, for good reason. Defendants explicitly asked Plaintiffs prior to the January 17, 2012 deadline whether they planned to submit reports from new experts, and they answered in the

Court confirmed that all of Defendants' experts would be deposed within the ensuing three weeks—that Plaintiffs first requested 30 days to submit "one or two expert reports." That would have allowed them to introduce new experts, under the guise of "rebuttal," after all expert discovery deadlines had expired and the depositions of Defendants' experts had been completed.

Plaintiffs' strategic decision not to designate an actuarial expert is the opposite of "good cause." *See Bruce v. County of Rensselaer,* 2003 WL 22436281, at *3 (N.D.N.Y. Oct. 20, 2003) ("litigation strategy cannot be deemed 'good cause'" (quoting *Downing v. Am. Airlines, Inc.,* 1988 WL 49211 at *1 n.1 (E.D.N.Y. May 9, 1988))); *see also La Gorce Palace Condo. Assoc., Inc. v. QBE Ins. Corp.,* 2011 WL 1522566, at *3 (S.D. Fla. Feb. 28, 2011) (same).

Plaintiffs' only response is that they "were diligent in seeking permission to serve their rebuttal within days of receiving" a copy of Dr. Walker's expert report with Attorneys' Eyes Only" ("AEO") information redacted. Objs. at 23; *see also* Dkt. 28 at 2 (Stipulation of Confidentiality and Protective Order ("Protective Order") providing for AEO designation). That contention is unfounded for at least five reasons.

First, Plaintiffs' counsel had all of Defendants' full, ***unredacted*** expert reports the moment Defendants timely served them on December 21, 2011. *See* Objs. at 9. This includes the reports of Dr. Walker and Drs. Chaplin/Behan.[9]

Second, Plaintiffs' argument is simply the latest recurrence of their repeatedly-rejected attack on the Protective Order, with which Judge Freeman was well-acquainted. On January 6, 2010, Plaintiffs claimed they were "severely hampered by [the Protective Order] as [they] take depositions and prepare for trial." Dkt. 32 at 2. On January 8, 2010, Judge Cote rejected that claim. *See id.* at 3. On March 3, 2010, Plaintiffs argued that the Protective Order "significantly hampered [their] ability to keep [their] clients updated regarding the case." Dkt. 33 at 3. Judge

---

negative. If Plaintiffs thought they needed an actuarial expert, but were not allowed one, they no doubt would have raised this issue with the Court prior to January 17th. But they did not.

[9] Against this background, Plaintiffs' unqualified statement that "[t]he January 31, 2012 delivery of the redacted Walker report was the first delivery of an expert report of Defendants to the Plaintiffs in this case," Objs. at 10, is misleading.

Cote rejected that claim on March 8, 2010. *Id.* On June 18, 2010 and August 23, 2010, Plaintiffs claimed they were "unable to provide verified responses to contention interrogatories served by Defendants . . . as a result of a Stipulated Protective Order previously issued in this case." Dkt. 68 at 1. On November 5, 2010, Judge Freeman rejected that argument. *Id.* at 2; *see also* Dkt. 80 at 3. As Defendants noted in a January 20, 2012 letter:

> [The] suggestion that "it is unfair for the Plaintiffs to have to go forward with any expert depositions without the informed assistance of our client," Halter Letter at 1, is materially the same argument that the Court has rejected throughout this case, with expert discovery substituted for "tak[ing] depositions and prepar[ing] for trial," Dkt. # 32 at 2, "keep[ing your] clients updated regarding the case," March 3, 2010 Liddle Letter to Hon. Denise Cote at 3, and "provid[ing] verified responses to contention interrogatories," Dkt. # 68 at 1. To be sure, AEO information does not somehow lose that protection because the case has proceeded to expert discovery. In fact, the Protective Order specifically includes expert witnesses, but not the parties or their representatives, as proper recipients of AEO information. *See* Dkt. # 28 ¶ 5. Not only would a contrary rule vitiate the AEO designation, but Mr. Hobbs [Plaintiffs' suggested recipient of this information] is the General Counsel of a hedge fund manager. He is not an expert in life settlements or any other topic addressed by Defendants' expert reports.

Dkt. 108, Ex. I at 2 (letter from Defendants' counsel discussing this issue at length).

    Third, the portions of the Walker report that Plaintiffs' counsel say they needed to discuss with their clients—none of whom are actuaries or have any specialized knowledge of life settlements—were not designated AEO. *See* Objs. at 10-11 & n.2 ██████████ ████████████████████████████████████ *see also* Ex. 4 ████████████ ███████████████████. As such, they were free to discuss those issues at any time after December 21, 2011.[10] And even if counsel had mistakenly believed otherwise, they unquestionably were free to tell their clients generally that ███████████████████ ████████████████████████████████████████████████████████████ ██████████ To be sure, if the information at issue *had* been AEO, then that is precisely how counsel would have been required to proceed. And if counsel wished to send the entire Walker

---

[10] Plaintiffs' counsel cannot seriously claim that they were unable to determine which portions of the report contained AEO documents or testimony. All such materials were clearly so designated, as required by the Protective Order. *See* Dkt. 108, Ex. I at 2-3 (so explaining).

report to their clients, they needed only redact the AEO portions. Defendants followed that same course, and a single paralegal completed the redactions in less than four hours.[11]

 <u>Fourth</u>, Plaintiffs' claim is belied by their representations to the Court and Defendants. Plaintiffs knew they had not provided redacted reports to their clients (although they certainly were free to do so) when they told the Court on January 9, 2011 that they "do not, at this time, see a reason to alter the remainder of the expert discovery schedule." Ex. 3. And when Defendants then asked whether Plaintiffs intended to submit reports from new experts, Plaintiffs' response was not: "We are not sure because we need to consult with our clients, but cannot due to the AEO designations." Instead, they affirmatively stated that they did not so intend. Forkner Decl. ¶ 2. Nor did Plaintiffs ask for an extension of the January 17, 2012 deadline, which they likewise allowed to pass knowing that they had not provided redacted reports to their clients.

 <u>Finally</u>, the hollowness of Plaintiffs' claim of "diligence" is cemented by their failure to attach any proposed actuarial report to either their letter to Judge Freeman or their Objections. They do not even identify such an individual. That is because "Plaintiffs still have not retained an actuarial expert in this case in any capacity." Objs. at 19. If Plaintiffs truly had been "startl[ed]" by Defendants' actuarial reports and diligently sought to respond, *id.* at 5, they surely would have said something to that effect during the month they requested for that purpose. At a bare minimum, they would have retained an actuary.

### C. Plaintiffs Made a Tactical Decision Not To Designate an Actuarial Expert.

 Despite their repeated assurances to the contrary, Plaintiffs made a strategic decision to submit no expert reports concerning damages—actuarial or otherwise. Plaintiffs admit that they "received a full draft report from [an] economist well in advance of the November 9th disclosure deadline," Objs. at 4-5, but "ultimately elected not to use an economist simply to calculate the damages flowing from Defendants' [alleged] breach of the warranties[.]" *Id.* at 5. Plaintiffs, of course, emphasize that this expert was not an actuary, and had prepared no actuarial opinions.

---

[11] Because Plaintiffs' counsel complained of the burden associated with redacting the reports—an unfounded complaint—Defendants offered to perform that work, provided that Plaintiffs compensated them for their time. Forkner Decl. ¶ 4. The total bill was $5,000. *Id.*

Objs. at 5. But Plaintiffs have been aware for years of the actuarial issues in this case and their obvious effect on damages. Plaintiffs' decision not to identify an actuarial expert in a suit over the value of life insurance policies was theirs to make, but as Judge Freeman observed, it was not because they were "somehow victims of unfair surprise." Dkt. 104 at 1.

First, it is axiomatic that a life insurance policy's value depends principally on an actuarial estimate of how long the insured is expected to live (which determines the expected premiums and carrying costs, as well as the expected timing of the death benefit). Plaintiffs, who invested three-quarters of a billion dollars in the Policies, cannot possibly claim they were unaware of this bedrock principle. Plaintiffs' lead negotiator was an actuary. Plaintiffs also hired an actuarial firm, Lewis & Ellis, Inc., to value the Policies in their 2007-08 bankruptcy. In a 2007 declaration, Lewis & Ellis stated that "[t]he value of the life settlement policy as an asset completely hinges on the life expectancy and medical condition of the insured." Ex. 5 ¶ 14. Plaintiffs' witnesses in this case ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ One of Plaintiffs' experts herein, Mr. Beloreshki, ████ ████████████████████████████████████████ The other, Mr. Glowacki, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ It is against this backdrop that Plaintiffs elected not to "retain any actuarial expert, or request an actuarial analysis of the pricing formula in their contracts from any expert[.]" Objs. at 21. That choice certainly was theirs to make. But it is the antithesis of "good cause."

Second, Plaintiffs' corporate parent, Ritchie Capital Management, LLC ("RCM")[12]

---

[12] RCM formed Plaintiffs (two defunct SPVs), see Dkt. 1 ¶¶ 4-5; ████████████████████ ████████████████████████ see Ex. 9 at 496:15-498:22; and is represented herein by Plaintiffs' counsel, see Objs. at 19 n.4

likewise retained an actuarial expert to testify in a related action concerning the Policies' value, *Huizenga Managers Fund, LLC v. A.R. Ritchie, et al.,* No. 07 CH 09626 (Cook County, Illinois) ("*Huizenga*").[13]   That expert stated during his August 2010 trial testimony that ███████████

████████████████████████████████████████████████████████

██████████████████████   *See* Ex. 11 at 4756:20-4757:5.   ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████   Ex. 12 (PX 2068) at 5, 8.

<u>Third</u>, Plaintiffs cannot credibly claim they were unaware that Defendants were contesting the Policies' value.   Defendants' Rule 30(b)(6) notice dedicated a topic to "[t]he value of the Conveyed Life Settlement Policies," Ex. 13 ¶ 12, which was immediately followed by one concerning "[t]he use of any mortality table, morality rating, mortality rating provider, life expectancy, or other actuarial information in connection with any transaction involving any" Policy, *id.* ¶ 13.   Defendants similarly issued subpoenas seeking, *inter alia*, "[a]ll documents and communications concerning the value of any Conveyed Life Settlement Policy[, including all] modeling and underwriting analyses[.]"   *See* Dkt. 88 at 21, 39.   One of these subpoenas was directed to Lewis & Ellis, which Plaintiffs' counsel represented in responding to the subpoena. It sought, among other things, "[a]ll documents and communications concerning the use of any mortality table, mortality rating, mortality rating provider, life expectancy, medical underwriting, or other actuarial information in connection with any transaction involving any Conveyed Life Settlement Policy."   Dkt. 88 at 58.   Through these efforts, Defendants developed an extensive record regarding the Policies' value. *See* Dkt. 104 at 3 (Plaintiffs acknowledge existence of this

---

[13]   Due to the "strongly overlapping" issues in this case and *Huizenga*, Judge Cote ordered Plaintiffs to produce the deposition transcripts in *Huizenga*. *See* Ex. 10 (3/19/10 Hr'g Tr.) at 3. Plaintiffs responded by producing the transcripts, but no exhibits. Judge Cote then ordered Plaintiffs to produce the deposition exhibits. *See id.* at 12. That pattern repeated when Plaintiffs produced the trial testimony in the *Huizenga* matter, but not exhibits. Under direction from the Court, Plaintiffs ultimately produced the exhibits, which contained multiple actuarial expert reports regarding the value of the life insurance policies at issue in this case.

record, but insist that the "factual record contradicts the Behan and Chaplin opinion").

If there was any doubt about Defendants' focus on these valuation issues, Defendants cross-examined Plaintiffs' witnesses for hours regarding the actuarially-derived value of the Policies. Plaintiffs could not reasonably have believed that these were idle conversations, or that this would not be pursued in expert discovery. The following exchange from Plaintiffs' Rule 30(b)(6) designee on the foregoing topics is illustrative:



*Note for the record that this witness is not an expert witness. He's here as a 30(b)(6) witness.*

(emphasis added). It is true, of course, that Defendants did not precisely quantify the actuarial value of the Policies prior to expert discovery. That is because, as Plaintiffs recognized, an actuarial expert is needed to do that. Plaintiffs cannot be surprised that this quantification came in Defendants' expert reports.

Fourth, Plaintiffs cannot credibly claim they were unaware that, in particular, "the value of the policies when purchased was a fraction of the agreed-upon purchase price." Dkt. 104 at 2. Plaintiffs assert that Defendants' position "was never expressed by any witness or expert[.]" *Id.*; Objs. at 4 (same assertion). But, Plaintiffs' own actuaries concluded that

Ex. 14 (LST 107).[14]

*See* Ex. 15 (LST 7).

---

[14]   The documents cited herein that bear an "LST" number were exhibits used by Defendants when deposing fact witnesses in this litigation prior to April 2010.

13



Ex. 16 (LST 147 at 2513).

*Id.* at 2518.

*Id.* at 2553, 2541.

*See id.* at 2558.

Dkt. 108, Ex. C at 90.  Plaintiffs' claim that "no discovery revealed . . . the alleged overpayment to the vast degree Defendants now assert" is untrue and does not establish "good cause."[15] Dkt. 104 at 2.

Fifth, the record belies Plaintiffs' claim that they needed redacted copies of Defendants' actuarial opinions before requesting their own actuarial expert.  In truth, Plaintiffs did not receive Defendants' redacted actuarial report until ***after*** they made that request.  *See* Objs. at 1.  So, they are forced instead to claim that they needed the redacted Walker report, which in turn requires them to assert that Dr. Walker is relying on the actuarial opinions of Chaplin/Behan in opining that Plaintiffs suffered no damages.  *See* Dkt. 104 at 1-2; Objs. at 11 ("Relying in part on Behan's opinion . . . Walker proffered the opinion that Plaintiffs suffered no out-of-pocket loss as a result of" LST's alleged breaches).  That is incorrect.  Dr. Walker testified:

Ex. 17 at 34:19-35:2; *see also id.* at 35:16-20

Dr. Walker explained

---

[15] Plaintiffs note that their bankruptcy valuations were as of 2007, not 2005 and 2006.  Objs. at 20.  This confirms Defendants' point.  Policies increase in value as insureds age, and Plaintiffs knew when their experts                    that the Policies were worth less than that in 2005-06.  Plaintiffs also suggest that the NYAG's allegations were publicly known in 2007.  But they say the very purpose of the bankruptcy was to "avoid the threat of rescission posed by the NYAG complaint, and to clear the title to the policies so Plaintiffs could resell them."  *Id.* at 8.  Thus, to the extent the NYAG's allegations had any effect on the Policies in Plaintiffs' hands (it did not), that effect was eliminated in the bankruptcy.

████████████████████████████   *Id.* at 30:21-22.   That Defendants'

damages analysis is corroborated by, but does not depend on, the opinions of Behan/Chaplin cuts

against the relief Plaintiffs seek.   Judge Freeman did not clearly err in so concluding.[16]

### D.   Plaintiffs' Burden-Shifting Argument Is Incorrect.

As Plaintiffs acknowledge, Defendants' actuarial reports concern damages, an issue on

which Plaintiffs bear the burden of proof.   *See* Dkt. 104 at 3 ("The Behan and Chaplin report

impacts a substantial issue – the existence of damages for breach of contract."); Objs. at 14-15

(to the same effect); *J.R. Loftus, Inc. v. White,* 85 N.Y.2d 874, 877 (1995) (plaintiff bears burden

of proving breach of contract damages); *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir.

2000) (same).   Plaintiffs nonetheless defend their decision not to submit any report from a

damages expert—actuary or otherwise—in their case-in-chief, claiming they can carry their

burden by comparing the Policies' contract price with the lower price they received in the

January 2008 bankruptcy auction.   *See* Objs. at 14-17.   Even if Plaintiffs were correct, they do

not begin to explain how this strategic judgment constitutes "good cause" for their failure to (1)

submit such a report by the January 17, 2012 deadline; or (2) comply with the February 24, 2012

expert discovery cutoff.   But Plaintiffs are incorrect.

Plaintiffs have asserted that they are "entitled to the benefit of [their] bargain, measured

as the difference between the value of [the policies] as warranted by [LST] and [their] true value

at the time of the transaction."   Dkt. 87 at 12-13 (quoting *Merrill Lynch & Co. Inc. v. Allegheny

Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007)).   It is "well established" that any such damages

must be "measured at the time of the breach."   *Merrill Lynch*, 500 F.3d at 185.   Here, Plaintiffs

claim that the breaches occurred on the dates the contracts were signed (in 2005) and on which

the Policies were purchased (in 2005 and 2006).   Dkt. 1 ¶¶ 25, 60 (claiming breaches "as of the

closing dates and each funding date").   Thus, Plaintiffs must prove, as of those dates, (1) the

Policies' value "as warranted," *i.e.*, without the alleged breaches; (2) the Policies' "true value"

---

[16] Plaintiffs say they seek a rebuttal to Chaplin/Behan, "not to the damages calculations of
Defendants' economist Walker."   Objs. at 11.   But Plaintiffs argue that this testimony is
significant because it bears on damages.   *See infra.*; Dkt. 104 at 3; Objs. at 1-2, 14-15.

with the alleged breaches; and (3) that the alleged breaches caused the diminution in value. *See Merrill Lynch*, 500 F.3d at 185 (plaintiff bears the burden of establishing value with and without breaches); *Berley Indus., Inc. v. City of New York*, 385 N.E.2d 281, 282 (N.Y. 1978) ("It is fundamental to the law of [contract] damages that one complaining of injury has the burden of proving the extent of the harm suffered[.]"); *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525-26 (2d Cir. 2004) (causation).[17]

Plaintiffs claim they can establish the Policies' value without the alleged breaches by merely noting the contract price. Objs. at 16 ("The 'sales price rule' establishes the market value of the life insurance policies Ritchie purchased as warranted, and thus 'absent breach.'"). The "sales price rule" is based on the assumption that when two parties agree on an asset's price in an arm's length transaction, that price reflects their collective judgment about the asset's value. *See Schonfeld*, 218 F.3d at 179. Here, however, ███████████████████████████████████ ███████████████████████████████████ Objs. at 17; *see also* Ex. 18 § 3.02(c). Although Plaintiffs assert that the "contracts" disclaimed such a representation, Objs. at 17, ███████████████████████████████████ ███████████████████████████████████ Ex. 18 § 3.02(c). This is why Defendants refer to them as "Plaintiffs' assumptions." ███████████████████████ ███████████████████████████████████ *Id.* Where one party specifically insists, as a condition of executing an asset sale contract, ███████████ ███████████████████████████████████ ███████████████████████████████████

But assume *arguendo* that Plaintiffs are correct, and can carry their initial burden of establishing the Policies' value without any breaches by blindly referring to the contract price. This says nothing about the Policies' fair market value **with** the alleged breaches or causation (to

---

[17] Plaintiffs also seek profits that they allegedly lost by not securitizing the Policies, and likewise bear the burden of proving any such damages with reasonable certainty. *See* Dkt. 1 ¶ 56; Objs. at 8; *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000). The actuarial value of the Policies—the assets in this asset-backed securitization—bears directly on that transaction's prospects.

say nothing of lost profits). Even under Plaintiffs' view, the Policies' value with the alleged breaches is not set forth in any contract. Nor can it be gleaned from the bankruptcy sale, which occurred in January 2008 and is thus irrelevant to the Policies' value at the time of the claimed breaches in 2005-06. Objs. at 16-17. Moreover, Plaintiffs claim they filed for bankruptcy to "avoid the threat of rescission posed by the NYAG complaint, and to clear the title to the policies so Plaintiffs could resell them." Objs. at 8; *see also id.* at 1 (bankruptcy filed "to clear Ritchie's title"); Dkt. 108, Ex. B at 19-20 n.76 (to same effect). And the Bankruptcy Court did, in fact, order a sale with clean title. *See* Ex. 19 at ¶¶ R, V (Ritchie I); Ex. 20 ¶¶ R, V (Ritchie II). Thus, the bankruptcy sale was not subject to the effect, if any, of the claimed breaches, and cannot be a measure of the Policies' value *at any time* with such breaches. Instead, to establish that value with specificity as of the time of the alleged breaches requires an actuarial analysis. *See supra.*

Nor can Plaintiffs carry their burden of establishing causation by referring to the bankruptcy sale price. Setting aside that that sale occurred in 2008, it is impossible to measure the impact of the claimed breaches on Policy values by comparing one valuation that is free of rescission risk to another valuation that is *likewise* free of rescission risk. To show that the breaches caused their alleged damages, Plaintiffs would have to isolate the breaches as the causative variable. That too requires an actuarial analysis.[18] Judge Freeman did not clearly err in finding no "good cause" for Plaintiffs' failure to timely disclose an actuarial expert based on their erroneous "burden shifting" argument.

* * * * *

For all of these reasons, Plaintiffs cannot show "good cause." As such, the Court need not reach the issue of whether Defendants would be prejudiced by Plaintiffs' request (they would be, *see infra*). Prejudice to Defendants is not pertinent to whether Plaintiffs acted diligently—or

---

[18] The question is not whether Plaintiffs bear the burden of proving their damages "with expert testimony." Objs. at 4. Plaintiffs bear the burden of proving their damages, period. They were free to decide whether to offer expert actuarial testimony in an effort to carry that burden, and to accept any consequences of that decision. But to the extent such testimony was pertinent, it unquestionably was pertinent to an issue on which Plaintiffs bear the burden.

instead made a strategic choice—in failing to comply with the scheduling order. *See Woodworth v. Erie Ins. Co.*, 2009 WL 3671930, at *3 (W.D.N.Y. Oct. 29, 2009) ("[T]he absence of prejudice to a nonmoving party does not alone fulfill the good cause requirement of Rule 16(b)."); *Augustine v. AXA Fin., Inc.*, 2008 WL 5025017, at *2 (S.D.N.Y. Nov. 24, 2008) (same). That is because of Rule 16(b)'s function in enabling the Court "to control its docket." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 2009 WL 3467756, at *6 (S.D.N.Y. Oct. 28, 2009) (quotation omitted). As the court observed in *Levy v. Eisner LLP*, "we reject plaintiff's assertion that this request [for untimely expert testimony] should be granted because it will not prejudice defendant. . . . The short answer is that the court's authority to manage discovery is designed to serve both the interests of the parties and the public interest in the prompt and efficient disposition of cases . . . . By ignoring the deadline for designation of experts and failing even to make a timely request for a six-week extension, and by also failing to justify the untimeliness of her belated request, plaintiff completely fails to carry her burden of persuasion or to make a case for setting aside the case-management requirements long ago imposed in this matter." 2006 WL 2015368, at *1 (S.D.N.Y. July 12, 2006); *see also Turner v. Hudson Transit Lines, Inc.*, 1991 WL 123966, at *4 (S.D.N.Y. July 2, 1991) ("The law does not compel courts to permit the designation of experts after the expiration of a court-ordered cutoff date of which counsel was well aware. Courts have the power to assert reasonable control over their dockets in order to assure that justice for all litigants be neither delayed nor impaired.") (quotation omitted).

### E.   Defendants Would Be Prejudiced By Plaintiffs' Request.

Defendants would be harmed by the further delay Plaintiffs' request would occasion. Plaintiffs first sued Defendants for breach of contract on May 2, 2007. Except for a brief interlude between this case and its predecessor in 2008-09, this claim has been pending since that time. Expert discovery in the *Second Ritchie Suit* was scheduled to close on June 25, ***2010***. But Plaintiffs managed to stall this case from April 19, 2010, four days before the deadline for submitting expert reports, until November 9, 2011, when they finally submitted those reports.

The pendency of this case is not favorable for Defendants or their businesses. *See*

*Holman v. ICN Pharms., Inc.*, 2000 WL 231084, at *1 (S.D.N.Y. Feb. 29, 2000) ("There can be no serious dispute that the continued pendency of litigation is, in itself, prejudicial and that the parties have a right to as prompt a resolution of disputes as is possible."). Every time during the past two years that Plaintiffs have delayed it due to their discovery violations (both completed and attempted), Defendants have been prejudiced. This pattern must stop, especially given that the delay Plaintiffs now seek would be attributable to their own strategic decision. Moreover, Defendants have diligently litigated this matter and Plaintiffs should not be regularly relieved of the consequences for their failure to do the same.

But the prejudice extends beyond delay. Plaintiffs' request, if allowed, would shift the order of proof on the damages element of Plaintiffs' contract claim. This is a well-known tactic, and it is prohibited. Plaintiffs, who were fully aware of the role of actuarial analysis in valuing life insurance policies, made the decision to forego expert reports on damages, including the value of the policies *with* the claimed breaches at the time of breach, causation, and lost profits, none of which is established by the contracts or the bankruptcy sale price.

This was Plaintiffs' decision to make. But it had consequences. One of those consequences was that Defendants proceeded to submit their reports on these issues pursuant to the Scheduling Order. Plaintiffs' request, if granted, would allow them to prepare their expert reports with Defendants' reports in hand. That is improper. On issues on which Plaintiffs bear the burden of proof, they are required to make a *prima facie* showing, to which Defendants then respond. They are not permitted to lie in wait to see how Defendants will defend a claim, and only then say what exactly they are claiming. Even reports that are properly considered "rebuttal" were to have been submitted before Defendants' experts were deposed.

As the Seventh Circuit explained in affirming the exclusion of an alleged "rebuttal" expert, "[t]he plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case . . . must put in his evidence on the issue as part of his case in chief. Otherwise the plaintiff could reverse the order of proof, in effect requiring the defendants to put in their evidence before the plaintiff put in his." *Braun v. Lorillard Inc.*, 84 F.3d 230, 237 (7th

Cir. 1996) (citation omitted). This concern is amplified here because Plaintiffs already have deposed all of Defendants' experts. If the Court grants Plaintiffs' request, Defendants' experts will not have the chance to review the opinions of Plaintiffs' experts, and to take those opinions into account in forming their own opinions. Instead, Defendants' experts already will be "locked down" into their opinions both in writing and by testimony by the time Plaintiffs submit their first expert report regarding their alleged damages. Plaintiffs' experts will, no doubt, improperly tailor their opinions on this aspect of Plaintiffs' *prima facie* case to those already offered by Defendants' experts. *See Madison Capital Co. v. S & S Salvage LLC*, 2011 WL 195639, at *4 (W.D. Ky. Jan. 19, 2011) ("a party cannot introduce experts 'merely by sticking the label "rebuttal" on a neglected part of its affirmative case'"). As the court said in *Madison Capital*: "Plaintiff bears the burden of proving its damages . . . . If Plaintiff wished to advance an argument that the fair market value of the Shields was different than the price paid . . ., it should have included an expert qualified to testify as such in its case-in-chief. It cannot now use the opportunity for rebuttal to introduce evidence it failed to account for in its case-in-chief. . . . Therefore, the Court finds that Defendants' motions to exclude [experts'] testimony as rebuttal experts should be granted, and [their] expert testimony is excluded." *Id.*[19]

---

[19] *See also In re Trasylol Prods. Liab. Litig.*, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010) (expert's "report appears to support Plaintiff's case-in-chief and is not proper rebuttal testimony. . . . Plaintiff did not designate him as an expert until two months after the expert disclosure deadline had passed, [and therefore expert's] testimony is untimely and properly excluded . . . ."); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 2005 WL 1300763, at *2 (N.D. Ill. Feb. 22, 2005) (striking "rebuttal" report: "A party presents its arguments as to the issues for which it has the burden of proof in its initial expert report. . . . [I]f [party] chose to pursue those arguments, [they] should have been included in its initial report. . . . There is no disruption of trial, but discovery has now closed and . . . depositions are soon to commence.").

In many cases, Plaintiffs make no effort to distinguish these cases on the improper use of "rebuttal" experts. In noting that *La Gorce* turned on "repeated failures of counsel to provide proper disclosures," Objs. at 18, *Baldwin Graphic* turned on the fact that the expert opinions there "should have been asserted initially and, thus, were not proper rebuttal," *id.*, and *Madison Capital* turned on the fact that plaintiffs must offer damages experts in their case-in-chief, *id.*, Plaintiffs are drawing an analogy—not distinguishing—between those cases and this one. As for the others, Plaintiffs' effort is only slightly more perceptible. They note that the expert evidence in *Braun* was offered at trial. *See* 84 F.3d at 237. That is true, but irrelevant. The court's "order

This case is similar to *La Gorce*, in which the court denied the plaintiff's request to supplement its expert reports, stating: "La Gorce's 'good faith' reason for needing to supplement is that after La Gorce's counsel saw QBE's strategy they decided to change their approach to this litigation. . . . This is not excusable neglect, substantial justification or good cause, but either a strategic choice or just poor planning. Furthermore, having the benefit of observing QBE's experts and reviewing QBE's experts' reports, La Gorce would have an unfair advantage if allowed to file untimely expert reports. ***That is the harm***." 2011 WL 1522566, at *3 (emphasis added). The court further observed that the plaintiff's inadequate expert disclosures "impact[ed] case management": "At this time, the parties' focus should be on drafting summary judgment and *Daubert* motions, not expert discovery." *Id.* So too here.

Before Judge Freeman, Plaintiffs' only argument in trying to establish a lack of prejudice was that the Court allowed Defendants to take certain fact discovery as a sanction for Plaintiffs' previous discovery violations. Dkt. 104 at 3. Plaintiffs suggested that they should be rewarded for those violations, contending that because that remedial discovery will proceed, they should be allowed simultaneously to undertake a new round of untimely expert disclosures. *Id.* They abandon this argument in their Objections. Instead, they now assert that "there has been no . . . pre-trial scheduling order entered." Objs. at 6. Of course there has. If Judge Freeman had not entered a binding scheduling order, then Plaintiffs would not have sought permission to deviate from it. *See id.* at 5. Plaintiffs also suggest that their request will not delay this case. *Id.* at 6. But Plaintiffs already have delayed this case for too long, and their current request already has exacerbated this delay. Expert discovery finally closed on February 24, 2012, some 20 months after the original deadline. If not for Plaintiffs' request, a summary judgment briefing schedule already would be in place, and that briefing would be underway. If their request is granted, that

---

of proof" holding did not reference the stage of the case, and did not turn thereon. Indeed, Defendants' other authorities make the identical point at the expert report stage. Plaintiffs also say that the expert in *Trasylol* did not try to rebut the opposing expert, Objs. at 18, but that is consistent with the case's holding that the "expert report appears to support Plaintiff's case-in-chief and is not proper rebuttal testimony." 2010 WL 4065436, at *2.

briefing will be further delayed by several months.  For these reasons as well, Judge Freeman did not clearly err in deciding that "this case must now move to dispositive motions."  Dkt. 102.

## II.   THE RESULT IS THE SAME UNDER RULE 37.

Plaintiffs' request would be equally inappropriate if Rule 37(c)(1) applied.  Under that rule, the Court considers "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997).[20]  Plaintiffs must also show that their failure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). <u>First</u>, as explained, Plaintiffs' failure to submit any expert report regarding their damages was tactical and deliberate.  <u>Second</u>, Plaintiffs obviously did not believe that they needed actuarial opinions as principal or rebuttal testimony, as both deadlines came and went without its submission.  Moreover, Plaintiffs do not need an expert to rebut Drs. Behan and Chaplin because the opinions of Defendants' damages expert do not depend on those of Behan and Chaplin. *See supra*. <u>Third</u>, Defendants would be prejudiced by Plaintiffs' request as set forth above.   And <u>finally</u>, contrary to Plaintiffs' assertions, a continuance would be necessary.  If the Court denies Plaintiffs' objections to Judge Freeman's order, then the parties will proceed immediately to summary judgment briefing.  But if the Court were to reverse Judge Freeman's decision, then additional expert discovery would ensue instead. Moreover, although it is true that no trial is scheduled, that is only because Plaintiffs have successfully delayed this case for so long.  Judge Freeman properly declined to reward these efforts by citing the lack of a trial date as a reason for allowing further delay.

For the same reasons, Plaintiffs' request is neither substantially justified nor harmless.  In *Softel*, Plaintiffs' lead Second Circuit case before Judge Freeman, *see* Dkt. 104 at 3, the court affirmed the denial of a request to serve a rebuttal report.  Its concluding observation applies almost perfectly here (except that a continuance would be required in this case):

---

[20] *Softel* did not consider the applicability of Rule 16(b)(4)'s "good cause" standard.

[N]o trial date had been set, and a continuance was available. However, expeditious management of discovery schedules is especially important in cases of this nature because they require extensive expert involvement over lengthy periods of time. Therefore, the burden on the trial court of granting a continuance is greater than in some other cases. Softel points to the fact that this case did not go to trial for many months after the preclusion order as evidence of the propriety of a continuance. This of course is 20/20 hindsight. Had the court granted a continuance for Softel, it probably would have had to grant additional time for Dragon to respond. When trial courts permit deadline slippage of this sort, trials cannot be scheduled when they ought to be, resulting in the backup of other cases and eventual scheduling chaos as a series of bottlenecks builds. Additionally, the enormous length of every step of the proceedings in this case militated against any more continuances. Denial of a continuance in the circumstances was certainly within the sound discretion of the trial judge.

118 F.3d at 962-63; *see also Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1083 (S.D.N.Y. 1990) ("[F]ailure to comply with a pretrial schedule for the parties to designate expert witnesses frequently results in the preclusion of the expert testimony. Therefore, the decision below was not clearly erroneous or contrary to law.").[21]

## III. JUDGE FREEMAN WAS NOT REQUIRED TO AWAIT A REPLY LETTER.

Plaintiffs imply—but do not claim explicitly—that Judge Freeman erred by denying their request without awaiting a reply letter. Objs. at 12-13. But Judge Freeman did not come to Plaintiffs' request cold. She repeatedly had extended the deadlines for expert discovery, most recently the day before Plaintiffs submitted their letter. *See* Dkt. 92, 99. She also was familiar with Plaintiffs' pattern of delay, *see e.g.*, Dkt. 68, 91, and had recommended not four weeks earlier that Plaintiffs be sanctioned for failing to timely disclose a damages theory, *see* Dkt. 97.

---

[21] As for Plaintiffs' other authorities, *Potter v. Phillips* favors Defendants. *See* 2004 WL 3250122, at *2–3 (E.D.N.Y. Mar. 28, 2004) (precluding untimely expert report because sponsoring party failed to designate the expert by either its original or extended deadline for doing so). The rest are inapposite. *See Scientific Components Corp. v. Sirenza Microdevices, Inc.*, 2008 WL 4911440, at *5 (E.D.N.Y. Nov. 13, 2008) (unlike here, plaintiff had "good-faith belief that it was complying with discovery orders"); *Exo-Pro, Inc. v. Seirus Innovative Accessories, Inc.*, 2008 WL 4878513, at **3-4 (E.D.N.Y. Feb. 19, 2008) (unlike here, prejudice to defendant was "partially attributable to Defendant's lack of action in objecting . . . to such delay"); *S.W. v. City of N.Y.*, 2011 WL 2224976 (E.D.N.Y. June 3, 2011) (no discussion of the kind of tactical decision, delay, or prejudice at issue here); *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995) (plaintiff submitted, albeit late, incomplete, unsigned report; here, Plaintiffs have not provided actuarial report even to date); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 22471909, at *1–2 (S.D.N.Y. Oct. 31, 2003) (allowing plaintiffs to submit untimely rebuttal to report from defendants that was itself untimely).

Given this familiarity, Judge Freeman had broad discretion in determining when she had enough information to form a sound basis for ruling. *See United States v. Berg*, 20 F.3d 304, 312 (7th Cir. 1993) (court rightly did not await reply where parties' opening briefs "contained ample presentation and discussion of the relevant issues and arguments, such that the court could, within its discretion, make a sound and reasoned decision"). Moreover, Judge Freeman knew that Plaintiffs were prohibited from making any new arguments in reply. *See PrecisionIR Inc.*, 693 F. Supp. 2d at 291 n.2, 297; *Harshaw v. Bethany Christian Servs.*, 2010 WL 1692833, at *29 n.11 (W.D. Mich. Apr. 26, 2010) ("[T]he court need not wait to see whether the [plaintiffs] file a reply. Their opening brief proffers no argument or theory which remotely undermines the court's conclusion . . . ; a reply cannot rectify this deficiency, because replies are prohibited from raising arguments or theories not raised in the opening brief."). Put simply, judges need not wait weeks before responding to each letter they receive, regardless of its merits. Such a rule would deprive the Court of the discretion that is indispensible in managing its docket day to day.[22]

\* \* \* \* \*

Deadlines matter. "The Magistrate's Scheduling Order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Eng-Hatcher*, 2008 WL 4104015, at *1. That is because "a scheduling order is the critical path chosen by the [court] and the parties to fulfill the mandate of [Rule] 1 in 'secur[ing] the just, speedy, and inexpensive determination of every action.'" *Hnot v. Willis Group Holdings Ltd.*, 2006 WL 2381869, at *3 (S.D.N.Y. Aug. 17, 2006). The victims, when that critical path is disrupted by Plaintiffs, are not only Defendants, but also the Court, its docket, and the administration of justice.

Judge Freeman has lived with this case through years of delay, including disregard of scheduling orders, by Plaintiffs. And she has shown restraint throughout that time. Most

---

[22] This conclusion is not affected by Plaintiffs' assertion that they were told that they could file a reply brief on or before February 22, 2012. Objs. at 12. Accepting Plaintiffs' account as accurate, Judge Freeman initially agreed to the submission of a reply letter, but, after focusing on the issues presented, realized she did not require such a submission in order to make a "sound and reasoned decision." *Berg*, 20 F.3d at 312. That reflected the sound exercise of discretion.

24

recently, when Plaintiffs disregarded Rules 26(a) and (e) in failing to disclose a damages category until nearly a year after fact discovery closed, Judge Freeman refused to preclude those damages, although she did recommend a variety of Rule 37(c)(1) sanctions. *See* Dkt. 100 at 9, 27. In denying preclusion, Judge Freeman observed that that remedy "would seem a particularly severe result" to impose on Plaintiffs. *Id.* at 25. This time, however, she concluded that enough is enough, and Plaintiffs should not be permitted to again disregard the Court's scheduling order.

Contrary to Plaintiffs' assertion, it is not "harsh" to hold a party to a scheduling order to which it agreed. Objs. at 6. There is nothing "remotely unreasonable or unjust in holding plaintiffs to major deadlines in a case management plan to which they themselves consented even ***before*** the Court's endorsement of the [plan] made those deadlines binding." *Hnot*, 2006 WL 2381869, at *5. In this case especially, it was not "harsh" for Judge Freeman to refuse to permit Plaintiffs to (1) sit with Defendants' allegedly unforeseeable actuarial report in hand; (2) tell the Court that they needed additional time to review it, and that they "do not, at this time, see a reason to alter the remainder of the expert discovery schedule," Ex. 3; (3) tell Defendants in the ensuing days that they did not intend to designate any additional experts, Forkner Decl. ¶ 2; (4) knowingly allow their extended deadline to pass without submitting any actuarial report; (5) schedule the depositions of all of Defendants' experts, and even request a two-day extension to complete the last of them, Dkt. 99; (6) wait until the Court "So Ordered" that agreement; and (7) the very next day ask for the first time to submit a "rebuttal" to the allegedly unforeseeable report, conveniently timed to come after Defendants' expert reports were submitted and their experts deposed. Judge Freeman certainly did not clearly err in concluding that, under these circumstances, "this case must now move to dispositive motions." Dkt. 102.[23]

## CONCLUSION

For the foregoing reasons, Judge Freeman's February 17, 2012 Order should be affirmed.

---

[23] As they have discussed, the parties will submit a proposed schedule for dispositive motions promptly following the Court's ruling on Judge Freeman's February 17, 2012 Order.

## CERTIFICATE OF SERVICE

I hereby certify that, on the 15th day of March, 2012, in accordance with Fed. R. Civ. P. 5 and the General Order on Electronic Case Filing (ECF), the foregoing was served via the district court's ECF system on:

Jeffrey L. Liddle, Esq.
James R. Hubbard, Esq.
James Halter, Esq.
Liddle & Robinson, L.L.P.
800 Third Avenue, 8th Floor
New York, N.Y. 10022
*Attorneys for Plaintiffs*


_____/s/Thomas Windom_____
Thomas Windom