**REDACTED VERSION - ORIGINAL FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND), LIMITED and RITCHIE RISK-LINKED STRATEGIES TRADING (IRELAND) II, LIMITED,

Plaintiffs,

v.

COVENTRY FIRST LLC, THE COVENTRY GROUP, INC., MONTGOMERY CAPITAL, INC., and LST I LLC,

Defendants.

Case No. 09 CV 1086 (VM)(DCF)
ECF Case

**ORAL ARGUMENT REQUESTED**

# PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S FEBRUARY 17, 2012 ORDER DENYING PLAINTIFFS' REQUEST TO DISCLOSE REBUTTAL EXPERT TESTIMONY

# TABLE OF CONTENTS

**Page No.**

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

ARGUMENT .......... 1

I. The Magistrate Judge's Conclusion That Plaintiffs' Request To Disclose A Rebuttal Actuarial Expert Was The Result Of Strategic Decision And Delay Is Clearly Erroneous .......... 1

A. Plaintiffs Did Not Withhold Any Expert Actuarial Testimony From Their Initial Expert Disclosures on November 9, 2011 .......... 1

B. The Behan Actuarial Opinion Had Never Been Asserted By Defendants Prior to Their Expert Report .......... 2

C. Plaintiffs' Rebuttal Request Was Promptly and Timely Made .......... 3

D. Plaintiffs Did Not Make Any Representation to Defendants on January 11, 2012 Regarding New or Rebuttal Expert Reports .......... 5

E. Plaintiffs Have Not Delayed This Case .......... 6

F. Plaintiffs Did Not Represent To The Court that They Would Disclose an Actuarial Expert, Nor Misrepresent Their Intention to Retain and Use a Damages Expert .......... 8

G. Defendants' Arguments Repeatedly Mischaracterize the Procedural Record .......... 8

H. Defendants Will Not Be Prejudiced if Plaintiffs are Permitted to Disclose One Rebuttal Actuarial Expert Report .......... 9

CONCLUSION .......... 10

## TABLE OF AUTHORITIES

Page No.

**Cases**

Schoenfeld v. Hilliard, 218 F.3d 164 (2d Cir. 2000) .......... 2, 3

**Rules**

Fed. R. Civ. P. 11 .......... 7

# ARGUMENT

## I. THE MAGISTRATE JUDGE'S CONCLUSION THAT PLAINTIFFS' REQUEST TO DISCLOSE A REBUTTAL ACTUARIAL EXPERT WAS THE RESULT OF STRATEGIC DECISION AND DELAY IS CLEARLY ERRONEOUS

The principal theme of Defendants' February 9th opposition letter to the Magistrate Judge (Dkt. 102), and their Response here, is that Plaintiffs attempted to sandbag the expert disclosures by disregarding the expert scheduling order, withholding existing expert actuarial testimony from their initial expert disclosures, then identifying "new experts under the guise of 'rebuttal reports' after Defendants had provided all of their expert reports and all of the Defendants' experts had been deposed." (Dkt. 111 at 4.) As Plaintiffs' Objections make clear, this accusation of "strategic decision and delay" – which was accepted by the Magistrate Judge without affording Plaintiffs the opportunity to respond by briefing or oral argument (Dkt. 104) – is speculation and not fact, and should have been rejected.

### A. Plaintiffs Did Not Withhold Any Expert Actuarial Testimony From Their Initial Expert Disclosures on November 9, 2011

The expert actuarial evidence Plaintiffs sought to disclose is rebuttal expert evidence, not evidence on which Plaintiffs have the burden of proof, and thus not evidence Plaintiffs were required to include within their initial expert disclosures, as Defendants continue to argue. As Plaintiffs explained in their Objections, Plaintiffs intend to rely on the net sale price, as established by the contract between the parties, to establish the market value of the policies when purchased. Plaintiffs do not bear any burden to bolster that valuation with actuarial testimony unless that value is challenged by Defendants.

In order to manufacture an argument to the contrary, Defendants continue to mischaracterize Plaintiffs' request as an application to "identify 'one or possibly two' new experts to testify regarding damages, an issue on which they bear the burden of proof." (Dkt.

111 at 5.) Plaintiffs' February 2nd request to the Magistrate Judge and Plaintiffs' Objections both make clear that Plaintiffs did not seek to disclose an expert economist to calculate Plaintiffs' damages, and that Plaintiffs had no burden concerning the actuarial value of the insurance policies in issue when their market value is established by arms' length sales transactions. Plaintiffs seek only to disclose expert actuarial testimony in rebuttal to the actuarial opinion of Behan and Chaplin ("Behan") that today criticizes the pricing formula Plaintiffs and Defendants adopted in the underlying contract for the purchase and sale of the insurance policies. Plaintiffs' burden, as their Objections make clear, is only to establish market value, and the best evidence of market value is the "sale price for the . . . asset[s], negotiated by parties at arm's length . . . ." Schoenfeld v. Hilliard, 218 F.3d 164, 178 (2d Cir. 2000). In fact, as Plaintiffs explained in their Objections, the burden is on Defendants "to demonstrate 'special circumstances which negate [the relevance] of a prior arm's length purchase price." Id. at 179 (citations omitted).

**B. The Behan Actuarial Opinion Had Never Been Asserted By Defendants Prior to Their Expert Report**

Defendants also suggest that Plaintiffs were aware of the actuarial challenge contained in Defendants' Behan December 21, 2011 report long before their expert reports were due in November 2011, and should have addressed the basis of that challenge in their initial expert disclosure. Defendants claim that one of the six ways Behan challenges the actuarial assumptions built into the contracts was discussed during fact discovery and should have been addressed by Plaintiffs' expert disclosures. That assumption was the use in the purchase contract of a mortality rating by one underwriter, Fasano, against a mortality table by another underwriter, AVS – which Behan says was an error, and caused the contract to overvalue the policies. However, fact discovery revealed that using Fasano ratings with the AVS table did not

significantly affect the market value of the policies. (Halter Supp. Decl. Ex. M at 282:18-19 ("[redacted]"); Halter Supp. Decl. Ex. N at 32:5-6 ("[redacted]"); Halter Supp. Decl. Ex. O at 2631:4-13 ("[redacted]").) Thus, the issue plainly did not appear to warrant expert testimony until the belated Behan challenge – six years after the arms' length purchases were made.

Plaintiffs were not aware that Defendants would use actuarial experts, or that those actuaries would attempt to assert actuarial assumptions that valued the policies Defendants sold to Plaintiffs for over $500 Million less than Plaintiffs paid in accordance with the parties' contract. Plaintiffs were not required to guess which experts Defendants were going to use and proactively rebut them, particularly since the market value of the policies, under New York law, is established by the price paid for the policies in accordance with the contract between the parties. Schoenfeld, 218 F.3d at 178.

### C. Plaintiffs' Rebuttal Request Was Promptly and Timely Made

The scheduling order in this case allowed Defendants to submit expert disclosures six weeks after Plaintiffs, and thereby permitted Defendants to rebut both of Plaintiffs' expert reports by allowing Defendants' reports to follow. In fact, Defendants' December 21, 2011 expert reports included such rebuttal. The scheduling order, submitted with the consent of counsel, did not include a date for Plaintiffs submission of rebuttal reports (Dkt. 92 and 93), despite the fact that the original scheduling order did (Dkt. 27).

Plaintiffs did not wait, as Defendants assert, until after expert discovery closed to make their rebuttal request. (Dkt. 111 at 1.) In fact, Plaintiffs made their request three weeks before the close of expert discovery, on February 2nd, the day the three week long schedule of

depositions for Defendants experts began in Washington, D.C. If Defendants actually believed, as they now assert, that it was improper for Plaintiffs to depose Defendants actuarial experts Behan and Chaplin prior to Plaintiffs' rebuttal to their reports, Defendants should have made that objection on February 2nd, which was substantially before the depositions of Behan (February 8th) and Chaplin (February 24th) were scheduled to take place. They failed to do so and for good reason. It would be hypocritical for Defendants to make such an argument, since they invited their own expert (Ziser) to attend the deposition of Plaintiffs' securitization expert (Beloreshki) on December 20th before Ziser disclosed his expert report on December 21st which directly and openly rebutted Beloreshki's expert report. (Brown Decl. Ex. 2 at 3:23.)

Plaintiffs' February 2, 2012 rebuttal request was made by pre-motion conference letter to Magistrate Judge Freeman within *three days* of the time Plaintiffs were first able to make that request, and only after Defendants refused consent. As Plaintiffs' Objections make clear, Defendants' blanket Attorneys' Eyes Only ("AEO") designation of every single one of the 1000 pages of expert reports (most single-spaced), delivered the day before the Christmas holidays, practically prevented Plaintiffs' counsel from reporting these voluminous expert opinions to their client until six weeks later – after Defendants finally agreed to redact any AEO material if Plaintiffs paid for it. Defendants made a conscious decision to blanket designate their expert reports AEO knowing that it would impede the ability of Plaintiffs' counsel to report those opinions to their clients. Moreover, the blanket designations were intentional. When confronted, and after agreeing to redact the portions of their reports that reflected AEO material, the redacted reports reflected the protection of only a very small amount of the reports' contents. Defendants' claim that Plaintiffs were able "to determine which portions of the report contained AEO documents or testimony [because a]ll such materials were clearly so designated" is simply

wrong. (Dkt. 102 at 9 n.10.) None of the content of the reports served December 21, 2011 was designated AEO, other than in blanket form. (See, e.g., Halter Decl. Exs. B and C.)

Plaintiffs' counsel raised the problem of sharing the expert reports with their clients with Defendants promptly, on January 6, 2012, and as required by the Protective Order, the parties conferred in an attempt to resolve the dispute. (Dkt. 28 at 7.) Though Defendants strongly rejected Plaintiffs' counsels' request to disclose the reports to their clients, and even in-house counsel, the parties ultimately resolved the dispute by Plaintiffs paying Defendants to redact the reports. (Halter Decl. ¶ 11.) But it took time – time during which Plaintiffs themselves did not have access to the reports to make an informed decision about whether a rebuttal expert witness was appropriate, or the ability to confer with counsel about them.[1] (Halter Decl. ¶¶ 8-16.) That decision was an important one for another reason. Behan and Chaplin charged Defendants over $500,000 for their report, and thus the financial commitment necessary to commission a rebuttal was an important consideration for Plaintiffs.

**D. Plaintiffs Did Not Make Any Representation to Defendants on January 11, 2012 Regarding New or Rebuttal Expert Reports**

On January 11, 2012, counsel for the parties met in Washington, D.C. During that conference a brief discussion took place regarding the scheduling of the depositions of Defendants' eight expert witnesses. Defendants' Response now asserts that Plaintiffs' counsel represented at that conference that "Plaintiffs did not intend to submit any additional reports from either their existing experts or any new expert." (Dkt. 113 at ¶ 2.) Without disputing the good faith of Defendants' counsel's recall of that meeting, or his understanding of the

[1] In fact, Plaintiffs themselves did not even have access to the Behan actuarial report when Plaintiffs made their rebuttal request on February 2, 2012. Plaintiffs only had access to the references to and quotes from the Behan report contained in the expert report of Defendants' damages expert, Walker, which they received late on January 31, 2012.

conversation, no representation of any kind was made by Plaintiffs' counsel regarding "new experts," or rebuttal experts, at that meeting. (Hubbard Supp. Decl. at ¶ 2). It is highly unlikely that any such question would have been posed, or that any such discussion occurred, for two reasons. First, the scheduling order did not permit Plaintiffs to disclose any "new expert" after November 9, 2011. (Dkt. 92 and 93.) Second, on January 11, 2012, eight business days into the New Year, Plaintiffs' counsel had not yet completed their review of the massive expert reports transmitted to them on December 21, 2011 and had made no decision whatsoever to request a rebuttal actuarial report, or whether to seek authorization to do so. (Halter Supp. Decl. ¶ 6.) The only discovery topic discussed on January 11th was whether Plaintiffs intended to <u>amend any of their prior expert reports,</u> as the deadline for both parties <u>to amend</u> was approaching six days later on January 17, 2012. Plaintiffs' counsel's recollection is that he indicated a <u>preliminary decision not to amend</u>, but that he was not asked any question about expert reports other than amendment. (Hubbard Supp. Decl. at ¶ 2.) Plaintiffs' counsel was not in a position to meaningfully discuss rebuttal reports with Plaintiffs themselves until after they received Defendants' redacted reports at the end of January.

**E. <u>Plaintiffs Have Not Delayed This Case</u>**

Defendants' Response attempts to bootstrap opposition to Plaintiffs' rebuttal request with the unsupported contention that Plaintiffs have "managed to delay" the expert disclosures for 18 months, from April of 2010 to November of 2011 (Dkt. 111 at 1), and similar rhetoric – "Plaintiffs' pattern of delay" (Dkt. 111 at 23); "years of delay, including disregard of scheduling orders." (Dkt. 111 at 24). This effort to blame Plaintiffs extends, unbelievably, to attempting to blame Judge Cote's recusal on Plaintiffs (Dkt. 111 at 2) when her decision resulted from the fact

that her stepson was the law partner of two attorneys retained by Coventry First to represent it in the NYAG investigation, and thus are central witnesses in the case.

Defendants' allegation of intentional delay is suspect for many reasons. First, no allegation has ever been made in this case that Plaintiffs asserted a position for the purpose of delaying the proceedings, an accusation that falls under Fed. R. Civ. P. 11. Second, blaming Plaintiffs is suspect at the outset, as it is Plaintiffs who have suffered hundreds of millions dollars in damages as a direct result of Defendants' unlawful conduct, and have no motive other than to reach trial at the earliest time consistent with sound preparation. Third, Plaintiffs' objections to Defendants' contention interrogatories, which Defendants suggest delayed the proceedings, cannot be characterized as improper. In fact, this Court previously concluded that Plaintiffs' objections were "not entirely without merit" (Dkt. 80 at 5) and that Defendants' interrogatories were "overly broad and unduly burdensome" (Dkt 80 at 6). "Given Defendants' overreach in both the drafting and scope of their interrogatories," on December 7, 2010, the Court ordered the parties to meet and confer and, if necessary, present their dispute to Magistrate Judge Freeman. (Dkt. 80 at 7.) On July 25, 2011, by order of Magistrate Judge Freeman endorsing the "supplemental interrogatory responses that Plaintiffs produced on a sample basis," that issue was resolved, with Plaintiffs supplying an extensive response on September 16, 2011. (Dkt. 91 at 1.)

Defendants make no mention, when accusing Plaintiffs of delay, of the numerous instances in which the proceedings were extended at their request. Defendants twice requested adjournment of the initial conference with the Court (Dkt. 70 and 73) where "[t]he status of discovery and appropriateness of modifying existing deadlines" was to be addressed. (Dkt. 71.) They also ignore, for example, the "period of 60-90 days" they requested for reviewing the supplemental interrogatory responses after receiving them. (Halter Supp. Decl. Ex. P at 3.)

**F. Plaintiffs Did Not Represent To The Court that They Would Disclose an Actuarial Expert, Nor Misrepresent Their Intention to Retain and Use a Damages Expert.**

Defendants' Response argues that "Plaintiffs elected to offer no actuarial or other damages expert, notwithstanding that they had assured the Court they would do so." (Dkt. 111 at 1 (emphasis added).) That argument is substantially misleading. While Plaintiffs did tell the Court and counsel that they intended to use a damages expert and damages report, we have explained that the decision was ultimately made that no such expert calculation of Plaintiffs' damages was needed. (Halter Decl. ¶¶ 20-21; Dkt. 106 at 4-5.) Defendants' contention that Plaintiffs' represented that they would proffer an actuarial expert, or any expert to address the pricing formula of the underlying contract, to the Court or otherwise, is simply false. No such representation is cited by the Response.

**G. Defendants' Arguments Repeatedly Mischaracterize the Procedural Record**

Defendants conclude their Response with a list of alleged points they argue justify Magistrate Judge Freeman's denial of Plaintiffs' rebuttal request. Each of these points is a mischaracterization of the procedural record. First, Plaintiffs did not "sit with Defendants' allegedly unforeseeable actuarial report in hand" at any time. (Dkt. 111 at 25.) Plaintiffs themselves did not have any of Defendants' expert reports because Defendants had designated each page of them AEO, and counsel could not release them to their client in any fashion. Second, contrary to Defendants' suggestion, Plaintiffs accurately informed the Court on January 9, 2012, when application was made to extend the deadline for the parties to amend their expert reports, that they did "not, at th[e] time, see a reason to alter the remainder of the expert discovery schedule." (Brown Decl. Ex. 3.) Plaintiffs' counsel was still digesting the 1,000 pages of Defendants' reports at that time, and had not yet made any decision to seek permission to rebut Defendants' actuarial experts, or seek their clients' authorization to do so. (Halter Supp.

Decl. ¶ 6.) Third, Plaintiffs did not permit any deadline for rebuttal reports to pass. (Dkt. 111 at 25.) The deadline Defendants point to was only for amended reports of previously disclosed experts (Dkt. 92 and 93) – the scheduling order did not contain a date for rebuttal experts. Fourth, contrary to Defendants' suggestion, the timing of Plaintiffs' request for expert rebuttal disclosure was unrelated to the Court's endorsement of a two-day extension to the expert discovery deadline. That extension was sought because Defendants simply were unable to provide dates for the depositions of all of their experts within the original February 22nd deadline (Dkt. 99). Finally, there is no evidence that Plaintiffs' February 2, 2012 letter request to Magistrate Judge Freeman was intentionally timed to allow Plaintiffs' rebuttal to follow the depositions of Defendants' experts. Plaintiffs made the request within three days of receiving Defendants' redacted expert reports; the timing was solely the result of Plaintiffs' inability to meaningfully discuss and approve the use of a rebuttal actuarial expert until the AEO designation on the relevant information was lifted by redaction on January 31st.[2]

### H. Defendants Will Not be Prejudiced if Plaintiffs are Permitted to Disclose One Rebuttal Actuarial Expert Report

Plaintiffs agree with Defendants that this case should move to the Court's consideration of a schedule for dispositive motions so long as the provisions of Section II (A) of the Court's Individual Practices are met. Defendants' pre-motion conference letter will permit the Court to review the scope of any proposed motion, and schedule the motions accordingly; Plaintiffs and

---

[2] Contrary to Defendants' assertion, Plaintiffs did not incorrectly claim their securitization expert Beloreshki "addressed 'the amount of profits' Plaintiffs claim to have lost." (Dkt. 111 at 4 n. 4.) Mr. Beloreshki indeed provided an opinion, based on testimony of fact witnesses, that Plaintiffs intended to profit from the securitization in the amount of $145.5 million. (Halter Decl. Ex. E at ¶ 88.) There is no dispute that Plaintiffs have asserted this $145.5 million figure represents lost profits. (Halter Decl. Ex. J at 14-15.) While Defendants fairly report that Beloreshki denied doing a profit calculation or offering an opinion on damages, it is equally clear that he did address the $145.5 million in profits Plaintiffs assert they lost when Moody's withdrew its rating for the securitization.

Defendants have agreed to jointly propose a briefing schedule to the Court at the appropriate time. There is no reason, however – and Defendants' Response presents none – that dispositive motions practice will be delayed if the Court permits Plaintiffs to disclose one rebuttal actuarial expert witness. The disclosure of that expert, and that expert's deposition, would almost certainly be concluded prior to the date set for the filing of any dispositive motion, and Defendants have not suggested a lack of time or resources to conduct one additional deposition. Defendants have utilized at least seven attorneys in significant roles during the recent litigation of this case, and outlined their summary judgment issues in detail in this record almost two years ago (Dkt. 44). They cannot reasonably argue that any summary judgment motion schedule set by the Court would be materially impacted by one rebuttal report addressed to the actuarial assumptions used by the parties in their contract.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court vacate or modify the Magistrate Judge's February 17, 2012 Order, and grant Plaintiffs leave to disclose expert rebuttal testimony addressed to the Behan expert opinion within 30 days of the Court's determination of Plaintiffs' Objection.

Dated: March 19, 2012
New York, New York

Respectfully submitted,
LIDDLE & ROBINSON, L.L.P.
James R. Hubbard
Jeffrey L. Liddle
James W. Halter
800 Third Avenue, 8th Floor
New York, NY 10022
Tel: (212) 687-8500
Fax: (212) 687-1505

BY: James R. Hubbard /JH
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 19th day of March, 2012, I caused true and correct copies of the foregoing to be served, by e-mail and by overnight delivery, on:

David A. Forkner, Esq.
Kenneth J. Brown, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
dforkner@wc.com
kbrown@wc.com

Dated: March 19, 2012
New York, New York

James W. Halter